## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-1873

JULIE ADAMS CURTIS,

        Plaintiff,

v.

LEVER UP INC.,
PAKEMS LLC,
CHASEFIELD CAPITAL INC.,
CHASEFIELD REAL ESTATE, LLC,
SCB GLOBAL CAPITAL MANAGEMENT, LLC,
BOCCUS GROUP LLC,
HAROLD PINE,
WALTER VAN WOUDENBERG,
RUSS MATTHEWS,
JORDAN PINE,
KELLIE BEIERS,
SETH EVERSON, and
JOHN DOES 1 – 10,

        Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Julie Adams Curtis ("Curtis"), for her Complaint against Defendants  Lever Up Inc. ("Lever Up"), Pakems, LLC ("Pakems"), Chasefield Capital Inc. ("Chasefield Capital"), Chasefield Real Estate, LLC ("Chasefield Real Estate"), SCB Global Capital Management, LLC ("SCB Global"), Boccus Group LLC ("Boccus Group"), Harold Pine ("Pine"), Walter van Woudenberg ("van Woudenberg"), Russ Matthews ("Matthews"), Jordan Pine, Kellie Beiers ("Beiers"), Seth Everson ("Everson"), and John Does 1 – 10, alleges on her own knowledge and on information and belief as follows:

## I.      NATURE OF THE CASE

1.      This is a case involving the founder and minority shareholder of Lever Up who was discriminated against, severely harassed because of her gender, and retaliated against during her employment and then ultimately, she was unlawfully terminated from the company she founded. Plaintiff complained about the abusive conduct to no avail. The hostile work environment and her termination was extreme and outrageous and caused her severe emotional distress.

2.      Defendants van Woudenberg, Pine, and Matthews breached their duty of loyalty owed to Lever Up.

3.      Defendants van Woudenberg, Pine, and Matthews intentionally interfered with prospective business advantages when they made the decision to terminate Curtis.

4.      After Curtis was wrongfully terminated, she discovered that prior to the purchase of Pakems Inc., during her employment, and after her termination, her personal accounts were accessed (including her personal email accounts and iCloud account), her emails were being monitored, her emails were being intercepted, and her personal computers were remotely hacked into so that Defendants could, including but not limited to, access documents, photos, videos, iMessages, text messages, secretly watch her through the camera of her personal computer as well as listen to her all while in her own residence. The foregoing actions were intentional, methodical, persistent and a clear invasion of her privacy. Defendants Pine, van Woudenberg, Everson, Matthews, Beiers, Jordan Pine and John Does 1 – 10 conspired to commit these unlawful acts against Curtis.  This conduct is referred to as "Computer-Related Conduct."

5.    Defendants Pine, van Woudenberg, Matthews, Jordan Pine, Everson, Beiers, and John Does 1 - 10 conspired to unlawfully terminate Curtis.

6.    Defendant Pine intentionally interfered with Curtis' employment contract.

7.    Defendants van Woudenberg, Matthews and Pine terminated Curtis in violation of public policy.

8.    Defendants van Woudenberg, Matthews and Pine breached the covenant of good faith and fair dealing by not exercising the option to purchase Curtis' shares in the company and forcing Curtis to remain partners with individuals that have committed unlawful acts against her.

9.    Defendant van Woudenberg broke his promises to Curtis that he would not terminate her without financially compensating her and would allow Curtis time to find a more suitable partner.

10.    Defendant Pine, both in writing and verbally, constantly made statements to others about Curtis that were false and that he knew were false.

11.    Defendants Pine, van Woudenberg, Everson, Matthews, Beiers, Jordan Pine and John Does 1 - 10 intentionally and negligently inflicted severe and permanent emotional distress against Curtis through all of the above and below stated actions.

12.    Chasefield Capital, Chasefield Real Estate, van Woudenberg and Pine are the alter egos of Pakems and Lever Up.

13.    Plaintiff asserts violations of the Stored Communications Act (18 U.S.C. § 2702 (a)) ("SCA"), Federal Wiretap Act (18 U.S.C. § 2511 and § 18 U.S.C. § 2520) ("FWA"), Computer Fraud and Abuse Act (18 U.S.C. § 1030) ("CFAA"), Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-401, et seq. ("CADA"), and the commission

of common law torts including Invasion of Privacy, Civil Conspiracy, Breach of Duty of Loyalty, Intentional Interference with Prospective Business Advantage, Outrageous Conduct, Intentional Interference of Contractual Relations, Defamation, Termination in Violation of Public Policy, Promissory Estoppel, and Breach of the Covenant of Good Faith and Fair Dealing. Curtis further asserts that Chasefield Capital, Chasefield Real Estate, LLC, van Woudenberg and Pine are the Alter Egos of Pakems and Lever Up.

14.     This suit is brought for damages, rescission, the appointment of a Receiver and an injunction. Given the gravity of this situation, a Receiver must be appointed immediately as the Defendants have basically shut the doors on Pakems. In addition, emergency injunctive relief is required to stop Defendants from further unlawful misconduct and to preserve evidence which might otherwise be destroyed.

## II.     PARTIES

15.     At all relevant times, Plaintiff Curtis was a resident of Colorado.

16.     Defendant Lever Up Inc. is a Colorado corporation with its principal place of business at 950 South Cherry Street, Suite 414, Denver, CO  80246.

17.     Defendant Pakems, LLC is a Colorado limited liability company with its principal place of business at 950 South Cherry Street, Suite 414, Denver, CO  80246.

18.     Defendant Chasefield Capital Inc. is a Colorado corporation with its principal place of business at 950 South Cherry Street, Suite 414, Denver, CO  80246.

19.     Defendant Chasefield Real Estate, LLC is a Colorado corporation with its principal place of business at 950 South Cherry Street, Suite 414, Denver, CO  80246.

20.     Defendant SCB Global Management, LLC is a foreign limited liability company organized under the laws of the State of Delaware, with its principal place of business at 300 S. Jackson Street, Suite 220, Denver, CO  80209.

21.     Defendant Boccus Group LLC is a Colorado limited liability company with its principal place of business at 4966 South Nelson Street, Unit A, Littleton, CO  80127.

22.     Upon information and belief, Defendant Harold Pine is a resident of Colorado, has an ownership interest in Chasefield Capital, Chasefield Real Estate, and Lever Up and is an employee of Chasefield Capital.

23.     Upon information and belief, Defendant Walter van Woudenberg is a resident of Colorado and has an ownership interest in Chasefield Capital, Chasefield Real Estate, and Lever Up.

24.     Upon information and belief, Defendant Russ Matthews is a resident of Colorado, has an ownership interest in SCB Global, is a director of Pakems and is on the Board of Directors of Lever Up.

25.     Upon information and belief, Defendant Jordan Pine is a resident of Colorado, is an employee of Chasefield Capital, and has an ownership interest in Lever Up.

26.     Upon information and belief, Defendant Kellie Beiers is a resident of Colorado, is an employee of Chasefield Capital, and has an ownership interest in Lever up.

27.     Upon information and belief, Defendant Seth Everson is a resident of Colorado and has an ownership interest in Boccus Group.

28.     Upon information and belief, Defendants John Does 1 – 10 are residents of Colorado and were engaged by Defendants Pine and van Woudenberg to carry out the alleged Computer-Related Conduct.

29.     The alleged Computer-Related Conduct was conduct either initiated by the Defendants individually, caused to occur, controlled, directed, authorized, encouraged, engaged and/or paid others to perform, assisted in, had knowledge of or participated in, and conduct for which each Defendant is liable.

30.     Further the Defendant companies are entities that employ the individual Defendants, own equipment that was used, own accounts that were used, paid for accounts that were used, engaged and/or paid others to perform, or Defendants had an ownership interest in the Defendant entities that were involved with committing the Computer-Related Conduct.

### III.     ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED

31.     Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

32.     Prior to filing this action, Plaintiff filed her Charges of Discrimination, Charge No. E2000006964x against Lever Up and Charge No. E2000006717x against Pakems, with the Colorado Civil Rights Division ("CCRD") for gender discrimination, disability discrimination, hostile work environment, and retaliation on or about January 24, 2020.

33.     On or about April 9, 2020, the CCRD issued a Dismissal and Notice of Right to Sue in connection with the Charges of Discrimination.

34.     The Dismissal and Notice of Rights letters are attached hereto as Exhibit A.

35.    This action is timely filed because it is filed within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue letter issued by the CCRD.

36.    Plaintiff has met all administrative prerequisites prior to filing this action.

## IV.    JURISDICTION AND VENUE

37.    Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

38.    Plaintiff brings this action under the Stored Communications Act (18 U.S.C. § 2702 (a)) ("SCA"), Federal Wiretap Act (18 U.S.C. § 2511 and § 18 U.S.C. § 2520) ("FWA"), Computer Fraud and Abuse Act (18 U.S.C. § 1030) ("CFAA"), Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-401, et seq. ("CADA") and common law tort claims.

39.    This Court has personal jurisdiction over all Defendants, based on the fact they all have engaged in business activities in and directed at the State of Colorado, have committed tortious acts within Colorado, have sufficient minimum contacts or are citizens of Colorado.

40.    This Court has original subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

41.    This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. §1367, as such claims arise out of the same case or controversy as Plaintiff's SCA, FWA, and CFAA and claims.

42.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because the conduct alleged to be unlawful occurred in this District.

## V.    FACTUAL BACKGROUND

43.    When Curtis got her first Apple device, an iCloud account was automatically created and the email account julie.adams7@icloud.com was created.

44.    In    2005,    Curtis    created    a    personal    email    account julieadamscurtis@yahoo.com that is hosted by Yahoo.

45.    In    2008,    Curtis    created    a    personal    email    account julieadamscurtis@gmail.com that is hosted by Google.

46.    In 2008, Curtis set up a personal Facebook account.

47.    In 2011, Curtis left her career as an attorney and invented the lightweight, packable shoe that she called Pakems.

48.    Curtis was the founder and CEO of Pakems Inc. which she incorporated in July 2011.

49.    In 2011, Curtis purchased an Apple Macintosh computer (hereinafter referred to as "MAC1") that was used for personal matters and for Pakems business. Pakems did not reimburse Curtis for this computer. This computer has always been and remains her personal computer.

50.    In 2012, Curtis created the email account jadams@apresgear.com that was hosted by Google. This account is tied to a Google GSuite account that Curtis has paid for and currently pays for. This account was used for sending and receiving emails for personal matters and during a limited period of time for Pakems business.

51.    In 2013, Curtis created the email account julieadams@pakems.com that was hosted by GoDaddy. This account was used for sending and receiving emails for personal matters and for Pakems business.

52.     In 2013, Curtis created the email account julieadamspakems@gmail.com that is hosted by Google. This account was used for sending and receiving emails for personal matters and during a limited period of time for Pakems business.

53.     In 2013, Curtis created a personal email account julieadamspakems1@gmail.com that is hosted by Google.

54.     In 2017, Curtis created the email account pakemskickstarter@gmail.com that is hosted by Google. This account was used for sending and receiving emails for Kickstarter-related matters.

55.     Curtis had an AppleID that was used by her and her son, Bodie Curtis, for the purpose of setting up their personal Apple computers and personal Apple iPhones. There was an iCloud account tied to the AppleID with the user ID julieadamscurtis@yahoo.com. An email account was created within her iCloud account julie.adams7@icloud.com.

56.     Curtis had a personal Apple iPhone with the phone number 303-204-5265 which was tied to her various accounts. Because of Defendants' actions with regard to this personal Apple iPhone, Curtis had to purchase a new Apple iPhone and had to change her personal cell phone number after approximately 22 years.

57.     Curtis used the software Keeper Security to store her personal passwords and Pakems-related passwords. This account can be accessed online and via an application on her computers.

58.     Curtis was the CEO of Pakems Inc. from 2011 until it was dissolved in 2018.

59.     Pakems Inc. never had a policy that Curtis or other independent contractors could not use company-related email accounts for personal matters. In other words, all of

the email accounts she created, she was allowed to use for personal matters and had an expectation of privacy in all of the content within the email accounts she created.

60.     On or about June 13, 2017, Curtis met Defendant Pine at the Go Pro Games in Vail, Colorado and began discussing a potential investment in her company Pakems Inc.

61.     On or about October 19, 2017, Pine let Curtis know that Chasefield Capital was not interested in an investment.

62.     On or about May 9, 2018, Curtis contacted Pine on a matter not related to Pakems. Pine informed Curtis that Chasefield Capital had changed its mind and was now interested in an investment in Pakems Inc.

63.     On or about August 21, 2018, Curtis met with Defendants Pine and van Woudenberg, and Pine informed her later that day that Chasefield Capital was going to invest in Pakems Inc.

64.     On August 30, 2018, Pine signed an agreement obligating Chasefield Capital to purchase inventory for Pakems Inc. and all of the funds received from the sale of the inventory was the property of Chasefield Capital.

65.     From September 7, 2018 through October 3, 2018, Curtis was paid by Chasefield Capital.

66.     On September 7, 2018, Lever Up Inc. was formed.

67.     On October 11, 2018, Pakems LLC was formed.

68.     Lever Up Inc. is the parent company of Pakems LLC and sole member of Pakems LLC.

69.     On October 26, 2018, Pakems LLC purchased Pakems Inc. pursuant to the terms and conditions set forth in the Asset Purchase Agreement.

70.     From October 18, 2018 through December 3, 2018, Curtis was paid a salary by Lever Up. Thereafter, Curtis was paid a salary by Pakems LLC. Employment taxes were taken out of her paychecks.

71.     On or about October 26, 2018, Pine, van Woudenberg, and Curtis signed an Action by Written Consent and became directors of Lever Up. Pine was the Chief Executive Officer and Secretary of Lever Up and van Woudenberg was the President.

72.     On or about October 26, 2018, Curtis signed an Employment Agreement with Lever Up that set forth the terms and conditions of her employment as Chief Executive Officer at Pakems, LLC.

73.     The Employment Agreement made it clear she was to report to the Manager, Lever Up, and was subject to the control, supervision, and oversight of Lever Up (via its board of directors).

74.     The Employment Agreement also provided that her job duties were subject to the control, supervision, and oversight of Lever Up (via its board of directors).

75.     On or about October 26, 2018, Curtis signed a Stock Restriction Agreement whereby she vested in 225 common stock shares of Lever Up (approximately a 29% ownership) and had the opportunity to vest in an additional 225 common stock shares in 48 equal monthly installments over a four (4) year period commencing on the third month anniversary of the Closing Date (October 26, 2018).

76.   The Stock Restriction Agreement also provided that an additional 225 common stock shares would accelerate and vest if she was terminated without cause or quit with good reason, as defined in the Stock Restriction Agreement.

77.   Set forth in paragraph 2 of the Stock Restriction Agreement, entitled Vesting., (d) Option to Purchase Vested Shares, "…(i) Upon the termination of Holder's [Curtis] Business Relationship with the Company for any reason, the Company shall have the option, … to purchase the then Vested Shares."  Pursuant to section (iii), the price of the common stock shares shall be $1,000 if she were to be terminated without cause on or before the first anniversary of the Closing Date.

78.   Initially, van Woudenberg held 450 common stock shares (approximately a 58% ownership) in Lever Up and Pine owned 100 common stock shares (approximately a 13% ownership). Pine transferred some of his Lever Up shares which resulted in him owning 61 common stock shares, Jordan Pine owning 13 common stock shares, Andrew Pine owning 13 common stock shares, and Beiers owning 13 common stock shares.

79.   Curtis provided passwords to Beiers, Jordan Pine, Everson, and van Woudenberg for Pakems-related accounts to change credit card information, analyze Pakems website, create a new Pakems website and redirect Pakems DNS to Shopify, fix email issues for contact@pakems.com and support@pakems.com, and access Digital Marketing data.

80.   For some of Curtis' personal accounts, she used the same or similar passwords that she used for Pakems-related accounts.

A.     **The December 13, 2018 Meeting – To Secretly Spy on Curtis, Defendants Installed Unauthorized Software on Curtis' Computers and Changed Settings on her iPhone Without Curtis' Authorization or Knowledge**

81.     In early December 2018, at the request of Pine, Curtis was directed to meet with Chasefield Capital's IT person, Defendant Everson.

82.     Curtis was told the purpose of this meeting was to set up her newer Apple Macintosh computer that had previously been her son's computer (hereinafter referred to as "MAC2") so that the email account julieadams@pakems.com, would be available to her via the software Microsoft Outlook.

83.     Directing Curtis' julieadams@pakems.com email account to Microsoft Outlook would allow Curtis to use her email account in conjunction with the calendar function within Microsoft Outlook. The decision to use Microsoft Outlook for her email platform was to solve the issue Curtis had in that she was not able to view meeting invites sent to her from Chasefield Capital because they used Microsoft Outlook.

84.     Curtis was also told that during the meeting Everson would give her access to a software program named SharePoint that is a cloud-based data storage application.

85.     Curtis was informed that SharePoint would allow her to upload certain Pakems files so the files could be shared with Chasefield Capital employees.

86.     In a December 3, 2018 email entitled "Meeting with IT," Beiers asked Curtis, "Are you able to come in Wednesday, Thursday, or Friday at 9 AM to meet with Seth, our IT guy?"

87.     Beiers subsequently sent Curtis a calendar meeting invite entitled "Security Installation." Based on that email, Curtis was notified that security software would also be installed onto her computer.

88.    On December 13, 2018 at approximately 10:00 a.m., Curtis met with Chasefield Capital's IT person, Defendant Everson, at Chasefield Capital's, Chasefield Real Estate's and Lever Up's offices.

89.    Everson is an agent of Chasefield Capital.

90.    Curtis provided the MAC2 computer to Everson as the MAC2 computer was to become her primary computer to use for Pakems' business.

91.    Curtis also brought to the meeting her older Apple Macintosh computer that she previously used for Pakems' business, the MAC1 computer, so that she could work while Everson was installing Microsoft Outlook and security software on her MAC2 computer. Beiers had emailed Curtis stating that these software installation meetings with Everson can take a while.

92.    After Everson was done with the software installation on the MAC2 computer, Everson asked Curtis if she wanted her email julieadams@pakems.com to also be available to her on her MAC1 computer. Curtis responded that she did, so she provided him the MAC1 computer. Curtis believed Everson was only installing Microsoft Outlook on her MAC1 computer.

93.    Everson also asked her if Curtis would like him to configure her personal iPhone so that she could access her email julieadams@pakems.com on her personal iPhone. Curtis responded that she did, so she provided him the iPhone.

94.    MAC1, MAC2 and Curtis' personal iPhone contained extremely personal and sensitive information, including but not limited to, personal photos, personal videos, personal text messages, personal documents, including financial information downloaded from her checking account, health information, personal letters, documents containing

diary type information such as her thoughts and feelings, personal emails, personal iMessages, including WhatsApp messages and Skype messages, passwords to her personal accounts, personal information regarding her divorce, personal information regarding relationships, and personal family information.

95.    Everson demanded that Curtis use a password for her julieadams@pakems.com email account that he generated from a website that he accessed on his computer and stated that he did not want Curtis to tell him the computer-generated password.

96.    As the CEO of Pakems, Curtis worked remotely at her residence. During her employment, Curtis lived in two different residences. Because one of her residences was a small apartment, her office (consisting of a desk, filing cabinet and office supplies) was located in her bedroom. Curtis was in the habit of always leaving her computer on and open. She never covered the camera on her computers. Curtis lived in this small apartment from February 1, 2018 to February 28, 2019.

**B.    Pine's and van Woudenberg's Abhorrent Workplace Conduct**

97.    During Curtis' employment, as explained below, she was subject to extreme and constant verbal abusive and threatening, offensive, intimidating, malicious, insulting, humiliating, and denigrating conduct at the hands of Pine. Curtis was the victim of a workplace bully because of her sex.

98.    On numerous occasions, through email, via telephone and during face-to-face meetings, Curtis complained to van Woudenberg about Pine's abusive conduct. During these discussions, van Woudenberg would state that he had never seen Pine treat someone the way that he was treating Curtis.

99.    Van Woudenberg continued to be witness to the abusive conduct and never took the appropriate corrective action to stop the abusive conduct.

100.    Pine, the Chief Executive Officer and Secretary of Lever Up, was the decision-maker with regards to Pakems for most of Curtis' employment at Pakems and dictated Curtis' job duties. She had to seek approval from board members in regard to the Pakems' budget and to sign contracts.

**1.    Pine Wishes Curtis to Fail as Pakems CEO**
   **and Sabotages Curtis' Efforts to Run Pakems**

101.    On numerous occasions, both verbally and in writing, Pine stated that Curtis was not "fit" to be a CEO and demanded that she be terminated. He made these statements in emails, dated January 8, 2019, January 13, 2019, February 18, 2019 and March 12, 2019.

102.    On a regular basis, van Woudenberg told Curtis that Pine wanted her to fail in her role as CEO.

103.    On or about November 12, 2019, Curtis met with Pine. Pine started the conversation stating that Beiers and Jordan Pine hated working with her and that he despised working with her. Curtis later learned from Beiers that this was a lie because Beiers told her she had really enjoyed working with Curtis.

104.    On January 7, 2019, Curtis received an email from Pine where he stated, "BTW I was privy to that conversation [between Curtis and Beiers] on the FBA you tube." At the time, Curtis believed that this was because he was in the office where the Chasefield Capital employees could overhear everyone's conversations. Curtis later learned that Pine was on vacation during the conversation so the only way he could have

been privy to the conversation was because he was listening to her conversations she had with others through Curtis' computer.

105.    In the same January 7, 2019 email, Pine stated, "I don't like the blaming [of] others issue for your information. It doesn't matter who fucked up. What matter [sic] is it gets done. My staff owns their fuck ups."

106.    Curtis responded to this email not understanding what Pine was talking about because she had not blamed anyone in the email. Pine's response was, "We'll see."

107.    Curtis did not understand this email or response at the time. Now it is understood that he was watching and listening to her via the camera and microphone on her computer and this is why he said, "We'll see."

108.    Curtis had never stated directly to Pine about how frustrated she was with all of Chasefield Capital's missteps because it didn't know anything about the footwear business, she only had those conversations with others, in what she thought, was the "privacy" of her own home.

109.    On January 20, 2019, Curtis had questions about the budget Pine put together and van Woudenberg asked Pine to answer Curtis' questions.  Pine responded that he would do this; however, Pine never did.

110.    Throughout Curtis' employment, she requested to engage five (5) different individuals that had footwear or industry experience to offer advice and assistance to grow the company. Curtis even offered to give up equity in the company to accomplish this. Pine and van Woudenberg said no to all of her requests.

**2.      Pine Threatens Curtis**

111.    During a January 8, 2019 telephone conversation between Pine and Curtis, Pine stated that he knew she wanted to meet with van Woudenberg outside of his presence (which Curtis later discovered was because he was monitoring her email) and stated that he dared her to complain about him to van Woudenberg because the last person that complained about him it did not end well for them.

**3.      Van Woudenberg Makes a Promise to Curtis That He
         Will Not Suddenly Fire Her Without Compensating Her**

112.    During a January 9, 2019 face-to-face meeting with Curtis, Pine and van Woudenberg, Pine began the meeting demanding Curtis be fired and that he had advised van Woudenberg not to invest in Pakems. Van Woudenberg later told Curtis that this was a lie because Pine insisted that he invest in Pakems.

113.    At the end of the meeting, Curtis asked van Woudenberg if he wanted her to quit. Curtis stated that she needed financial stability because over the course of the prior year, she had made so many financial sacrifices to keep Pakems operational and invested the rest of her entire life savings. Curtis told van Woudenberg that at times she struggled to pay rent and buy groceries for her and her son and she did not want to ever go through that again.

114.    Van Woudenberg responded that he would not just suddenly fire her one day and put her in the same financial position she had recently been in.

115.    Van Woudenberg also stated that he could never get another CEO for what she was being paid. Van Woudenberg then stated, "if there's no Julie, then there's no Pakems because you [Curtis] are Pakems."

116.    The next day, on January 10, 2019, despite van Woudenberg's assurances, Curtis received an email from van Woudenberg informing her that Pine's conduct caused van Woudenberg to change his mind about Chasefield continuing to partner with Curtis and invest more money. Van Woudenberg demanded that Curtis find a new "more suitable partner capable of taking Pakems to where it deserves to be."

### 4.  Pine Tells Lies About Curtis

117.    Van Woudenberg continued in the January 10, 2019 email,

> *"Speaking for myself, I favour a solution that will allow us to extract from Pakems, and leave you with the potential for switching tracks and joining up with a more suitable partner capable of taking Pakems to where it deserves to be.  It seems obvious to us that the deep-seated differences between particularly you and [Pine] do not allow for a fruitful relationship to run and grow the business. … I am prepared to spend time with you to help make that happen.  … I do not want to put a timeline on this process but, I am sure you agree that time is of the essence, as a long disruption will play havoc with your business cycle."*

118.    It is obvious from this email that Pine was telling van Woudenberg lies about the relationship between Curtis and Pine. The real relationship was that Curtis was the victim of Pine's bullying and not that there was a personality conflict which made it seem like Curtis' personality was an issue.

119.    Pine stated to Matthews that he had a conflict with Curtis, that Curtis was performing badly, and Curtis was not receptive to advice or criticism.

120.    In a February 18, 2019 email, Pine stated to Curtis and van Woudenberg that, "[Curtis] clearly doesn't want to be accountable and has demonstrated it by not providing the requested information or by blaming others, obfuscating or deflecting."

**5.    Pine's   Hostile   Behavior   and   Actions
Towards Curtis Was Sexual Discrimination**

121.    During one conversation between Pine and Curtis, Pine stated to her that she was "one of those girls that lies in bed at night and makes stuff up."

122.    Pine also told Curtis that he thought Curtis was "one of those people" that was too afraid to sell.

123.    On February 13, 2019, Curtis received a derogatory email from Pine telling her that she needed to learn to read the year-end balance sheet and income statement insinuating that she was not competent enough to understand the year-end balance sheet and income statement.

124.    On February 14, 2019, Curtis sent an email to Beiers. Beiers responded that Curtis had to include Pine on every email. Curtis responded that she "was once again hoping to limit the verbal abuse because [she] didn't think that [Pine] needed to be involved. Curtis further stated that, "[t]his issue caused [Pine] to send [Curtis] yet again another email lambasting [Curtis] – he doesn't cc anyone on those emails" and that Curtis hoped Beiers could understand why she was trying to work with just her on that particular issue.

**6.    Others Found Pine's Behavior "Bizarre" and "Abusive"**

125.    During a conversation with Beiers about the way Curtis was being treated, Beiers stated that Pine's behavior towards Curtis was "bizarre."

126.    Angela Miles, an independent contractor who assisted with Pakems' marketing efforts, witnessed Pine's behavior toward Curtis and stated to Curtis that she believed Pine's conduct towards Curtis was "abusive" and that Pine's behavior really upset her to the point that she no longer wanted to be on Pakems conference calls.

127.    Van Woudenberg stated to Curtis on various occasions that he had never seen Pine treat anyone the way that he was treating Curtis and that he unfortunately could never invest in another company like Curtis' because of what he had witnessed - Pine's abusive behavior towards Curtis.

128.    During a March 11, 2019 telephone call, Pine immediately began the call by telling Curtis she was on thin ice and began yelling and screaming at her that he was coming after her, threatened her that she was going to be fired, and that she needed to stop playing stupid about a meeting she had scheduled with his accountant regarding the incorrect financial statements that changed three (3) times that Pine provided to Curtis.

129.    Curtis did not raise her voice during this conversation. Curtis' operations assistant, Stephanie Childers ("Childers"), overhead the telephone conversation.

130.    Curtis spent much of the call trying to figure out why Pine had called her out of the blue and had begun the conversation by threatening her and was so irate to the point of yelling and screaming at her.

131.    It now makes sense that this call was not out of the blue; Pine called Curtis because he was unlawfully listening to the conversation Childers and Curtis were having and the subject of their conversation was what made him so livid. This was the reason Pine called her at that exact moment in time.

132.    Pine's behavior on this telephone call was so threatening, it left Curtis physically shaking.

133.     Childers was so alarmed by what she heard she stated that Curtis should be afraid of Pine, to never meet with Pine by herself, and that he seemed very unstable.

134.    Curtis immediately closed all the blinds to her house, checked to make sure that all of her doors and windows were locked, and has not felt safe since that telephone call on March 11, 2019, especially in light of all of the other conduct that she has uncovered that has been directed toward her.

135.    The next day, on March 12, 2019, Pine sent an email to van Woudenberg and Curtis stating,

> *"Yesterday was most unpleasant which seems to be a recurring theme for Julie and me. Considering that, I have decided that I will remove myself 100% from Lever Up and Pakems. I have some very strong opinions about the direction and management of the firm that conflict with Julie."*

136.    Pine again mischaracterized what had occurred on this phone call and made it appear that Curtis was confrontational or raised her voice during the meeting. This was not true. Curtis never once raised her voice and merely kept asking why she was on thin ice, why she needed to watch her back, and why he kept stating that he wanted her fired because she knew this already from countless conversations and emails.

137.    After Pine resigned on the board of Lever Up, Curtis was told that Defendant Matthews would replace him.

138.    On March 21, 2019, Pine sent an email to Everson instructing him to "disconnect Chasefield internal drives and separate Pakems as its own entity as of 4.15.2019. Contact Julie as to how she wants to handle IT she may choose someone else or no one." The drives were never separated, and Curtis never contacted Everson as she did not have a need for an IT person.

139.    After every face-to-face meeting with van Woudenberg and Matthews, van Woudenberg would tell Curtis that they were going to meet with Pine afterward.

140.   Curtis was in constant fear that Pine would get his way and she would be fired.

**7.     Pine Falsified Pakems' Tax Returns to His Personal Benefit**

141.   After Pine resigned from the board of Lever Up, he was permitted to continue working with his accountant to file Pakems' 2018 taxes and create the monthly Balance Sheets and Income Statements.

142.   On April 3, 2019, Curtis met with van Woudenberg to let him know that she had accidentally uncovered the fact Pine tried to hide that Chasefield Capital owed Pakems over $9,000 and that the revised Profit & Loss Statement and Balance Sheet Pine submitted to them were wrong because of Pine's cover-up.

143.   The next day, on April 4, 2019, Curtis received an email from Pine letting her know that he was still in charge of handling accounting going forward and that Curtis would not be able to write checks on behalf of Pakems.

144.   This directive from Pine was offensive in that Curtis, the CEO of Pakems, was being treated as a person that could not be trusted with the Pakems' bank account.

145.   On April 24, 2019, van Woudenberg sent an email to Curtis stating,

> "*Julie, I also suggest that you give up on trying to adjust 2018 accounting. The small adjustments resulting from an expensive and time-consuming effort are just not worth it, and are a major distraction from your sales efforts. Our focus needs to be on generating revenues and margins.*"

146.   On April 30, 2019, Pine sent an email to Curtis and van Woudenberg in an attempt to explain why the Balance Sheet that he submitted to them was wrong. In this email, Pine stated, "It has been here since 12.31.2018 and my accountant failed to mention, and I only focused on the income statement for Chasefield at year-end. Between

the two of us, we miscommunicated" and that he will send the funds totaling $9,217.18 to Pakems.

147.    In this email, Pine appeared to blame his accountant for the almost $9,000 discrepancy even though Pine submitted an invoice to Pakems for $9,000 on January 31, 2019, the same day the accountant revised Pakems financials to reflect this invoice. Further, this invoice dated January 31, 2019, was reflected as an account payable in the 2018 Pakems' financials that were done using cash basis accounting, meaning this was a mistake to include any accounts payable information and should only be reflected in the year it is paid.

148.    As of June 24, 2019, Pine had not transferred the funds from Chasefield Capital to Pakems.

149.    On May 1, 2019, Curtis sent an email from her personal email account to her accountant stating that she was concerned about her fiduciary responsibility as the CEO of Pakems and a lawyer to file a false tax return.

150.    Because Pine was secretly reading emails from Curtis' personal account, Pine incorrectly conveyed to van Woudenberg that she was meeting with the accountant to have her try to adjust the 2018 accounting.

151.    Curtis merely had questions that she needed an accountant to answer and actually met with the accountant and paid the accountant to have her complete Pakems Inc. taxes for the first part of 2018 (before the Chasefield Capital purchase of Pakems Inc. occurred).

**8.    Curtis Ends Up in Hospital**

152.    On May 31, 2019, Curtis went to the hospital with heart attack symptoms.

153.   On June 4, 2019, Curtis told van Woudenberg and Matthews that she went to the hospital with heart attack symptoms and that the doctors told her that the symptoms were more than likely caused by stress.

154.   On June 4, 2019, Curtis, van Woudenberg and Matthews met with a third-party to discuss a strategy for finding a more suitable partner.

155.   On June 18, 19, and 20, 2019, Curtis attended the Outdoor Retailer Trade Show where she made several potential business opportunities.

156.   On June 19, 2019, when Curtis saw van Woudenberg and Matthews, she told them about some of the business opportunities she had made at the trade show and that L.L. Bean loved the samples she provided and wanted additional samples made in its plaid pattern.

C.   **Curtis Terminated For Health Issues and Pakems Left to Fail**

157.   Less than three weeks after her trip to the hospital, on Saturday, June 22, 2019, Curtis received an email from van Woudenberg stating that she needed to be at a meeting with him and Matthews at Matthews' office on Monday, June 24, 2019.

158.   Van Woudenberg told Curtis that Matthews and he had decided to remove Curtis from the board of directors and to terminate her employment.

159.   Curtis asked why she was being terminated. One of the reasons van Woudenberg stated was that it was in the company's best interest because of Curtis' health issues.

160.   Curtis asked who was going to run the company now that she had been terminated. Van Woudenberg stated that Chasefield Capital would run the company. Curtis gasped because on several occasions, including emails, Pine admitted that

Chasefield had negatively impacted Pakems, that they didn't have the requisite experience to operate a shoe company, they didn't understand the process to send shoes to Amazon as a FBA (Fulfilled By Amazon) vendor, were very busy running three (3) other companies and on multiple occasions had stated that Chasefield Capital was not a suitable partner.

161.   Curtis stated that she did not want to remain partners with them and no longer wanted her ownership interest in Pakems and wanted them to buy her 450 shares (her unvested shares vested since she was terminated without cause) for $450,000 as set forth in her Stock Restriction Agreement.

162.   Van Woudenberg stated that he would not exercise this option unless he absolutely had to.

163.   At the termination meeting, Curtis was given an Option Agreement that set forth she has until July 1, 2020, to purchase all of the common stock in the corporation not held by her in the amount of the greater of $2,000,000 or nine times (9x) the company's EBIDA for the trailing twelve months prior to giving written notice of her intent to exercise the option, as determined by the Board of Directors in good faith, divided by the company's equity capitalization immediately prior to the closing date. Within this document she discovered that van Woudenberg now owned 754 shares of Lever Up common stock (approximately a 58% ownership when considering Curtis' vested 450 shares).

164.   After Curtis was terminated, she discovered that Defendants cut off her access to julieadams@pakems.com and did not set up an automatic reply letting

individuals who sent Curtis an email that Curtis was no longer with Pakems. Curtis was never asked what her password was to her business email account.

165.    Curtis was not given a warning that she needed to change anything she was doing, or she would be fired.

166.    Curtis had been following the strategy for Pakems van Woudenberg and Matthews had approved.

167.    Upon information and belief, Matthews became a part-time CEO of Pakems. Matthews did not have any prior footwear industry experience.

168.    Due to Curtis' termination, Pakems' lost sales and potential sales opportunities that Curtis was cultivating, either directly or through sales representatives, including, but not limited to, Uncharted Supply Company, L.L.Bean, Dick's Sporting Goods, REI, Dunham's, Camping World, Vail Resorts, Alterra, Gorsuch, Steamboat Resort, Summit Sports, Gabe's, a UK Distributor, and Sinner.

169.    On June 25, 2019, Curtis returned Hamish Lorimer's, Stepping Out Footwear, phone call from the previous day. Mr. Lorimer was an Australian distributor. He stated that he had received an email from Matthews stating that Curtis was no longer with Pakems and that Mr. Lorimer would be working directly with him and that Matthews was in the process of making a decision on new management.

170.    On July 2, 2019, Lorimer sent an email to Matthews stating,

> *"I have decided to hold off ordering Pakems stock for my current winter. I was a little taken back that [Curtis] has been removed from the business, especially as she is the Founder of the Pakems brand. She has also been instrumental in supporting me to set up the brand for web & Amazon sales down under. So I am a little nervous investing funds now in the brand until I can see what your management teams plans are moving forward."*

171.   Every single future order that Curtis obtained and potential sales opportunities she was working on went away because she was terminated.

172.   Neither Matthews nor van Woudenberg reached out to Curtis after they fired her to find out what potential opportunities she was working on, or who had requested samples. Matthews nor van Woudenberg must have believed they knew everything Curtis was working on by listening to all of her conversations or through hacking into her computers.

173.   After Curtis was terminated, the revenue realized over the latter part of the year was less than it was while Curtis was employed.

174.   One of the reasons Defendants gave as the reason Curtis was terminated in their CCRD response was that Pakems' gross profit was not enough to cover Curtis' salary.

175.   After Curtis was terminated, Pakems' gross profit went down and was not enough to cover Matthew's salary. The average monthly total income during Curtis' tenure was $7,135.16 per month and during Matthews' tenure it was $55.36 per month.

176.   Upon information and belief, Matthews, a male, has not been fired.

177.   On March 13, 2020, Patrick Bernal, counsel for certain Defendants, stated in a letter, "In January and early February 2020, I exchanged a series of emails with Ms. Curtis, concerning the potential dissolution, or sale, of Pakems, LLC, and its holding company, Lever Up, Inc."

178.   Upon information and belief, Defendants conducted a liquidation sale and have currently shut the doors on Pakems and are not making Pakems available for sale.

179.    Curtis will lose the over $1 million that she invested in Pakems if the company is dissolved and no efforts are made to attempt to sell the company.

180.    On July 25, 2019, Curtis gave written demand to inspect and copy certain documents pursuant to Colo. Rev. Stat. Ann. § 7-116-102.

181.    To date, Curtis has not received minutes of shareholders' meetings, records of actions taken without a meeting, minutes of meetings of the board, waivers of notice of meetings, or the names and business addresses of all of the current officers and directors.

182.    Further, Curtis has requested specific information regarding the company's inventory.  Curtis has not received the requested information.

**D.    Defendant's Hacked Curtis' MAC1 and MAC2 Personal Computers and Personal iPhone to Secretly Spy on Curtis and Read Her Private Information**

183.    Soon after Curtis was terminated, she began noticing unusual things going on with her MAC1 and MAC2 computers and her personal iPhone.

184.    The unusual things first began with noticing that there were several emails on her iPhone that were from someone named "Stupid."

185.    Curtis noticed, including, but not limited to:

(a) files on her MAC1 and MAC2 computers that were not files that she created;

(b) she discovered a hidden library on her MAC2 computer with various folders that she did not create;

(c) she began noticing that there were files and applications opened on her computers that she had not opened;

(d) she noticed that when she stepped away from her MAC2 computer, the programs and files visible on the screen were not the same when she returned;

(e) she noticed that software programs were installed on her MAC2 computer that she did not install; and,

(f) she noticed software programs were removed from her computer that she did not remove.

186.   Ultimately, all of these observations led to the following extremely disturbing, exceptionally shocking, and particularly offensive and disgusting discoveries.

187.   When Curtis met with Everson on December 13, 2018, he downloaded and installed much more than Chasefield Capital or Everson informed Curtis Everson was installing.

188.   At the meeting in Chasefield Capital's offices, at 11:28 a.m., Everson installed a software package entitled chasefieldcapitalmainoffice.4.0.4889-installer(1).pkg@base.pkg onto Curtis' MAC2 computer.

189.   This software package contained the spyware software entitled NinjaRMMAgent 4.0.4889 ("Ninja Spyware").

190.   Below is screen shot of a log file from Curtis' MAC2 computer (emphasis

added).



191.   The Ninja Spyware was used to remotely access Curtis' personal computer

whenever Defendants wanted to and without her authorization or knowledge.

192.   Rather than merely installing Microsoft Outlook and setting up Curtis' email

julieadams@pakems.com to also be available to her on her MAC1 computer, Everson

installed the same chasefieldcapitalmainoffice.4.0.4889-installer(1).pkg@base.pkg

software package onto Curtis' MAC1 computer that he installed on her MAC2 computer.

193.   Similarly, Everson installed the Ninja Spyware on Curtis' MAC1 computer.

194.   The Ninja Spyware log file indicates that Everson granted access to the

Ninja Spyware to four individuals.

195.   On December 13, 2018, at 11:41 a.m., Everson downloaded and installed

software called TeamViewer on Curtis' MAC2 computer.

196.    Below is screen shot of a log file from Curtis' MAC2 computer.



197.    This TeamViewer software can be used in conjunction with the Ninja Spyware and enabled the Defendants to remotely access Curtis' MAC2 computer whenever they wanted to and have the ability to remotely "control" her computer.

198.    Similarly, Everson installed the TeamViewer software on Curtis' MAC1 computer.

199.    Everson assigned Curtis' MAC1 and MAC2 computers to his TeamViewer account so that the devices could be remotely managed and monitored by the account owner and others he granted access to at any time.

200.    Everson also customized the settings within the TeamViewer software so that the TeamViewer software would automatically launch every time Curtis logged into her computers and, unbelievably, **Everson turned off the logging function so that this application would not create log files when the application was used**.

201.   Everson also hid the TeamViewer software on Curtis' MAC1 and MAC2 computers as evidenced by the file path on her computers, which was /Applications/.TeamViewer/TeamViewer.app – the "." In front of "TeamViewer" indicates a hidden folder.

202.   Not only did TeamViewer allow the Defendants to remotely access Curtis' personal computers without her knowledge, but Defendants configured the TeamViewer software so that they could send files to themselves.

203.   On December 17, 2018, at 1:21 p.m., Defendants, without Curtis' authorization or knowledge, reconfigured the TeamViewer software so that the main window on her MAC2 computer could be remotely controlled and gave themselves the capability to clip images from the folder /user/bodiecurtis/pictures/photoslibrary and gave themselves the ability to view the images they created and placed in that file, videos they created and placed in that file, and selected the option to also hear the audio from the videos they viewed.

204.   This was the initial method Defendants used to secretly spy on Curtis by accessing the camera and microphone on her computer, capture screen shots of her, videoed her and listened to the audio.

205.   Below is screen shot of a log file from Curtis' MAC2 computer.



206.   Everson, without Curtis' authorization or knowledge, changed the Administrator settings on Curtis' MAC2 computer and added additional Administrators within a Group called "Administrator's Public Folder" and another Group called "Bodie Curtis's Public Folder." Within these Groups, Everson selected "Everyone" so that any and all Defendants could access her computer.

207.   Below is screen shot from Curtis' MAC2 computer.



208.    The result of this was that when the Defendants accessed Curtis' MAC2 computer, without Curtis' permission or authorization, and download applications, folders, files, saved information to /var/ files, etc., Defendants would do it by accessing the computer user "bodiecurtis" and they would access the Library that was hidden on Curtis' MAC2 computer.

209.   Below are screen shots from Curtis' MAC2 computer.



210.   Most of the actions and conduct described below was discovered in the folder entitled "Library" that had been hidden on Curtis' MAC2 computer or within the log information on the back end of her MAC2 computer.

211.   At the December 13, 2018 meeting, Everson installed the security program Webroot on Curtis' MAC2 computer.

212.   After the December 13, 2018 meeting, Defendants, without Curtis' authorization or knowledge, accessed Curtis' computer on various occasions to change parameters of the Webroot security program. For example, Defendants accessed Curtis' MAC2 computer on January 10, 2019, at 10:50 a.m., and on February 17, 2019, at 6:52 a.m. to make changes within Webroot. And, as set forth below in more detail, Defendants later hacked into Curtis' MAC2 computer after she was terminated and deleted Webroot from her MAC2 computer.

213.   Everson, without Curtis' authorization or knowledge, changed the settings on Curtis' MAC1 computer, MAC2 computer and personal iPhone so that all of the devices were connected to Curtis' personal iCloud account.

214.   As noted by the time stamp, Everson, at the December 13, 2018 meeting added or changed the email accounts within Curtis' iCloud account, namely julie.adams7@icloud.com and julieadamscurtis@yahoo.com, and hid the julieadamscurtis@yahoo.com email account in her iCloud account. This was done without Curtis' authorization or knowledge.

215.   Below are screen shots from Curtis' MAC2 computer.





216.  Months after Curtis was terminated, on August 14, 2019 at 3:44 p.m., Defendants hacked into Curtis' MAC2 computer and either created or modified the iCloud account "214253806."

217.  Below are screen shots from Curtis' MAC2 computer.



218.  At the December 13, 2018 meeting with Everson, without Curtis' authorization or knowledge, the contacts and images from Curtis' personal iPhone were downloaded to the hidden folder on her MAC2 entitled Library.

219.    Below is a screen shot from Curtis' MAC2 computer.



220.    One minute later, Defendants, without Curtis' authorization or knowledge, downloaded Curtis calendar associated with her personal email account julieadamscurtis@yahoo.com. The result of this was that Defendants could review every meeting that Curtis had scheduled within that calendar dating back to 2004.

221.    Below is a screen shot from Curtis' MAC2 computer.



222.    Within the Photos application on Curtis' MAC2 computer, the settings were altered so that all of the photos and videos on her iPhone downloaded to her MAC2 computer to the file path /user/bodiecurtis/pictures/photoslibrary, and at 12:41 p.m. on December 13, 2018, Everson configured, without Curtis' authorization or knowledge, the "photoanalysisd" so that the "Favorites" photos were set to photos and videos of Curtis and her son. Further, the changes made to the settings on her personal devices resulted in Curtis' photos and videos to download to her son's phone and vice versa. Because Curtis' was not informed of this change to her iPhone, Curtis and her son did not understand why this populating of photos and video on their iPhones suddenly happened. They spent hours trying to remedy this and ultimately, Curtis' son lost every photo and video on his iPhone.

223.   At the December 13, 2018 meeting with Everson, without Curtis' authorization or knowledge, Defendants installed the "MobileDeviceKitLite" framework so that all of the content on Curtis' personal iPhone would upload to her MAC2 computer. This included all of her personal photos, videos, text messages and voice mail messages.

224.   Once uploaded to her MAC2 computer, this voluminous amount of personal and private content was stored in a folder entitled "Mobile Documents" on Curtis' MAC2 computer. Defendants would synchronize Curtis' personal iPhone through the Bluetooth technology on both her MAC2 computer and her personal iPhone in order to gain access on a periodic basis to her personal photos, videos, text messages and voice mail messages.

225.   This "Mobile Documents" folder was modified and opened the day before Defendants fired Curtis, on June 23, 2019 at 9:57 a.m.

226.   Below is a screen shot from Curtis' MAC2 computer.



227.    On July 29, 2019, more than a month after Curtis was fired, computer logs indicate that Defendants hacked into her MAC2 computer and launched the application AppleMobileDeviceHelper within Sync Services to further cause her personal iPhone to be synchronized to her computer.

228.    The security and privacy settings on both MAC1 and MAC2 were changed to allow for all incoming connections from com.apple.webkit.networking.wpc.

229.    On February 27, 2019 at 2:02 p.m., Defendants hacked into Curtis' MAC2 computer to add a WebKit.Plugin.32.

230.    Then on August 14, 2019, about two months after they fired Curtis, at 9:06 a.m., they hacked into her computer and changed the preferences associated with com.apple.webkit.networking.

231.    At the December 13, 2018 meeting with Everson, without Curtis' authorization or knowledge, Everson also changed settings on Curtis' personal iPhone so that all of the notes on her personal iPhone were sent to her personal email account julieadamscurtis@yahoo.com.

232.    These notes contained extremely personal and sensitive information, including, but not limited to, passwords to various personal accounts and her son's social security number.

233.    Defendants, without Curtis' authorization or knowledge, accessed this email account and all of the notes were read within her Yahoo email account.

234.    At the December 13, 2018 meeting with Everson, without Curtis' authorization or knowledge, Silverlight was installed on Curtis' MAC2 computer. This

software program compresses very large files to be sent over the network and is usually used for sending video files.

235.    At the December 13, 2018 meeting with Everson, without Curtis' authorization or knowledge, the Defendants used Curtis' AppleID to download the OneDrive application to her MAC2 computer.

236.    Curtis did **__not__** provide her AppleID password to Defendants and was never told that OneDrive was going to be installed on her computer. She was under the impression that SharePoint was to be the cloud storage solution and that she would be in control of what documents she wanted to upload to SharePoint.

237.    Below is a screen shot from Curtis' MAC2 computer.



238.    Within the OneDrive software, without Curtis' authorization or knowledge, two folders were created entitled "Personal" and "Business1."

239.   Below is a screen shot from Curtis' MAC2 computer.



240.   Without Curtis' authorization or knowledge, the OneDrive's synchronization function was set so that all of the content in both the Personal and the Business1 folders on Curtis' MAC2 computer would be copied and uploaded to a Chasefield drive.

241.    Below are screen shots of log files from Curtis' MAC2 computer.





242.    After the December 13, 2018 meeting with Everson, later that evening after Curtis was home with her computers in her possession, her MAC2 computer, without Curtis' authorization or knowledge, was remotely accessed at 6:58 p.m. and the OneDrive

application that was installed earlier in the day using her AppleID and password was deleted and another OneDrive application was uploaded and installed.

243.   The new version of OneDrive was set to automatically open every time Curtis logged into her MAC2 computer. Additionally, Defendants selected to hide the OneDrive software on Curtis' MAC2 computer when she logged into her the computer.

244.   Below is a screen shot from Curtis' MAC2 computer.



245.   After the December 13, 2018 meeting with Everson, without Curtis' authorization or knowledge, at 3:45 p.m. the software program StellarPhoenixMacRecovery was downloaded and installed on Curtis' MAC1 computer. This was well after Curtis left the Chasefield offices with her MAC1 and MAC2 computers.

246.   The StellarPhoenixMacRecovery software was used to access all deleted files, photos, videos, and/or documents on Curtis' personal MAC1 computer.

247.   At the December 13, 2018 meeting with Everson and afterwards, without Curtis' authorization or knowledge, about thirty (30) folders were created on Curtis' MAC2 computer in order for various applications on the MAC2 computer to interact with other applications.

248.   On January 4, 2019 at 2:19 p.m., Defendants, without Curtis' authorization or knowledge, remotely accessed Curtis' MAC2 computer and the application BlueJeans was secretly installed and hidden on Curtis' MAC2 computer.

249.   BlueJeans is a software program used for remote web video conferencing, similar to Zoom.

250.   Below is a screen shot of a log file from Curtis' MAC2 computer.



251.   After downloading the BlueJeans software, without Curtis' authorization or knowledge, Defendants created and scheduled a queue of "meetings." On the same day, the settings of the BlueJeans software were deliberately changed so that when the

scheduled "meetings" occurred, access was granted to auto-select the computer's camera ("FaceTime HD Camera"), the built-in internal microphone, and built-in internal speakers. The video capabilities within the application was deliberately set to "local video stream" so that Defendants could stream the video recordings of the scheduled "meetings."

252.   Curtis was not invited to nor aware of the scheduled meetings within the BlueJeans software.

253.   On January 4, 2019, at 2:23 p.m., Defendants began secretly capturing video of Curtis through her MAC2 computer's camera via the BlueJean software.

254.   Below is a screen shot from Curtis' MAC2 computer.



255.   Furthermore, the device VirtualVideoCapture [BJN] was opened and enabled to be streamed and the device VirtualScreenCapture [BJN] was also opened and

enabled to be streamed. The video device was enabled to RenderLocalView to the drivername BJN.

256.    On January 4, 2019, at 2:23 p.m., according to BlueJean log files, Defendant posted "messages" to postToClient@/users/luke/jenkins2/workspace/Furiosa_2.9.0-RZT4NGT4SN2SSME2CHEYO6ZV35WEVAZL3WGMCXKLJAE577W3Z6HQ/Carthage/Checkouts/app/sipmanager/skinnysipmanager.h:241.

257.    Without Curtis' authorization or knowledge, the "security profile" for the BlueJeans software was set up using Curtis' email address julieadams@pakems.com.

258.    After installing BlueJeans on January 4, 2019, Defendants began accessing the software the next day and repeatedly accessed BlueJeans on at least twenty (20) occasions over the next forty-five (45) days.

259.    On several occasions, Defendants remotely accessed Curtis' MAC2 computer, without Curtis' authorization or knowledge, to launch the BlueJeans software to secretly capture video of Curtis in the evening or at night. For example, Defendants used the BlueJeans software on January 17, 2019 at 9:27 p.m., January 27, 2019 at 12:36 a.m., February 6, 2019 at 8:20 p.m., and on February 8, 2019 at 9:21 p.m. and 9:54 p.m. On February 8, 2019, between the times Defendants used the BlueJeans software, which was at 9:21 p.m. and 9:54 p.m., at 9:53 p.m., Defendants modified the TeamViewer application.

260.    During this time period, Curtis lived in a small apartment. Her office was located in her bedroom and the bathroom was attached to the bedroom. As stated above, Curtis was in the habit of always leaving her computer on and open. She never covered

the camera on her computers. Curtis used her bedroom to dress, undress and for private intimate moments. It is very likely that the videos and/or images taken by Defendants from Curtis' computer would have captured Curtis nude and/or during those private intimate moments. Curtis is absolutely sickened, mortified, disgusted and repulsed thinking about Defendants' unlawful and morally offensive actions.

261. On February 14, 2019 at 5:28 p.m., Defendants changed the CalendarAuthManagerStartListeningForInterAppCommunication application. At 6:17 p.m., Defendants accessed the Calendar applications within her computer and created calendar events tied to the 214253806 account that Defendants created and hid in Curtis' iCloud account and scheduled "EventAllDay" meetings.

262. On December 20, 2018 at 8:38 p.m., April 26, 2019 at 9:32 a.m., May 12, 2019 at 12:04 p.m., and on June 9, 2019 at 10:25 p.m., approximately 500 personal text messages sent to and from Curtis' son's iPhone were read. Unbeknownst to Curtis. these test messages were automatically saved on Curtis' MAC2 computer because Curtis' son's iPhone was somehow tied to the MAC 2 computer.

263. Some of these text messages had been sent or received a year prior to when Chasefield Capital purchased Pakems Inc. and were from the time Curtis' son was twelve and thirteen years old. These personal text messages included texts from Curtis, the boy's father, his grandparents, his uncle, and his friends. Curtis' son is aware of this invasion of his privacy and the other spying that occurred and no longer feels safe staying at Curtis' house.

264. On June 11, 2019, Defendants were very busy with Curtis' MAC2 computer. Defendants may have determined that they were going to fire Curtis as this day was seven

(7) days after Curtis told van Woudenberg and Matthews that she was in the hospital because of stress and twelve (12) days until she would be fired without warning on June 24, 2019.

265.  On June 11, 2019, Defendants, without Curtis' authorization or knowledge, remotely accessed Curtis' MAC2 computer and, specifically her personal WhatsApp account. Curtis used the WhatsApp software to send and receive text messages.

266.   On June 11, 2019, Defendants, without Curtis' authorization or knowledge, remotely accessed Curtis' MAC2 computer and, specifically her Keeper Security Password account. Curtis used the Keeper Security Password software to securely save all of her personal passwords in one place.

267.  On June 11, 2019, Defendants, without Curtis' authorization or knowledge, remotely accessed Curtis' MAC2 computer and, specifically her personal Skype account. Curtis used the Skype software for scheduling remote video conferencing meetings. Skype utilizes a computers' camera and microphone.

268.  On June 11, 2019 between 8:39 a.m. and 9:54 a.m., Defendants, without Curtis' authorization or knowledge, remotely accessed Curtis' MAC2 computer and made changes to the WhatsApp software, the Keeper Security Password software, and the Skype software on Curtis' MAC2 computer.

269.   Below is a screen shot from Curtis' MAC2 computer.



270.   Later the same day, June 11, 2019 at 2:28 p.m. and 2:29 p.m., Defendants, without Curtis' authorization or knowledge, retrieved data that was saved in the WhatsApp software, the Keeper Security Password software and the Skype software.

271.    Below are screen shots from Curtis' MAC2 computer.





272.    In or about 2013, Curtis created a Skype account that she used for personal Skype calls and for business calls.

273.    At the December 13, 2018 meeting with Everson, Everson installed the software program Skype for Business. Therefore, Curtis considered the Skype account

she created in or about 2013 her personal Skype account. Her personal Skype account identifier, or handle, was "julieadams303."

274.    From June 12, 2019 to June 17, 2019, Curtis did not have any remote meetings or calls that used required her to use her personal Skype account or the Skype for Business account. Being that Curtis' personal Skype account had been set-up years prior, Curtis had no reason to be making changes to her personal Skype account during this time period.

275.    However, on June 14, 2019 at 7:14 a.m., Defendants, without Curtis' authorization or knowledge, created a second Skype handle within Curtis' personal Skype account entitled "live#3Ajulieadams_13."

276.    Below are screen shots from Curtis' MAC2 computer.



277.    It is extremely concerning that Defendants chose the specific naming convention for the newly created Skype handle. A Skype handle that has the word "live"

at the beginning indicates that the Skype handle is tied to an email address. Curtis' original account is tied to her telephone number. Defendants tied their newly created "live#3Ajulieadams_13" handle to an email address in an attempt to schedule meetings and access her computer camera and microphone and to conceal their actions. Recently, Curtis attempted to access the "live#3Ajulieadams_13" handle on Skype but it no longer exists which suggests that Defendants have since deleted this account.

278.   Beginning on June 12, 2019, and continuing until June 17, 2019, Defendants, without Curtis' authorization or knowledge, created and/or modified within the Skype software numerous folders, files, logs and plists files. Notably the first configuration changes made started on June 12, 2019 at 3:19 a.m.

279.   Most alarming, Defendants, without Curtis' authorization or knowledge, appear to have set up Skype meetings based on the folder they created within Skype called "webrtc_event_logs."

280.   Defendants' creation of the Skype account and this folder suggests that Defendants would connect to Skype by logging into the Skype software through the Internet and use this account to capture video of Curtis.

281.   Curtis was not invited to nor aware of these scheduled meetings within the Skype software.

282.   On June 23, 2019, the day before Curtis was fired, Defendants, without Curtis' authorization or knowledge, were very busy copying and collecting significant amounts of Curtis' personal information. Defendants accessed numerous personal folders on Curtis' MAC2 computer and accessed numerous non-business related software programs.

283.   For example, on June 23, 2019 at 9:57 a.m., Defendants, without Curtis' authorization or knowledge, accessed a hidden folder on Curtis' MAC2 computer entitled "Mobile Documents."

284.   Below is a screen shot from Curtis' MAC2 computer.



285.   On June 23, 2019, the date before Defendants fired Curtis, there were numerous changes that Defendants made to Curtis' MAC2 computer, without Curtis' authorization or knowledge, as evidenced by accessing folders and plist files that were created, including, but not limited to, CloudDocs, com.apple.shoebox.plist, com.apple.mobilemail.plist, iCloud.com.google.container.plist, iCloud.com.microsoft.skype.teams.plist, com.apple.icloud_fmfd, com.apple.keyboardservicesd, and iCloud.com.apple.iBooks,iTunesU.plist.

286.   Curtis was never told nor provided a policy that alerted her to the fact that her personal MAC1 and MAC2 computers would be remotely accessed, and she never

gave consent nor was she aware that her personal computers were being remotely accessed.

287.   After the December 13, 2018 meeting with Everson, on an almost daily basis, Curtis spent an inordinate amount of time trying to accomplish simple tasks because her MAC2 computer was always out of memory or was crashing.

288.   Curtis' computer issues were caused by all of Defendants' efforts to secretly spy on her and gain access to every bit of personal information that could be found or gleaned from her personal MAC1 and MAC2 computers, Curtis' personal iPhone, her son's personal text messages, and every single conversation or any other conduct that occurred in the "privacy" of her personal residence.

E.   **Defendants' Unlawful Actions Did Not
Cease After Curtis Was Terminated**

289.   Shortly after Curtis was terminated, she began noticing irregularities in her julieadamscurtis@yahoo.com email account and emails related to actions she knew nothing about.

290.   For example, on or about July 27, 2019, Curtis discovered an email in her personal Yahoo email account that indicated that the security software company Webroot had been contacted and the message sent to them stated, "I am trying [to] open up Webroot."

291.    Below is a screen shot from Curtis' MAC2 computer.



292.    Curtis did not contact Webroot, nor was she trying to open up Webroot on her computer.

293.    Curtis was very alarmed that her personal email was somehow involved with Webroot and reached out to their customer care department. She learned that there had been a phone call made to Webroot and that the person who contacted Webroot had the audacity to give Webroot Curtis' personal email address as if it was their own.

294.    Furthermore, on July 13, 2019, when Curtis finished a run, she looked at her iPhone to turn off her music and there was a text message that someone was trying to use her AppleID.

295.    Below is a screen shot from Curtis' personal iPhone.



296.    This was very upsetting to Curtis because it was evidence Defendants were trying to use Curtis' AppleID and password to hack into her personal iCloud or iTunes accounts. Recently, Curtis has discovered that Defendants were receiving these Apple ID Verification text messages with the login access codes because Defendants were able to turn on the Bluetooth on her computer and pair it with her personal iPhone.

297.    About a week ago, Curtis' old iPhone attempted to pair with her new Apple computer and she discovered that Defendants had changed the settings on her personal iPhone to automatically pair with her MAC2 computer.

298.    When Curtis returned home after her run, there was evidence that made her believe that her MAC2 computer had been accessed without her authorization or knowledge. When Curtis left on her run, she was working on a Microsoft Word document entitled "Causes of Action Chasefield" that was created in anticipation of this litigation and covered by privilege because Cutis is an attorney.

299.    However, what was open on her MAC1 computer was her newly created personal Dropbox account.

300.    Below is a screen shot from Curtis' MAC2 computer.



301.    Curtis checked to determine if Microsoft Word had somehow quit or crashed and was therefore the cause of the different window open. Microsoft Word was still running.

302.    That day, July 13, 2019, Curtis spent the next several hours trying to figure out what was going on with her MAC1 and MAC2 computers and whether Defendants were truly accessing her computers – which was something she did not want to be true. She was already devastated by the fact she had been fired from the company she founded, and now she was feeling stalked by these same men.

303.    Curtis did not know where to begin trying to figure out what was going on or how to prove Defendants were accessing her computer, so she just started taking screen shots of her computer to see if something raised a red flag.

304.    One screen shot Curtis took on July 13, 2019 at 6:47 p.m. was of the applications on her MAC2 computer.

305.    Below is a screen shot from Curtis' MAC2 computer.



Screen Shot 2019-07-13 at 6.47.33 PM.png

PNG image - 452 KB
Created   Saturday, July 13, 2019 at 6:47 PM
Modified   Saturday, July 13, 2019 at 6:47 PM
Last opened   --

306.    This screen shot indicated on the bottom row of icons that on July 13, 2019, the security software Webroot was an application on Curtis' MAC2 computer.

307.    Not only had her computers become her nemesis, but Defendants' attempts to access accounts meant Curtis was constantly getting text notifications on her iPhone related to Defendants attempts to hack into various accounts.

308.    For example, on June 26, 2019, two (2) days after Curtis was terminated, she received a notification on her personal iPhone that Google blocked Defendants from

signing in with the password for the email account pakemskickstarter@gmail.com. This was not Curtis as she had no reason or desire to log into this email account.

309.    Again, on July 29, 2019, Curtis received notification on her personal iPhone that Google blocked Defendants from signing in with the password for the email account pakemskickstarter@gmail.com.

310.    And, yet again on July 31, 2019, again, much to Curtis' annoyance, she received another notification that Google blocked Defendants from signing in with the password for the email account pakemskickstarter@gmail.com.

311.    When Curtis investigated the July 31, 2019, log in attempt, she was able to capture the IP address for the computer that was attempting to log into this email account. The IP address was 71.218.51.224.

312.    Below is a screen shot from Curtis' MAC2 computer.



313.    This was actually the IP address of Curtis' computers used in her house; thus, indicating that Defendants had hacked into her MAC1 or MAC2 computer on July

31, 2019, more than a month after Defendants fired her, and were using her computer to try to log into the email account pakemskickstarter@gmail.com.

314.   During this period in time after Curtis was fired from Pakems, Curtis' thoughts were filled with trying to stay one step ahead of Defendants and was so upset by what they were doing to her. Curtis wanted to determine how to keep Defendants out of her MAC1 and MAC2 computers and it just did not seem like she was able to do this. By then, she had changed all of the passwords to all of her accounts and to her computer, but nothing seemed to be effective, and she was seeing so many things going on with her computers that were suspicious.

315.   On August 10, 2019, Curtis checked to see if Webroot was still on her computer. Curtis went to her loathed computer and checked the applications on her computer. Much to her surprise, disgust, and fright, the Webroot application was no longer on her computer.

316.    Below is a screen shot from Curtis' MAC2 computer.



Screen Shot 2019-08-10 at 4.22.52 PM.png

PNG image - 446 KB
Created    Saturday, August 10, 2019 at 4:23 PM
Modified   Saturday, August 10, 2019 at 4:23 PM
Last opened  --

317.    Curtis called Webroot to ask how a Webroot application could be removed from her computer and the customer service person stated that the only way it could be removed was by someone physically being in her computer and uninstalling it.

318.    After discovering this and after seeing so much suspicious activity, Curtis started making sure she was more deliberate with her investigation into her MAC1 and MAC2 computers.

319.    At that time is when Curtis started making sure that she shut down all applications on her computer before going to bed so when she saw an application was opened the next time she got on her computer, she was certain it was not something that had been opened by her.

320.    Also, because Curtis did not know how Defendants were accessing her MAC1 and MAC2 computers, she thought quitting all applications at night before going to bed would somehow "kick" Defendants out of her computers and Defendants could not "do things" to her computers when she was asleep.

321.    One night, when Curtis was ready to call it quits for the day of trying to determine what was going on with her MAC1 and MAC2 computers, she took a screen shot of the computer's request whether she really wanted to quit all computer applications.

322.    On August 14, 2019, at 11:31 p.m., she took a screen shot of this before clicking the button to quit all computer applications.

323.    Below is a screen shot from Curtis' MAC2 computer.



324.    Next, Curtis went to the Terminal Application to see if Defendants were still logged into her computer – by this time she had noticed a "ttys000" in the terminal logs

and her research informed her that this indicated there was someone else "networked" into or connected to her computer.

325.   Below is a screen shot from Curtis' MAC2 computer.

```
wtmp begins Tue Aug  7 18:18
Bodies-MacBook-Air:~ julieadams$
  [Restored Aug 14, 2019 at 11:47:22 PM]
Last login: Wed Aug 14 23:46:09 on console
Restored session: Wed Aug 14 23:29:31 MDT 2019
Bodies-MacBook-Air:~ julieadams$ last
julieadams  ttys000                  Wed Aug 14 23:47   still logged in
julieadams  console                  Wed Aug 14 23:46   still logged in
reboot      ~                    Wed Aug 14 23:45
shutdown    ~                    Wed Aug 14 23:31
julieadams  ttys000                  Wed Aug 14 22:29 - 22:29  (00:00)
julieadams  console                  Wed Aug 14 22:29 - 23:31  (01:01)
reboot      ~                    Wed Aug 14 22:29
julieadams  ttys000                  Wed Aug 14 17:06 - crash  (05:23)
julieadams  console                  Wed Aug 14 17:06 - crash  (05:23)
reboot      ~                    Wed Aug 14 17:05
julieadams  ttys000                  Wed Aug 14 16:28 - crash  (00:37)
julieadams  console                  Wed Aug 14 13:15 - crash  (03:50)
reboot      ~                    Wed Aug 14 13:15
julieadams  console                  Wed Aug 14 08:57 - crash  (04:17)
reboot      ~                    Wed Aug 14 08:57
julieadams  console                  Tue Aug 13 19:05 - crash  (13:51)
reboot      ~                    Tue Aug 13 19:05
julieadams  console                  Tue Aug 13 17:29 - crash  (01:36)
reboot      ~                    Tue Aug 13 17:28
julieadams  console                  Tue Aug 13 11:54 - crash  (05:34)
reboot      ~                    Tue Aug 13 11:54
julieadams  console                  Tue Aug 13 10:02 - crash  (01:52)
reboot      ~                    Tue Aug 13 10:02
julieadams  console                  Mon Aug 12 23:53 - crash  (10:08)
reboot      ~                    Mon Aug 12 23:53
julieadams  console                  Mon Aug 12 19:41 - crash  (04:11)
reboot      ~                    Mon Aug 12 19:41
julieadams  ttys000                  Mon Aug 12 19:30 - 19:30  (00:00)
julieadams  console                  Mon Aug 12 19:19 - crash  (00:21)
reboot      ~                    Mon Aug 12 19:19
julieadams  console                  Mon Aug 12 18:46 - crash  (00:32)
reboot      ~                    Mon Aug 12 18:46
julieadams  console                  Mon Aug 12 18:32 - crash  (00:14)
reboot      ~                    Mon Aug 12 18:31
julieadams  console                  Mon Aug 12 14:25 - crash  (04:06)
reboot      ~                    Mon Aug 12 14:24
julieadams  console                  Mon Aug 12 13:13 - crash  (01:11)
reboot      ~                    Mon Aug 12 13:13
julieadams  console                  Sun Aug 11 19:29 - crash  (17:44)
reboot      ~                    Sun Aug 11 19:28
julieadams  console                  Sun Aug 11 16:00 - crash  (03:28)
reboot      ~                    Sun Aug 11 16:00
julieadams  console                  Sat Aug 10 21:22 - crash  (18:37)
```

326.   The next morning, Curtis logged into her computer at 6:40 a.m.

327.   When Curtis logged into her MAC2 computer, the first screen that popped up showed that the "Audio Devices" settings were open.

328.    Below is a screen shot from Curtis' MAC2 computer.



329.    This was especially alarming to Curtis because she knew that she closed out of all applications before she went to bed. What else was especially mortifying to her was that the word "audio" was in the name of this setting. The first thing that crossed her mind was whether this meant "listening" and could this mean that Defendants were listening to her.

330.    Curtis began researching what this setting was used for and discovered that it could be used with allowing her computer to dictate what was spoken into the computer or what was showing on the computer screen.

331.    Next, Curtis looked at the "Recent Items" that had been opened on her computer and the last applications opened were Audio MIDI Setup.app, Digital Color Meter.app, Disk Utility.app, Keychain Access.app, Microsoft Error Reporting.app, Safari.app, System Preferences.com, Terminal.app, and VoiceOver Utility.app.

332.  Below is a screen shot from Curtis' MAC2 computer.



333.  Curtis began researching all of these applications on her computer. She kept taking screen shots of what she discovered.

334.  The System Information.app was last opened at 12:14 a.m., after she went to bed.

335.  The Digital Color Meter.app showed it was opened at 12:14 a.m. after she went to bed.

336.  The Desk Utility.app was opened at 12:11 a.m. after she went to bed.

337.  The Audio MIDI Setup.app was last opened at 12:08 a.m. after she went to bed.

338.  The Keychain Access.app was opened at 12:03 a.m. after she went to bed.

339.  The Terminal.app showed opened at 11:47 a.m. which made sense to Curtis because she knew she opened this application right before she went to bed.

340.    The Voice Over Utility.app was opened at 11:49 a.m. after she went to bed.

341.    What all this meant was unknown to Curtis until very recently.

342.    Upon understanding and belief, it became too expensive for Defendants to hire out someone or too time consuming for Defendants to continually spy on Curtis waiting for her to do something interesting in front of her computer or for her to have an interesting conversation around her computer with her son, ex-husband, brother, mom or dad, lawyers, or friends.

343.    Therefore, Defendants changed settings on her MAC2 computer to get the information they wanted in a different way. Defendants changed the settings on Curtis' MAC2 computer so that every word spoken in front of her MAC2 computer would be typed out for Defendants to read at a later time and for everything on her screen to be typed out for Defendants to read at a later time.

344.    Curtis discovered the Preferences folder in the hidden "bodiecurtis" library on her computer that not only was the Voice Over Utility application opened on her computer, but Defendants enabled the trackpad and set the default preference for the audio output selection device to be in "braille" mode.

345.    Below is a screen shot from Curtis' MAC2 computer.



346.    Defendants then changed the System Preference settings for the display on her computer to default to "Airplay." This allows for videos to be shared and is a way to mirror your entire computer screen. Another plist file shows that Defendants created a cache to "show braille verbosity detail."

347.    Below is a screen shot from Curtis' MAC2 computer.



348.    Later that morning, on August 15, 2019 at 7:11 a.m., a change was made to a plist file created at 12:08 a.m. that same morning to change the order of the windows on Curtis' MAC2 computer.

349.   Below is a screen shot from Curtis' MAC2 computer.



350.   The lazy and cheap man's spying mechanism was now in place to continue Defendants' violation into Curtis' entire personal life. Her company was now theirs, and so was the only thing she thought she had left that belonged to her – her privacy – but that was gone now, too. Defendants left her penniless and completely exposed – everything she had worked so hard to accomplish in her life and with Pakems was no longer hers – Defendants destroyed Pakems and Curtis' private life became something for them to listen to, then judge, pick apart, discuss and spit out.

351.   On August 29, 2019, Curtis discovered another outrageous thing that Defendants had done to her. When she turned on her MAC1 computer, she saw a window indicating that the computer had been copied via Passport for Mac sixty-six days prior. This was perplexing to her since this was her older Macintosh computer and she did not have a reason to save it, nor did she save it.

352.    Sixty-six days prior to when Curtis saw this on her MAC1 computer was June 23, 2019, **the day before she was fired**.

353.    Below is a screen shot from Curtis' MAC1 computer.



354.    Unfortunately for Curtis, Defendants remotely saved a copy of Curtis' MAC1 computer using Passport for Mac. Seven (7) years of her personal life were stolen with the click of a single computer button and was now in the uncleans hands of the Defendants.

355.    Upon information and belief, Defendants would have preferred to have just copied the entire MAC2 computer, but unfortunately for them (upon information and belief), because of everything they had manipulated on that computer, there was not enough memory to copy it so they had to painstakingly go through individual files to view them, copy them, and send them.

356.    After Curtis was terminated, not only did Defendants gain unauthorized access to Attorney/Client Privileged documents, Defendants gained unauthorized access to, at least, Attorney/Client Privileged emails, screen shots of her investigation into unauthorized accessing her personal computers and personal accounts, YouTube videos she had watched, Google searches she had done, downloads of her personal financial

information, photos and videos from her iPhone that were taken after she was terminated, and additional email accounts she created after she was terminated.

**F.    Defendants' Unlawfully Accessed Curtis' Personal Accounts Before the Deal with Chasefield Capital Was Done, While She Was CEO of Pakems, and After She was Fired**

357.   Upon information and belief, an individual believed to be one or more of the Defendants, guessed passwords for Curtis' personal accounts, guessed the password to access the Keeper Security application that had her personal passwords, accessed the notes in the Notes application on her personal iPhone that Everson reconfigured to send to julieadamscurtis@yahoo.com that contained personal passwords, obtained passwords by monitoring her email account and text messages on her iPhone, passed along passwords that were given for other legitimate business reasons, exceeded their authority when they used passwords that were given for legitimate business reasons, and/or exceeded authorization when they accessed Pakems accounts, in order to access Curtis' personal accounts.

**1.    Defendants' Unlawfully Access Curtis' Personal Account Prior to Chasefield Capital's Purchase of Pakems Inc.**

358.   Upon information and belief, Pine guessed the password and accessed the julieadams@pakems.com email account hosted by GoDaddy, including Attorney/Client Privileged communications and other investment offers that were being considered by Curtis, prior to October 26, 2018, to gain an unfair negotiation advantage in regard to Curtis' employment and the sale of Pakems.

359.   An individual believed to be one or more of the Defendants, without Curtis' authorization or knowledge, attempted to sign in and use Curtis' password for the

personal email account julieadamscurtis@gmail.com on September 16, 2018 at 9:38 p.m., September 19, 2018 at 7:28 a.m., and September 19, 2018 at 6:53 p.m.

360.   Below is a screen shot from Curtis' MAC2 computer.



361.   Curtis had forgotten that this account was ever created as it had been created in 2008 and Curtis never sent emails from this account. The recovery email for this account is julieadamscurtis@yahoo.com so an email had been sent to this account when the original julieadamscurtis@gmail.com had been set up.

**2.   Defendants' Unlawfully Access Curtis' Personal Account While She Was Employed As CEO of Pakems**

362.   On December 4, 2018, an individual believed to be one of the Defendants, without Curtis' authorization or knowledge, accessed Curtis' personal Facebook account and changed the primary email for Facebook notifications to julieadams@pakems.com so the notifications went to an email account Defendants were monitoring.

363.    Below is a screen shot from Curtis' MAC2 computer.



364.    On December 17, 2018, Jordan Pine provided the GoDaddy account password to Everson so that he could fix an issue with contact@pakems.com and support@pakems.com. Unfortunately, the password was used to do a lot more than repair the issue with these two email accounts.

365.    On December 17, 2018, at 2:17 p.m., the julieadams@pakems.com email account was accessed, without Curtis' authorization or knowledge, and the DNS settings were changed so that Curtis' entire email account which contained over 113,482 emails dating back to 2013, including thousands of personal emails and Attorney/Client privileged emails, were downloaded to Chasefield Capital's Microsoft 365 account with the IP address 104.47.40.36. Thousands of personal emails were opened and read by one or more of the Defendants.

366.   Below is a screen shot from Curtis' MAC2 computer.



367.   However, the other GoDaddy email accounts support@pakems.com, contact@pakems.com, info@pakems.com, and jackadams@pakems.com were not downloaded to Chasefield Capital's Microsoft 365 account.

368.   One or more of the Defendants began monitoring the email account julieadams@pakems.com and read emails. Within the Chasefield Capital OneDrive folder that Curtis discovered on her computer, there are several attachments to emails that Curtis sent or received, however, these emails were not sent to anyone at Chasefield Capital. Thus, the only way they would have downloaded these attachments and then uploaded them to the Chasefield Capital OneDrive is from reading all of the Curtis' emails and giving themselves access to various attachments.

369.   On February 5, 2019, February 22, and March 23, 2019, one or more of the Defendants, without Curtis' authorization or knowledge, changed the password to Curtis' personal email account julieadamspakems@gmail.com to gain access to and intercept emails in this email account.

370.    Below is a screen shot from Curtis' MAC2 computer.



371.    After Defendants changed the email account password on February 5, 2019, Curtis sent a text message to Angela Miles stating "My password was changed 3 days ago – weird.  I'm getting emails now. I got it.  Thanks."

372.    After Defendants again changed the password on March 23, 2019, an email sent to this account stated that the new sign-in was from Microsoft Edge on Windows. Curtis did not own a device that was on a Windows platform. Whenever Curtis was forced to change the email account password because Defendants changed the password to the account and her password no longer worked, one or more of the Defendants would go into the account and change it to a password only they knew in order to continue accessing and intercepting emails in that account.

373.   On or about February 11, 2019, one of the Defendants, without Curtis' authorization or knowledge, changed the IMAP settings in the julieadamspakems@gmail.com personal Gmail account so that new sent and received emails would go to Defendant's Microsoft 365 Outlook account and be intercepted.

374.   Below is a screen shot from Curtis' MAC2 computer.



375.   On or about February 11, 2019, one of the Defendants, without Curtis' authorization or knowledge, changed the password and settings to the jadams@apresgear.com personal Gmail account. Defendants also changed the POP settings so that all of the emails in that account since November 15, 2012 were downloaded to Defendant's Microsoft 365 Outlook account. Defendant also changed the IMAP settings so that any new emails sent or received would be intercepted. The change to the IMAP settings prevented emails from going into the jadams@apresgear.com email account from February 11, 2019 through August 1, 2019. This means that Defendants intercepted Curtis' emails from June 25, 2019 through August 1, 2019, which was after

Curtis' termination. There are 20,954 emails in that account, including thousands of personal emails.

376.    One of the Defendants, without Curtis' authorization or knowledge, accessed her jadams@apresgear.com Gmail account, went to the Contacts tab, selected the contact information for Curtis, and added the nickname "Stupid" to her contact.

377.    Below is a screen shot from Curtis' MAC2 computer.



378.    This is why Curtis' name on sent emails from julieadamscurtis@yahoo.com changed from her name to Stupid on her iPhone.

379.    Defendants have tried to go to great lengths in an effort to hide the identity of those that accessed her personal Google accounts, personal Facebook account, her personal Yahoo account and her computers. There are several log ins from Comcast and Verizon accounts (neither one is a provider used by Curtis) and several other providers, such as University Corporation Atmospheric Research, Micfo, Denver Cloud Network, Global Telehost, and Internet Systems Consortium.  Further, several IP address locations are in Greenwood Village, Boulder, Broomfield, Westminster and Littleton.  Subpoenas

that will be issued will identify the information necessary to reveal the identity of those that hacked into Curtis' personal accounts and into her computers.

380.    There are several IP addresses that have logged into the email account julieadamscurtis@yahoo.com that do not appear to be from Curtis' residence and are showing in her email account as suspicious logins. During the time period in question, there were hundreds of thousands of emails in this account.

381.    Below is a screen shot from Curtis' MAC2 computer.



### 3.    Defendants' Unlawfully Access Curtis' Personal Account After She Was Terminated

382.    On July 13, 2019, at 12:01 p.m., Curtis received an "AppleID verification" notification on her iPhone that requested that she enter her AppleID so that her iCloud or iTunes account could be accessed. Curtis had been on a run so this was not her trying to access either her iCloud or iTunes accounts.

383.    On September 19, 2019, at 2:30 p.m., Curtis was preparing for a job interview when she received an email that a password reset was requested and a request to recover her julieadamspakems@gmail.com personal email account. This was extremely upsetting to Curtis that they were still trying to access her personal accounts

and was a major distraction right before a very important job interview with a large Denver law firm.  Curtis did not get the job.

384.    On October 24, 2019, Curtis was on a business trip after finally procuring employment.  She was alarmed when she got a notification on her cell phone stating "Did you ask Google to recover access for julieadamspakems1@gmail.com.

385.    Below is a screen shot from Curtis' personal iPhone.



386.    By this point, she had a new iPhone because of what she discovered was occurring and she feared Defendants could still access everything that was on that cell phone. But Curtis needed something off of her old iPhone so she turned it on. She was able to access this email and discovered that at 8:11 a.m. on October 24, 2019, Defendants attempted to change the password and recover the personal email account julieadamspakems1@gmail.com.

387.   Below is a screen shot from Curtis' MAC2 computer.



388.   There was an email sent to julieadams@pakems.com in 2013 that was in her GoDaddy account and subsequently downloaded to Chasefield Capital's Microsoft 365 account stating that this email account was created. Curtis had forgotten that this account was ever created.

389.   Below is a screen shot from Curtis' computer.



390.   One of the Defendants, without Curtis' authorization or knowledge, accessed Curtis' personal iCloud account and connected their device to this account.

391.   Below is a screen shot from Curtis' MAC2 computer.



392.   On December 19, 2019, almost six (6) months after Curtis was terminated, she discovered that a suspicious device was connected to her iCloud account. She locked the device and provided a phone number for the owner of the devise to call.  Later that day, a telephone call was received from a blocked telephone number, but the caller immediately hung up. Upon information and belief, one or more of the Defendants were linked to her iCloud account after she was terminated and had access to personal documents, photos, and videos that were created or taken after she was terminated.

393.   On January 4, 2020, Defendants used the Internet Service Provider Internet Systems Consortium to hack into Curtis' personal email account julieadamscurtis@yahoo.com.

394.   While Defendants were in her account, they researched how to remove unusual activity in her Yahoo account as recorded in a Yahoo log entry "/kb/account/find-remove-unusual-activity-yahoo-account-sln2073.html".

395.    Below is a screen shot from Curtis' MAC2 computer.

```
"page_uri": "/kb/account/find-remove-unusual-activity-yahoo-account-sln2073.html",
"user_device_info#device_type": "desktop",
"ip_address": "199.88.135.211",
"ip_geo_info#zip": "80209",
"dt": "20200114",
"browser_name": "google chrome",
"page_domain": "help.yahoo.com",
"ip_geo_info#state": "colorado",
"user_device_info#make": "Virtual",
"referrer_domain": "help.yahoo.com",
"is_logged_in": "true",
"ip_geo_info#city": "denver",
"user_privacy_info#dnt": "!",
"logged_event_timestamp": "1579020977358",
"browser_version": "79",
"user_device_info#model": "Desktop Browser",
"event": "link",
"ip_geo_info#country": "us",
"user_agent": "Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/79.0.3945.88 Safari/537.36"
```

396.    Defendants received a Preservation of Evidence letter immediately after they fired Curtis. Therefore, Defendants' egregious spoliation of evidence in Curtis' own personal account, in an effort to hide their unlawful behavior after they were under a legal obligation not to destroy evidence, is problematic to Defendants' and their potential available defense of this litigation.  Curtis will request a spoliation of evidence instruction to the jury at the time of trial.

397.    Almost eight (8) months after Curtis was terminated, on February 28, 2020, she was with her friends in Steamboat Springs, Colorado when she received a notification on her new cell phone with a security code for her personal PayPal account.

398.   Below is a screen shot from Curtis' personal iPhone.



399.   A couple days later, on March 2, 2020, she received a notification on her old cell phone with a security code for her personal PayPal account.

400.   Below is a screen shot from Curtis' personal iPhone.



401.   Curtis tried to recreate how this occurred. In order for PayPal to send this notification, Defendant needed to input both of her cellular telephone numbers into the PayPal website. Thus, Defendants were attempting to hack into her personal PayPal accounts. This was extremely upsetting to Curtis that they were continuing to stalk her through every means they could think of.

402.    Plaintiff's personal accounts Facebook, iCloud, Keeper Security, PayPal, Skype, and WhatsApp that were accessed by one or more Defendants will be referred to as "Personal Accounts."

403.    Plaintiff's email accounts julieadamscurtis@yahoo.com hosted by Yahoo, jadams@apresgear.com hosted by Google, julieadamspakems@gmail.com hosted by Google, julieadamspakems1@gmail.com hosted by Google, julieadamscurtis@gmail.com hosted by Google, julieadams@pakems.com hosted by GoDaddy and Microsoft, and Julie.adams7@iclod.com hosted by Apple, that were accessed, attempts made to access, and or downloaded by one or more of the Defendants, will be referred to as "Email Accounts."

404.    All of the conduct related to her personal computers, personal cell phone, accessing her Personal Accounts, accessing, downloading and monitoring her Email Accounts, attempts to access her Personal Accounts and Email Accounts will be referred to as "Computer-Related Conduct."

## G.    Financial Impact of the Unlawful Computer Activities and Access to Curtis' Personal Accounts

405.    After Plaintiff was fired, she spent several months and thousands of hours investigating and is continuing to investigate the Computer-Related Conduct, including but not limited to looking at her personal computers and iPhone, taking screen shots on all of her devices, talking to customer service departments at various companies where her accounts reside, hiring a computer expert, talking to individuals in law enforcement, talking to lawyers, writing Preservation of Evidence letters to the various companies, changing all of the passwords to all of her accounts, purchasing paper, purchasing printer

ink, etc. This resulted in significant lost wages and costs, and costs that Curtis is still incurring.

406.    Plaintiff was forced to borrow computers and from various people and buy a used laptop because her computers were still being accessed and she can no longer use her MAC1 and MAC2 computers because they can still be accessed by Defendants. The camera light on her MAC2 computer no longer comes on when an application is using the camera.  This is something that the Defendants turned off so that Curtis would not know she was being stalked.  One night the camera light on her MAC2 came on suddenly and then went off.  This must have been the time when they disabled the light.

407.    Plaintiff was forced to buy a new iPhone and get a new cell phone number after 22 years of having the same number.

408.    These costs are well over $5,000.

## H.    Chasefield Capital Treated Lever Up and Pakems As Parts of Chasefield Capital and Not As Separate Companies

409.    Chasefield Capital employees had carte blanch access to Pakems' bank account and could write checks without approval. They wrote themselves checks, hired vendors such as Pine's nephew who was a lawyer and accountants, and paid them, all without approval from Curtis, van Woudenberg, or Matthews.

410.    Funds were frequently transferred between Chasefield Capital's, Lever Up's, and Pakems' bank accounts.

411.    Despite Pine's assertions in a budget he created and presented to Curtis and van Woudenberg that Chasefield Capital's management fees during a three (3) month period would be $1,250, Chasefield Capital created an invoice and immediately

transferred funds to the Chasefield Capital bank account, without approval, for $9,000 for three (3) months of Chasefield Capital management services.

412.    Chasefield Capital's IT contractor was hired by Chasefield Capital to put spyware on Curtis' personal computers and paid by Chasefield Capital out of Pakems bank account, and then later paid directly by Chasefield Capital.

413.    Chasefield Capital was not made to pay Pakems back when Curtis uncovered the fact that it owed Pakems approximately $9,000.

414.    At her termination meeting, she was given an Option Agreement whereby she learned that van Woudenberg had an additional 304 shares of common stock related to his additional investment. At that time, Curtis was on the Board of Directors, however, there was not a board meeting held to vote on the granting of the additional shares.

415.    Chasefield Capital owned the Chasefield Capital computers used to access Curtis' computers, the Microsoft 365 account, and upon information and belief, paid for the BlueJeans account that was used to commit the Computer-Related Conduct against Curtis.

416.    Chasefield Capital employees were either the individuals involved with the Computer-Related conduct or directed it to be done, including the most egregious conduct of using TeamViewer to spy on her, downloading BlueJeans to her personal computer so that they could watch her and listen to her in her own residence, configuring her Skype to do the same and then changing the settings on her computer to type what she said and what was on her computer.

417.    Pakems was inadequately capitalized.

418.    On March 21, 2019, Pine sent an email to Everson stating,

*"Hi Seth – please disconnect Chasefield internal drives and separate Pakems as its own entity as of 4.15.2019. Contact Julie as to how she wants to handle IT she may choose someone else or no one."*

419.   This shows that Chasefield Capital and Pakems were considered as one entity and Chasefield Capital, as well as Chasefield Real Estate, LLC, van Woudenberg and Pine, was an alter ego of Pakems. This disconnection never occurred.

## VI.  CLAIMS FOR RELIEF

### CLAIM I
### (Violation of the Stored Communications Act (SCA) (18 U.S.C. § 2701)

420.   Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 419 of this Complaint as though fully incorporated herein.

421.   Defendants intentionally and knowingly accessed Plaintiff's password protected Email Accounts and Personal Accounts that were on servers owned by Google, GoDaddy, Microsoft, Yahoo, Apple, Facebook, WhatsApp, and two personal computers which are facilities through which electronic communication services are provided.

422.   By accessing the various facilities, without authorization or in excess of authorization by Curtis, Defendants obtained, altered, and/or transferred a wire or electronic communications while in electronic storage, including but not limited to, reading personal and Attorney/Client emails, viewing personal photos, viewing personal videos, viewing personal documents, reading iMessages, viewing posts and messages in Facebook, transferring and directing emails to be downloaded so that they could be read in violation of the provisions of 18 U.S.C. § 2701.

423.   Curtis has been seriously damaged as a direct and proximate cause of the Defendants' unauthorized access or access in excess of authorization in the Email Accounts and Personal Accounts in violation of the provisions of 18 U.S.C. § 2701.

424.   Through Defendants' actions set forth above, Plaintiff suffered actual damages in an amount to be determined at trial, which includes, but is not limited to, an unfair advantage in the negotiation of the purchase of Pakems and the contracts related to the employment of Curtis, loss of Attorney/Client confidentiality in the negotiation of Pakems and in this pending litigation, the contracts relating to the employment of Curtis, a factor in the hostile work environment that Curtis was subjected to and the decision to terminate her employment, and the thousands of hours spent investigating the unauthorized access into Plaintiff's Personal Accounts and Email Accounts.

425.   Through Defendants' actions set forth above, Plaintiff is also entitled to statutory damages pursuant to 18 U.S.C. § 2707 of $1,000 for every email, document, photo and video accessed; punitive damages; reasonable attorneys' fees and costs; and all such other and further relief as the court may deem just and equitable.


**CLAIM II**

**(Violation of the Federal Wiretap Act (FWA) 18 U.S.C. § 2511 and § 18 U.S.C. § 2520)**

426.   Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 425 of this Complaint as though fully incorporated herein.

427.   Through Defendants' actions set forth above, Defendants knowingly, purposefully and intentionally participated in, directed, and were aware of the actions taken for the purpose of intercepting, endeavoring to intercept, or procured another person to intercept or endeavor to intercept wire, oral, or electronic communications, at the time of transmission in violation of the provisions of 18 U.S.C. § 2511, including, but not limited to, intercepting emails sent to and from julieadams@pakems.com,

jadams@apresgear.com, julieadamspakems@gmail.com and julieadamscurtis@yahoo.com, intercepting iMessages on Curtis' MAC2 computer, intercepting photos, videos, and documents that were sent to Curtis' Apple iCloud account and intercepting photos, videos, and text messages that were on Curtis' personal iPhone.

428.   Through Defendants' actions set forth above, Defendants knowingly, purposefully and intentionally participated in, directed, and were aware of the actions taken for the purpose of intercepting, endeavoring to intercept, or procured another person to intercept or endeavor to intercept wire, oral, or electronic communications, in violation of the provisions of 18 U.S.C. § 2511, including, but not limited to, by using Curtis' computers and the software thereon, as eavesdropping devices to intercept, and/or retain recordings of  Curtis, via the camera, microphone and speakers on Curtis' computer, to watch  Curtis and listen to Curtis while in her personal residence and in her bedroom likely capturing Curtis nude and/or during private intimate moments.

429.   Through Defendants' actions set forth above, Defendants intentionally disclosed, or endeavored to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of the provisions of 18 U.S.C. § 2511.

430.   Through Defendants' actions set forth above, Defendants intentionally used, or endeavored to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of the provisions of 18 U.S.C. § 2511.

431.    Curtis has been seriously damaged as a direct and proximate cause of the Defendants' actions set forth above that violate the FWA.

432.    Through Defendants' actions set forth above, Plaintiff suffered actual damages in an amount to be determined at trial, which includes, but is not limited to loss of Attorney/Client confidentiality in the this pending litigation, a factor in the hostile work environment that Curtis was subjected to and the decision to terminate her employment, and the thousands of hours spent investigating the interception that occurred.

433.    Through Defendants' actions set forth above, Plaintiff is also entitled to statutory damages pursuant to 18 U.S.C. § 2520; punitive damages due to the willful and wanton, reckless and malicious misconduct of Defendants; reasonable attorneys' fees and costs; and all such other and further relief as the court may deem just and equitable.

### CLAIM III
### (Violation of the Computer Fraud and Abuse Act (CFAA) (18 U.S.C. § 1030)

434.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 433 of this Complaint as though fully incorporated herein.

435.    Curtis' computers and iPhone are protected computers as that term is defined in the CFAA.

436.    Through Defendants' actions set forth above, Defendants knowingly and intentionally conspired to access Plaintiff's personal computers and synchronize her personal iPhone to her MAC1 and/or MAC2 computers without authorization or exceeding authorization, and obtained information from these devices and knowingly caused the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caused damage without Plaintiff's authorization to her computers

and personal iPhone, and intentionally accessed her computers and personal iPhone without her authorization, in violation of the provisions of 18 U.S.C. § 1030, and as a result of such conduct, caused damage and loss or recklessly caused damage well in excess of $5,000 over the year prior to the filing of this complaint.

437.   The remote hack into Curtis' computers in violation of the provisions of 18 U.S.C. § 1030, allowed the Defendants to obtain information they were not entitled to, including, but not limited to, very personal and sensitive information, by watching her through the camera on her computer in her own residence in her bedroom likely capturing Curtis nude and/or during private intimate moments, listening to her conversations through the microphone on her computer in her own residence, configuring her computer to type what was said around her computer or on the computer screen, accessing her iMessages on her MAC2 computer, accessing her WhatsApp and Skype accounts, accessing her text messages on her personal iPhone, and gaining access to Curtis' Apple iCloud account that contained personal documents and photos and videos that were on Curtis' personal iPhone.

438.   Curtis has been seriously damaged as a direct and proximate cause of the Defendants' actions set forth above that violate the CFAA.

439.   Through Defendants' actions set forth above, Plaintiff suffered actual damages in an amount to be determined at trial, which includes, but is not limited to loss of Attorney/Client confidentiality in the this pending litigation, a factor in the hostile work environment that Curtis was subjected to and the decision to terminate her employment, and the thousands of hours spent investigating the interception that occurred.

440.    Through Defendants' actions set forth above, Plaintiff is also entitled to compensatory damages; reasonable attorneys' fees and costs; and all such other and further relief as the court may deem just and equitable.

## CLAIM IV
### (Invasion of Privacy – Intrusion Upon Seclusion)

441.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 -440 of this Complaint as though fully incorporated herein.

442.    Plaintiff had a justifiable expectation of privacy of what occurred in her own residence and expected that she was not being watched and listened to in her own residence and in her bedroom, during all hours of the night and day, likely capturing Curtis nude and/or during private intimate moments.

443.    Plaintiff had a justifiable expectation of privacy of the content in:

(a)    her Email Accounts, especially when Everson emphasized that the email account julieadams@pakems.com was password protected,

(b)    her iCloud account that contains photos and videos from her cell phone,

(c)    the personal documents, photos, and videos on her personal MAC1 and MAC2 computers,

(d)    documents on her personal iPhone,

(e)    texts on her personal cell phone, including personal information in the Notes application,

(f)    her Internet searches, and

(g)    messages that were sent via WhatsApp and Skype.

444.    Through Defendants' actions set forth above, Defendants knowingly and intentionally conspired to intrude upon Plaintiff's solitude and her private affairs.

445.    The intrusions by Defendants were and are substantial and of the kind that would be highly offensive to the ordinary reasonable person and the intrusions were and are extremely offensive to Plaintiff.

446.    Plaintiff did not consent to the intrusions and did not have knowledge at the time of what Defendants were doing to her.

447.    Whatever purpose Defendants had for invading her privacy was unwarranted and continued after she was fired.

448.    It was foreseeable that the intrusions could result in severe and permanent emotional distress, embarrassment, personal humiliation, mental anguish and suffering, physical suffering, loss of income, loss of security, and impairment to the Plaintiff's reputation.

449.    As a direct and proximate result of the intrusion of seclusion and invasion of privacy by Defendants van Woudenberg, Pine, Matthews, Everson, Beiers, Jordan Pine, and John Does 1 – 10, Curtis has suffered and continues to suffer from, including but not limited to, extreme and permanent emotional distress, mental anguish, harm to her interest in privacy, harm to her interest in security, impairment of the quality of life, embarrassment, personal humiliation, mental anguish and suffering, physical suffering, loss of income, and impairment to the Plaintiff's reputation and is entitled to appropriate actual and compensatory damages.

450.    The actions of the Defendants were malicious and intentional and thus, Curtis is entitled to recover punitive damages.

**CLAIM V**
**(Unlawful Discrimination Based on Sex in Violation of the Colorado Anti-Discrimination Act ("CADA", C.R.S. § 24-34-402, *et seq*.)**

451.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 450 of this Complaint as though fully incorporated herein.

452.    Plaintiff was an employee pursuant to Colorado Civil Rights Commission Rule 10.2(N)(4) since she was subject to the company's direction and control.

453.    Lever Up and Pakems are employers pursuant to CADA.

454.    CADA prohibits discrimination based on sex.

455.    Pine's and van Woudenberg's conduct includes, but is not limited to, Pine frequently stating that Curtis was not fit to be a CEO, frequent threats and demands that Curtis should be fired, Pine lied to Curtis and about her, Pine taunted  Curtis with statements regarding the fact he was actually watching her and listening to her through her computer, Pine used profanity towards Curtis, Pine threatened Curtis about complaining about him to van Woudenberg, Pine sabotaged Curtis' work, Pine yelled and screamed at Curtis that she was on thin ice, Pine yelled and screamed at Curtis that she needed to watch her back which was a physical threat meant to intimidate her, Pine told Curtis to stop playing stupid, Pine told Curtis that she was just one of those girls that lies in bad at night and makes things up, van Woudenberg constantly telling Curtis that Pine wanted her to fail, van Woudenberg constantly telling Curtis that he was going to meet with Pine after their meetings, van Woudenberg demanded that Curtis spend her time finding a new partner because of Pine's treatment of her, and van Woudenberg and/or Pine directing another Defendant to add the nickname "Stupid" in her contact in her personal Gmail account.

456. Upon information and belief, van Woudenberg is an investor in four (4) companies.

457. Upon information and belief, Defendants did not spy on any of the male CEOs of the other four (4) companies, watch them in their bedrooms or listen to all of their conversations they had in their personal residences.

458. Based on the above-described acts, practices and omissions, the Defendants Lever Up and Pakems engaged in unlawful discrimination under CADA based on Plaintiff's sex (female).

459. Defendants Lever Up and Pakems willful and intentional actions against Curtis, because of her gender, were frequently severe, pervasive, and physically threatening and altered the terms and conditions of Curtis' employment, unreasonably interfered with her work performance and created an abusive and hostile working environment.

460. Defendants Lever Up and Pakems conduct was sufficiently severe and pervasive that a reasonable person in Curtis' position would find the work environment to be hostile and abusive.

461. At the time of the above described conduct, and as a result of such conduct, Curtis believed that her work environment was hostile and abusive.

462. Van Woudenberg was witness to the abusive behavior and Curtis complained to van Woudenberg about Pine and he failed to take prompt, remedial action to stop the conduct.

463. Curtis was treated different than all other males which was noted by Beiers when she stated that Pine's conduct towards Curtis was bizarre, van Woudenberg stated

that he had never seen him treat anyone the way he was treating her, Ms. Miles stating that Pine's behavior towards Curtis was abusive, and Ms. Childers' statement that Pine's abusive behavior towards her was so alarming that he appeared to be unstable.

464.    Curtis suffered adverse employment actions.

465.    Lever Up and Pakems conduct amounts to actionable discrimination by not only subjecting her to sufficiently severe or pervasive harassment based on her sex, but also failing to act to end the harassment.

466.    Pine's conduct amounts to actionable sexual harassment in violation of CADA.

467.    Curtis was treated differently than other similarly situated males in that other males were not subject to the abusive conduct and she was replaced by a male that negatively impacted the financial condition of the company, failed to grow the business, and failed to obtain potential sales opportunities and was not terminated.

468.    In unlawfully discriminating against Curtis, Defendants Lever Up and Pakems acted willfully, wantonly and/or with malice or with conscious and/or reckless indifference to her equal rights under the law, thereby necessitating the imposition of exemplary damages.

469.    As a direct and proximate result of Defendants Lever Up and Pakems action, Curtis has suffered damages, including lost wages and benefits, severe and permanent emotional and physical pain and suffering, hospital expenses, and embarrassment and she is entitled to general and special damages, and economic damages including front and back pay.  Curtis is also entitled to and seeks her attorneys' fees and costs as permitted by law.

## CLAIM VI
### (Aiding & Abetting a Sexually Hostile Work Environment in Violation of the Colorado Anti-Discrimination Act, C.R.S. § 24-34-401, *et seq.*)

470.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 469 of this Complaint as though fully incorporated herein.

471.    Defendant Pine engaged in acts defined by CADA to be a discriminatory or unfair employment practices, specifically, a sexually hostile work environment.

472.    Defendant van Woudenberg aided, abetted, incited, or compelled Defendant Pine to engage in those acts by failing to prevent or correct the sexually hostile work environment.

473.    Defendants Jordan Pine, Beiers, and Everson aided, abetted, incited, or compelled Defendant Pine to create a hostile work environment by providing passwords, access to her computer and personal accounts, including watching her and listening to her.

474.    Because Defendants van Woudenberg, Jordan Pine, Beiers and Everson aided, abetted, incited, or compelled Defendant Pine to engage in acts defined by CADA to be a discriminatory or unfair employment practices, Curtis suffered damages.

## CLAIM VII
### (Unlawful Discrimination Based on Disability in Violation of the Colorado Anti-Discrimination Act ("CADA"), C.R.S. § 24-34-402, et seq.)

475.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 474 of this Complaint as though fully incorporated herein.

476.    Plaintiff was regarded as having a mental disability that substantially limited one or more major life activities.

477.    Plaintiff was qualified for her position.

478. On June 4, 2019, Plaintiff told van Woudenberg and Matthews that she had been in the hospital because she was having heart attack symptoms that were caused by stress. This was prior to a meeting regarding finding a new investor.

479. Shortly thereafter, Curtis was told by van Woudenberg that "it was in the company's best interest to terminate her employment because of her health issues."

480. Curtis was terminated because of her disability or perceived disability.

481. On several occasions, Curtis asked for an accommodation in the form of asking permission to engage experienced individuals to offer advice, guidance and assistance.

482. Curtis' accommodation requests were denied.

483. The above set forth conduct amounts to unlawful disability discrimination in violation of CADA.

484. As a direct and proximate result of Defendants Lever Up and Pakems actions, Curtis suffered damages.

## CLAIM VIII
### (Retaliation in Violation of the Colorado Anti-Discrimination Act, C.R.S. § 24-34-401, et seq.)

485. Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 484 of this Complaint as though fully incorporated herein.

486. Curtis was threatened that if she complained to van Woudenberg about Pine's behavior towards her it wouldn't end well for her just like the last person that had complained about his conduct.

487.    Plaintiff engaged in statutorily protected activity when she opposed and reported the unlawful and discriminatory practices under CADA by complaining about the hostile work environment to van Woudenberg.

488.    Defendants van Woudenberg and Pine subjected Curtis to less favorable terms, conditions and privileges of employment immediately after she complained of the harassment, she was told she needed to now spend her time finding a new more suitable partner and she was subjected to further abusive conduct.

489.    Defendants van Woudenberg and Pine unlawfully retaliated against Curtis in the terms and conditions of her employment and subjected her to further harassment because she engaged in the above-described statutorily-protected activities.

490.    Defendants van Woudenberg, Pine and Matthews retaliated against Curtis when they ultimately terminated her employment.

491.    As a direct and proximate result of Defendants van Woudenberg's, Matthew's and Pine's actions, Curtis has suffered damages.

492.    In unlawfully discriminating and retaliating against Curtis, Defendants Pine, van Woudenberg and Matthews acted willfully, wantonly, and/or with malice or with conscious and/or reckless indifference to Curtis' equal rights under law, thereby necessitating the imposition of exemplary damages.


**CLAIM IX**
**(Termination in Violation of Public Policy)**

493.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 492 of this Complaint as though fully incorporated herein.

494. Van Woudenberg directed Curtis to give up on trying to make sure that the 2018 taxes that were filed were correct stating that the small adjustments resulting from an expensive and time-consuming effort are just not worth it and are a major distraction from her sales efforts.

495. The direction to give up on trying to ensure that the 2018 taxes that were filed prohibited Curtis from performing a public duty or exercising an important job-related right or privilege.

496. The direction undermined a clearly expressed public policy of the professional ethics code that applied to her as a licensed attorney in the state of Colorado and her fiduciary duty to the company as the CEO of Pakems and the right or privilege as an employee.

497. The ethical obligation of not filing a false tax return is designed to serve the interests of the public.

498. Curtis pushed to hire another accountant to review the financial information that Pine gave her that Curtis knew was incorrect and was mistakenly accused of hiring her own accountant to investigate the taxes that were filed because of the information Pine relayed to van Woudenberg from an email message sent to Curtis' accountant from Curtis' personal email account..

499. One of the reasons Curtis was terminated was as a result of exercising the privilege of ensuring the tax returns filed were not false which she was entitled to do as an employee of Pakems and Lever Up.

500.   Curtis believed that directing her to give up on trying to ensure that the taxes filed were correct was against her ethical obligations as an attorney and fiduciary duty as a CEO.

501.   Van Woudenberg, Pine, and Matthews were aware or reasonably should have been aware that Curtis' refusal to comply with the directive was based on her reasonable belief that the directive was contrary to a clearly expressed duty as an attorney and CEO and violative of Curtis' legal right or privilege as an employee.

502.   As a proximate cause of Defendant van Woudenberg's, Pine's and Matthews' actions, Curtis suffered damages, including her salary and benefits, damages for emotional distress, physical pain and suffering, and punitive damages.


**CLAIM X**
**(Outrageous Conduct)**

503.   Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 502 of this Complaint as though fully incorporated herein.

504.   Defendants knowingly and intentionally engaged in extreme and outrageous conduct and/or they intended to cause severe mental suffering.

505.   The direct and proximate result of Defendants' actions caused Plaintiff severe permanent emotional distress. Defendants knowingly and intentionally engaged in extreme and outrageous conduct, and a pattern of conduct in that the infliction of severe mental suffering was calculated or recklessly or callously inflicted. Defendants conspired to access her personal computers, access her personal Email Accounts, and access her Personal Accounts.

506. Defendants, after Curtis was fired, continued accessing her personal computer, accessing her personal Email Accounts and attempted to access her personal email and personal accounts, and video her so that they could watch her and listen to her in her own residence, all of which invaded her most private secrets.

507. Defendants knowingly and intentionally engaged in extreme and outrageous conduct, and a pattern of conduct in that the infliction of severe mental suffering was calculated or recklessly or callously inflicted.

508. Defendants subjected Curtis to an extremely hostile and abusive working environment, discriminated against her, and made the decision to fire her as the founder of the company and someone who had all of her money tied up in the success of the company.

509. The above listed behavior is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

510. As a direct and proximate result of the above-stated extreme and outrageous conduct of Defendants van Woudenberg, Pine, Matthews, Everson, Beiers, Jordan Pine, and John Does 1 – 10, Plaintiff has suffered and continues to suffer damages, injuries, and losses, including but not limited to, severe and permanent psychological injury, including, but not limited to, emotional distress, mental anguish, pain and suffering, intimidation, humiliation, extreme anger and helplessness about stopping the violations into her private life that have continued for at least eight (8) months after her termination.

511.    Plaintiff is entitled to compensatory and punitive damages for the significant emotional harm caused.

## CLAIM XI
### (Breach of Duty of Loyalty)

512.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 511 of this Complaint as though fully incorporated herein.

513.    Defendant van Woudenberg, as a majority shareholder and director of Lever Up, owed a duty of loyalty to the minority shareholder and employee Curtis to act solely for the benefit of the company.

514.    As the director of Lever Up, Matthews owed the minority shareholder and employee Curtis a duty of loyalty to act solely for the benefit of the company.

515.    As the CEO, Secretary and Shareholder of Lever Up, Pine owed the minority shareholder and employee Curtis a duty of loyalty to act solely for the benefit of the company.

516.    Defendants van Woudenberg, Matthews and Pine violated their duty of loyalty they owed to Plaintiff when they made the decision to engage in Computer-Related Conduct against Curtis, terminate Curtis, and replace her with Matthews on a part-time basis.

517.    The Computer-Related Conduct against Curtis has subjected Lever Up and Pakems LLC to liability and caused Curtis to suffer damages, including damages for invasion of privacy and severe permanent emotional distress.

518.    The termination of Curtis and the decision to replace her with Matthews resulted in guaranteed sales going away, significant revenue making opportunities to go

away, the financial health of the company has been severely negatively impacted while Matthews has been the CEO, there is a lack of potential opportunities because of Matthews' failure to obtain those opportunities, and the opportunity to find a more suitable partner to take Pakems where it deserved to go went away. Currently it appears Pakems have shut their doors which is causing significant impact to the company and its value.

519.    Plaintiff has suffered damages and will continue to sustain damages as a direct and proximate result of Defendants' breach of their duty of loyalty in an amount to be proven at trial.

520.    Defendants van Woudenberg, Matthews and Pine's interference directly and proximately caused damages to Curtis in that her termination caused significant revenue making opportunities to go away, revenue has been severely negatively impacted while Matthews has been the CEO, there is a lack of potential opportunities because of Matthews' failure to obtain those opportunities, upon information and belief the company is being liquidated which means Curtis will lose her approximately $1 million investment, and the present dismal company's performance under Matthews' control has impacted the ability to find a new more suitable partner.


**CLAIM XII**
**(Intentional Interference with Prospective Business Advantage)**

521.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 – 520 of this Complaint as though fully incorporated herein.

522.    Curtis had business relationships, prospective business relationships or relationships with sales representatives that had very close relationships with Stepping Up Footwear, Uncharted Supply Company, L.L.Bean, Dick's Sporting Goods, REI,

Dunham's, Camping World, Vail Resorts, Alterra, Gorsuch, Steamboat Resort, Summit Sports, Gabe's, a UK Distributor, and Sinner.

523. Defendants van Woudenberg, Matthews and Pine intentionally and improperly interfered with all of these business relations when they terminated Curtis.

524. Upon information and belief, one of the decisions to terminate Curtis was based on the fact the potential business relations would improve her sales numbers which would have prevented them from arguing her termination was because of the sales numbers.

525. Hamish Lorimer with Stepping Out Footwear was going to place an order the same day Curtis was terminated.

526. Curtis was terminated a mere four (4) days after she attended the Outdoor Retailer Trade Show where the purpose of the three (3) day trade show was to create potential business relations, which she accomplished, and a mere five (5) days before she was terminated she relayed to van Woudenberg and Matthews that the trade show was going well, she was finding many potential business opportunities, L.L.Bean loved the samples she had provided and wanted additional samples made using their particular plaid pattern.

527. Defendants van Woudenberg, Matthews and Pine's interference caused these individuals and entities not to enter or continue the prospective business relations with Pakems.

528. Defendants van Woudenberg, Matthews and Pine's interference directly and proximately caused damages to Curtis in that her termination caused significant revenue making opportunities to go away, revenue has been severely negatively

impacted while Matthews has been the CEO, there is a lack of potential opportunities because of Matthews' failure to obtain those opportunities, upon information and belief the company is being liquidated which means Curtis will lose her approximately $1 million investment, and the present dismal company's performance under Matthews' control has impacted the ability to find a new more suitable partner.

## CLAIM XIII
### (Conspiracy)

529.   Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 528 of this Complaint as though fully incorporated herein.

530.   Defendants conspired to accomplish an unlawful purpose or a lawful purpose by unlawful means.  Defendants had a meeting of the minds in their course of action and one or all committed an unlawful, overt act to further the object or their course of action.

531.   Specifically, Defendants Pine, van Woudenberg, Jordan Pine, Beiers, Everson and John Does 1-10 intentionally conspired and agreed by words or conduct to accomplish unlawfully accessing, obtaining, downloading, reviewing and/or monitoring her Personal Accounts, personal Email Accounts, and accessing Curtis' personal computers. Further, there was an agreement to intercept wire, oral, or electronic communications. When Matthews became a Director of Pakems, he conspired with the other Defendants.

532.   Further, Defendants Pine, van Woudenberg, and Matthews conspired to unlawfully terminate Curtis.

533.   As a result, Plaintiff suffered injuries, damages and losses as a proximate cause of such wrongful acts.

## CLAIM XIV
### (Intentional Interference with Contractual Relations)

534.   Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 – 533 of this Complaint as though fully incorporated herein.

535.   In emails dated January 8, 2019, January 13, 2019, February 18, 2019 and March 12, 2019, Pine voiced his opinion that he wanted Curtis to either resign or be fired.

536.   Pine constantly stated to Curtis and van Woudenberg that he did not believe she was fit to be a CEO and demanded that she be fired.

537.   Van Woudenberg frequently stated that Pine wanted her to fail.

538.   Pine frequently would not assist Curtis with things she needed assistance with as the CEO of Pakems.

539.   Van Woudenberg sent an email to Curtis agreeing that he would give her time to find a new more suitable partner.  Pine was carbon copied on this email.

540.   Pine frequently demanded that there be a time limit put on the agreement to give her time to find a new more suitable partner.

541.   Plaintiff had an Employment Agreement with Lever Up signed by the parties on October 26, 2018.

542.   Defendant Pine had knowledge of the contract, as he was a signatory to the contract on behalf of Lever Up.

543.   Defendant Pine intentionally made it known that he wanted Curtis fired which induced van Woudenberg's decision without true justification to terminate Curtis.

544.    Defendant Pine's conduct improperly interfered with her Employment Agreement when that agreement was terminated.

545.    Defendant Pine's conduct improperly interfered with the agreement that Curtis was to be given time to find a new more suitable partner.

546.    Defendant Pine's conduct was the proximate cause of the damages suffered by Curtis.

547.    Curtis is entitled to damages, including but not limited to lost benefits and wages, lost opportunity of future growth of Pakems if Curtis were able to find a new more suitable partner, potential to sell the company, lost profits, loss from negative impact to Pakems' financial position, loss of investment in Pakems Inc., severe permanent emotional distress, and harm to her reputation.

548.    Curtis is entitled to punitive damages as Pine's conduct was outrageous.


**CLAIM XV**
**(Defamation (Libel and Slander))**

549.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 548 of this Complaint as though fully incorporated herein.

550.    On numerous occasions, both verbally and in writing, Pine stated to van Woudenberg that Curtis was not "fit" to be a CEO.

551.    Pine stated to van Woudenberg and Matthews that there was a personality conflict between Curtis and Pine.

552.    Pine stated to Matthews that he had a conflict with Curtis, she was performing badly, and she was not receptive to advice or criticism.

553.   Pine stated in an email to Curtis and van Woudenberg on February 18, 2019, that, "Julie clearly doesn't want to be accountable and has demonstrated it by not providing the requested information or by blaming others, obfuscating or deflecting."

554.   On March 12, 2019, Pine sent an email to van Woudenberg and Curtis stating, "Yesterday was most unpleasant which seems to be a recurring theme for Julie and me."

555.   All of the above statements were a written or spoken publications of a false assertion of fact made with knowledge of or reckless disregard for the falsity of the publications.

556.   All of the above statements were published to third parties.

557.   All of the above statements caused harm to Curtis' reputation by prejudicing or lowering her in the estimation of van Woudenberg and Matthews.

558.   All of the above statements are defamatory per se as they were meant to damage her business reputation.

559.   All of the above statements caused injury, damage and prejudiced Curtis' business reputation.

560.   That as a direct and proximate result of the defamatory statements made by Defendant Pine, Curtis has suffered injury to her reputation, suffered humiliation, emotional distress, mental anguish and suffering, caused her to need to find a more suitable partner, was impactful on the decision to terminate her employment, caused the approximately $1 million loss of her investment in Pakems, and loss of income.

561.   The defamatory statements that Defendant Pine made were intentional, with malice or with reckless disregard as whether they were false or not, thus the Plaintiff is entitled to punitive damages.

## CLAIM XVI
### (Promissory Estoppel)

562.   Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 561 of this Complaint as though fully incorporated herein.

563.   Curtis asked van Woudenberg whether he wanted her to quit because she had made so many financial sacrifices to keep Pakems operational and was left penniless and she did not want to ever go through that again.  He responded with a verbal promise that he would not just suddenly fire her one day and put her in the same financial position she had recently been in.

564.   In an effort to further emphasize his promise that she would not suddenly be fired without a monetary payment, he stated that "if there's no Julie, then there's no Pakems because you [Julie] are Pakems."

565.   Van Woudenberg made a written promise that she be given the time to find a new more suitable partner.

566.   Van Woudenberg should have reasonably expected that the promise that Curtis would not be suddenly terminated would induce her to continue her employment with Pakems and led her to believe that he would exercise the option to purchase her shares in the company for $450,000 if she was terminated.

567.   Van Woudenberg should have reasonably expected that Curtis believed that she should spend her time finding a new partner and that she had the time to find a

new partner, especially in light of the fact Matthews, van Woudenberg and Curtis had a meeting a mere two (2) weeks with third-party about finding a new partner.

568.    Curtis relied on the promise that she would not suddenly be fired and to her detriment, she was suddenly fired which left her in a compromised financial position because van Woudenberg did not exercise the option to purchase Curtis' shares in the company.

569.    Curtis relied on the promise that she had time to find a new more suitable partner and to her detriment she was fired which prevented her from being able to find a new partner.

570.    Both of van Woudenberg's promises should be enforced to prevent injustice.

571.    Curtis' damages include non-payment of $450,000, lost benefits and wages, lost opportunity of future growth of Pakems if Curtis were able to find a new more suitable partner, potential to sell the company, lost profits, loss from negative impact to Pakems' financial position, loss of investment in Pakems Inc., and emotional distress.


### CLAIM XVII
**(Breach of the Covenant of Good Faith and Fair Dealing)**

572.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 571 of this Complaint as though fully incorporated herein.

573.    Defendants Pine and van Woudenberg entered into a Stock Restriction Agreement with Curtis on October 26, 2018.

574.    Curtis performed any and all obligations pursuant to the Stock Restriction Agreement.

575.    Pursuant to the Stock Restriction Agreement, Defendant van Woudenberg had discretion to terminate Curtis' employment within a year of her anniversary date with the company and the option to purchase her shares in the company for $450,000.

576.    Defendants Pine, van Woudenberg and Matthews failed to perform their obligation under the agreement.

577.    Defendants Pine, van Woudenberg, and Matthew's discretion was abused when they opted not to exercise the option which resulted in a breach of implied duty of good faith and fair dealing.

578.    Curtis had the reasonable expectation that this option would be exercised if she was terminated within a year since this amount was tied to the hard dollar amount of her investment in the company.

579.    Curtis also had the reasonable expectation that this option would be exercised because she never thought she would be forced to remain partners with individuals that made a decision to terminate her employment or with individuals that would violate numerous laws against her.

580.    Curtis also had the reasonable expectation that this option would be exercised if she was terminated within a year since Pine refused her request during the negotiation of her employment to be given severance if she were to be terminated within a year.

581.    Curtis also had the reasonable expectation that this option would be exercised if she was terminated within a year when she agreed to sell her company to Defendants and go from being a majority shareholder to a minority shareholder.

582.     Defendants van Woudenberg and Pine entered into the Stock Restriction Agreement in bad faith and Curtis was left to rely on the good faith of the party in control of exercising the option clause.

583.     Curtis was damaged by the Defendants' abuse of discretion in the amount of $450,000.

584.     If Pine, van Woudenberg, and Matthews were not required to exercise the option in the Stock Restriction Agreement in good faith, then they would effectively receive the benefit of purchasing her company, no longer paying her salary, and avoid buying her shares in exchange for nothing.  Further, it would render the Stock Restriction Agreement unfair and contrary to the parties' intent of mutual benefit.


## CLAIM XVIII
### (Alter Ego Liability)

585.     Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 584 of this Complaint as though fully incorporated herein.

586.     Lever Up is the parent of Pakems, is the sole member of Pakems, and was treated as one and the same company.

587.     Employees of Chasefield referred to Pakems as a DBA (Doing Business As) of Lever Up.

588.     Pine and van Woudenberg caused the incorporation of Lever Up.

589.     Pine and van Woudenberg are the directors and officers for Chasefield Capital, Chasefield Real Estate, LLC, Pakems and Lever Up.

590.     Funds were commingled between Chasefield Capital, Pakems, Lever Up and van Woudenberg.

591.    Pine paid invoices from the Lever Up and Pakems bank accounts that were not approved by van Woudenberg or Curtis, including paying himself for his services that well exceeded what had been approved.

592.    Pine transferred funds from the Lever Up checking account into the Chasefield Capital checking account. When it was later determined by Curtis that the funds transferred into the Chasefield Capital checking account exceeded what was supposed to be transferred by over $9,000, Pine was not required to transfer $9,000 back to the Lever Up checking account.

593.    Curtis was paid for her services by Chasefield Capital, then Lever Up, then Pakems.

594.    Curtis could not take independent action unless it was approved by the board of Lever Up.

595.    Pine and van Woudenberg failed to keep corporate minutes.

596.    Chasefield Capital purchased and owned the Pakems' inventory.

597.    Chasefield Real Estate, LLC was formed on July 12, 2019, after Curtis notified Defendants to preserve evidence because she would be filing an action.  Upon information and belief, this company is being used to transfer assets of Chasefield Capital.  As such, Chasefield Real Estate, LLC is liable for any debts, obligations, acts, and liabilities of Chasefield Capital, Lever Up, and Pakems.

598.    The Computer-Related Conduct was done at the direction of a Chasefield Capital employee(s) and accomplished by Chasefield Capital employees, the ability to remotely access Curtis' computer was software that was within a software package owned by Chasefield Capital called chasefieldcapitalmainoffice.4.0.4889-

installer(1).pkg@base.pkg, TeamViewer was installed on Curtis' computer by a Chasefield Capital IT contractor and the downloading of TeamViewer allowed Chasefield Capital to secretly spy on Curtis in various ways, a Chasefield Capital employee(s) monitored her email and accessed her Personal Accounts and Email Accounts, including during a time period when she was no longer an employee of Pakems and when Pine was no longer on the Board of Directors or an officer of Lever Up, and Chasefield Capital owned the accounts and equipment used to engage in the Computer-Related Conduct against Curtis.

599.   The above-stated facts show there was a unity of interest and lack of respect given to the separate identity of the various entities such that the personalities and assets of Pakems, Lever Up, Chasefield Capital, Chasefield Real Estate, LLC, Pine and van Woudenberg are indistinct.

600.   Pine, van Woudenberg, and Chasefield Capital are responsible for the corporate liability of Pakems and Lever Up because they committed the unlawful acts against Curtis, used their assets to commit the unlawful acts against Curtis, used its employees and agents to commit the unlawful acts against Curtis, and made the decision to commit the unlawful acts against Curtis.

601.   The shareholders of the various entities disregarded treating Chasefield Capital, Pakems, and Lever Up as a separate entity such that adhering to the legal fiction of the corporation being a separate entity would result in fraud, promote injustice, or lead to an evasion of legal obligation.

602.   A fair and equitable result will be achieved by disregarding the separate corporate entities.

603.   Chasefield Capital, Chasefield Real Estate, LLC, van Woudenberg and Pine are liable for any debts, obligations, acts and liabilities of Lever Up and Pakems.

## VII.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff respectfully demands that the claims alleged herein be adjudicated in a trial by jury.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Julie Adams Curtis respectfully requests this Court to enter judgment in her favor and against Defendants on all claims for relief asserted in this Complaint and Request for Jury Trial, and in addition, grant the following relief:

1.   To enter judgment in favor of Plaintiff and against Defendants Lever Up Inc., Pakems, LLC, Chasefield Capital Inc., Chasefield Real Estate, LLC, SCB Global Capital Management, LLC, Boccus Group LLC, Pine, van Woudenberg, Matthews, Pine, Beiers, Everson, and John Does 1 – 10, finding the acts of the Defendants Lever Up Inc., Pakems, LLC, Chasefield Capital Inc., Chasefield Real Estate, LLC, SCB Global Capital Management, LLC, Boccus Group LLC, Pine, van Woudenberg, Matthews, Pine, Beiers, Everson, and John Does 1 – 10 constitute violations of the Stored Communications Act (18 U.S.C. § 2702 (a)), the Federal Wiretap Act (18 U.S.C. § 2511 and § 18 U.S.C. § 2520), and the Computer Fraud and Abuse Act (18 U.S.C. § 1030).

2.   To enter judgment in favor of Plaintiff and against Defendants Lever Up Inc. and Pakems, LLC finding the acts of the Defendants Lever Up Inc. and Pakems, LLC

constitute discrimination in violation of the Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-401, *et seq.*

3.     To enter judgment in favor of Plaintiff and against Defendants van Woudenberg, Pine, Jordan Pine, Beiers and Everson finding the acts of the Defendants van Woudenberg, Pine, Jordan Pine, Beiers and Everson constitute aiding & abetting a sexually hostile work environment in violation of the Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-401, *et seq*.

4.     To enter judgment in favor of Plaintiff and against Defendants van Woudenberg and Matthews finding the acts of the Defendants van Woudenberg and Matthews constitute unlawful disability discrimination in violation of the Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-401, *et seq*.

5.     To enter judgment in favor of Plaintiff and against Defendants van Woudenberg, Pine and Matthews finding the acts of the Defendants van Woudenberg, Pine and Matthews constitute unlawful retaliation in violation of the Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-401, *et seq*., violation of public policy, breach of the duty of loyalty, intentional interference with prospective business relations, and breach of the covenant of good faith and fair dealing.

6.     To enter judgment in favor of Plaintiff and against Defendants van Woudenberg, Pine, Matthews, Everson, Beiers, Jordan Pine, and John Does 1 – 10, finding the acts of Defendants van Woudenberg, Pine, Matthews, Everson, Beiers, Jordan Pine, and John Does 1 – 10 constitute invasion of privacy, conspiracy, and outrageous conduct.

7.      To enter judgment in favor of Plaintiff and against Defendant Pine finding the acts of Defendant Pine constitutes intentional interference with contractual relations and defamation.

8.      To enter judgment in favor of Plaintiff and against Defendant van Woudenberg finding the acts of Defendant van Woudenberg constitutes promissory estoppel.

9.      To enter judgment in favor of Plaintiff and against Defendants Chasefield Capital, Chasefield Real Estate, LLC, van Woudenberg and Pine, finding the acts of Defendants Chasefield Capital, Chasefield Real Estate, LLC, van Woudenberg and Pine constitute alter ego liability.

10.     To award Plaintiff actual, statutory, and compensatory damages as a result of Defendants' unlawful conduct.

11.     To award Plaintiff punitive damages as a result of Defendants' willful, intentional and malicious conduct and willful violation of CADA.

12.     To award Plaintiff, the remedies of damages for back pay, restored benefits, actual monetary damages, loss of wages, salary, retirement contributions, out of pocket medical expenses, all loss of income, and all loss of monetary damages to which she is entitled, pursuant to a willful violation of CADA.

13.     To award Plaintiff preliminary and permanent injunctive or other equitable relief as this Court deems necessary to protect Plaintiff's interests and to prohibit Defendants from further engaging in the wrongful conduct of the nature alleged herein.

14.     To award Plaintiff pre-judgement and post-judgement interest to the extent permitted under the law.

15.     In light of the threat to dissolve the Company, Defendants actions of selling corporate assets at a substantial discount, Plaintiff's potential loss of her investment if the Company is dissolved instead of given to her or sold, Plaintiff seeks the appointment of a Receiver to manage the business and affairs of Pakems/Lever Up to prevent waste of corporate assets and to maximize the value of the Company through its continued operation until the resolution of the instant action.

16.     To award Plaintiff emergency injunctive relief to stop Defendants from further unlawful misconduct and to preserve evidence which might otherwise be destroyed.

17.     To award Plaintiff an award that the option clause in the Stock Restriction Agreement be exercised.

18.     To award Plaintiff reasonable litigation expenses and attorneys' fees.

19.     To award Plaintiff such further relief as this Court deems just and proper.


                                        Respectfully Submitted,

Dated:  June 25, 2020                   s/ Christopher L. Limpus
                                        Christopher L. Limpus
                                        LIMPUS + LIMPUS, LLC
                                        7723 Arlington Drive
                                        Boulder, CO 80303
                                        Telephone: (303) 731-9540
                                        E-mail: chris@limpuslaw.com

                                        Fredrick P. Coogan, III
                                        COOGAN & ASSOCIATES, P.C.
                                        225 Broken Fence Road
                                        Boulder, CO 80302
                                        Telephone: (512) 496-1071
                                        E-mail: fcoogan@cooganfirm.com

                                        Attorneys for Plaintiff Julie Adams Curtis