**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-1873-DDD-NYW

JULIE ADAMS CURTIS,

        Plaintiff,

v.

LEVER UP INC.,
PAKEMS LLC,
CHASEFIELD CAPITAL INC.,
CHASEFIELD REAL ESTATE, LLC,
SCB GLOBAL CAPITAL MANAGEMENT, LLC,
BOCCUS GROUP LLC,
HAROLD PINE,
WALTER VAN WOUDENBERG,
RUSS MATTHEWS,
JORDAN PINE,
KELLIE BEIERS,
SETH EVERSON, and
JOHN DOES 1 - 10

        Defendants.

---

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

Plaintiff Julie Adams Curtis ("Curtis"), for her First Amended Complaint against Defendants Lever Up Inc. ("Lever Up"), Pakems, LLC ("Pakems"), Chasefield Capital Inc. ("Chasefield Capital"), Chasefield Real Estate, LLC ("Chasefield Real Estate"), SCB Global Capital Management, LLC ("SCB Global"), Boccus Group LLC ("Boccus Group"), Harold Pine ("Pine"), Walter van Woudenberg ("van Woudenberg"), Russ Matthews ("Matthews"), Jordan Pine, Kellie Beiers ("Beiers"), Seth Everson ("Everson"), and John Does 1 – 10, alleges on her own knowledge and on information and belief as follows:

## I.      NATURE OF THE CASE

1.      This is a case involving the founder and minority shareholder of Lever Up who was discriminated against, severely harassed because of her gender, and retaliated against during her employment and then ultimately, she was unlawfully terminated from the company she founded. Plaintiff complained about the abusive conduct to no avail. The hostile work environment and her termination was extreme and outrageous and caused her severe emotional distress.

2.      Defendants van Woudenberg, Pine, and Matthews breached their duty of loyalty owed to Curtis.

3.      Defendants van Woudenberg, Pine, and Matthews intentionally interfered with prospective business advantages when they made the decision to terminate Curtis.

4.      After Curtis was wrongfully terminated, she discovered that prior to the purchase of Pakems Inc., during her employment, and after her termination, her personal accounts were accessed (including her personal email accounts and iCloud account), her emails were being monitored, her emails were being intercepted, and her personal computers were remotely hacked into so that Defendants could, including but not limited to, access documents, photos, videos, iMessages, text messages, secretly watch her through the camera of her personal computer as well as listen to her all while in her own residence. The foregoing actions were intentional, methodical, persistent and a clear invasion of her privacy. Defendants Pine, van Woudenberg, Everson, Matthews, Beiers, Jordan Pine and John Does 1 – 10 were all involved in the commission of these unlawful acts against Curtis.

5.      Defendants Pine, van Woudenberg, Matthews, Jordan Pine, Everson, Beiers, and John Does 1 - 10 conspired to terminate Curtis.

6.      Defendant Pine intentionally interfered with Curtis' employment contract.

7.      Defendants van Woudenberg, Matthews and Pine terminated Curtis in violation of public policy.

8.      Defendants van Woudenberg, Matthews and Pine breached the covenant of good faith and fair dealing by not exercising the option to purchase Curtis' shares in the company and forcing Curtis to remain partners with individuals that have committed unlawful acts against her.

9.      Defendant van Woudenberg broke his promises to Curtis that he would not terminate her without financially compensating her and would allow Curtis time to find a more suitable partner.

10.     Defendant Pine, both in writing and verbally, constantly made statements to others about Curtis that were false and that he knew were false.

11.     Defendants Pine, van Woudenberg, Everson, Matthews, and John Does 1 - 10 intentionally and negligently inflicted severe and permanent emotional distress against Curtis through all of the above stated actions.

12.     Chasefield Capital and Chasefield Real Estate are the alter egos of Pakems and Lever Up.

13.     Plaintiff asserts violations of the Stored Communications Act (18 U.S.C. § 2702 (a)) ("SCA"), Federal Wiretap Act (18 U.S.C. § 2511 and § 18 U.S.C. § 2520) ("FWA"), Computer Fraud and Abuse Act (18 U.S.C. § 1030) ("CFAA"), Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-401, et seq. ("CADA"), and the commission

of common law torts including Invasion of Privacy, Civil Conspiracy, Breach of Duty of Loyalty, Intentional Interference with Prospective Business Advantage, Outrageous Conduct, Intentional Interference of Contractual Relations, Defamation, Termination in Violation of Public Policy, Promissory Estoppel, and Breach of the Covenant of Good Faith and Fair Dealing. Curtis further asserts that Chasefield Capital and Chasefield Real Estate, LLC are the Alter Egos of Pakems and Lever Up.

14.     This suit is brought for damages, rescission, the appointment of a Receiver and an injunction. Given the gravity of this situation, a Receiver must be appointed immediately as the Defendants have basically shut the doors on Pakems. In addition, emergency injunctive relief is required to stop Defendants from further unlawful misconduct and to preserve evidence which might otherwise be destroyed.

## II.     PARTIES

15.     At all relevant times, Plaintiff Curtis was a resident of Colorado.

16.     Defendant Lever Up Inc. is a Colorado corporation with its principal place of business at 950 South Cherry Street, Suite 414, Denver, CO  80246.

17.     Defendant Pakems, LLC is a Colorado limited liability company with its principal place of business at 950 South Cherry Street, Suite 414, Denver, CO  80246.

18.     Defendant Chasefield Capital Inc. is a Colorado corporation with its principal place of business at 950 South Cherry Street, Suite 414, Denver, CO  80246.

19.     Defendant Chasefield Real Estate, LLC is a Colorado corporation with its principal place of business at 950 South Cherry Street, Suite 414, Denver, CO  80246.

20.     Defendant SCB Global Management, LLC is a foreign limited liability company organized under the laws of the State of Delaware, with its principal place of business at 300 S. Jackson Street, Suite 220, Denver, CO  80209.

21.     Defendant Boccus Group LLC is a Colorado limited liability company with its principal place of business at 4966 South Nelson Street, Unit A, Littleton, CO  80127.

22.     Upon information and belief, Defendant Harold Pine is a resident of Colorado, has an ownership interest in Chasefield Capital, Chasefield Real Estate, and Lever Up and is an employee of Chasefield Capital.

23.     Upon information and belief, Defendant Walter van Woudenberg is a resident of Colorado and has an ownership interest in Chasefield Capital, Chasefield Real Estate, and Lever Up.

24.     Upon information and belief, Defendant Russ Matthews is a resident of Colorado, has an ownership interest in SCB Global, is a director of Pakems and is on the Board of Directors of Lever Up.

25.     Upon information and belief, Defendant Jordan Pine is a resident of Colorado, is an employee of Chasefield Capital, and has an ownership interest in Lever Up.

26.     Upon information and belief, Defendant Kellie Beiers is a resident of Colorado, is an employee of Chasefield Capital, and has an ownership interest in Lever up.

27.     Upon information and belief, Defendant Seth Everson is a resident of Colorado and has an ownership interest in Boccus Group.

28.     Upon information and belief, Defendants John Does 1 – 10 are residents of Colorado and were engaged by Defendants Pine and van Woudenberg to carry out the alleged Computer-Related Conduct.

29.     The alleged Computer-Related Conduct was conduct either committed by the Defendants, initiated by the Defendants, caused to occur, controlled, directed, authorized, ratified, encouraged, engaged and/or paid others to perform, assisted in, had knowledge of or participated in, and conduct for which each Defendant is liable.

30.     Further the Defendant companies are entities that employ the individual Defendants that committed the unlawful conduct, own equipment that was used, own accounts that were used, paid for accounts that were used, engaged and/or paid others to perform, or Defendants had an ownership interest in the Defendant entities that were involved with committing the Computer-Related Conduct.

### III.     ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED

31.     Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

32.     Prior to filing this action, Plaintiff filed her Charges of Discrimination, Charge No. E2000006964x against Lever Up and Charge No. E2000006717x against Pakems, with the Colorado Civil Rights Division ("CCRD") for gender discrimination, disability discrimination, hostile work environment, and retaliation on or about January 24, 2020.

33.     On or about April 9, 2020, the CCRD issued a Dismissal and Notice of Right to Sue in connection with the Charges of Discrimination.

34.     The Dismissal and Notice of Rights letters are attached hereto as Exhibit A.

35.     This action is timely filed because it is filed within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue letter issued by the CCRD.

36.     Plaintiff has met all administrative prerequisites prior to filing this action.

## IV.     JURISDICTION AND VENUE

37.     Plaintiff incorporates by reference the above paragraphs 1 - 36 as though set forth separately herein.

38.     Plaintiff brings this action under the Stored Communications Act (18 U.S.C. § 2702 (a)) ("SCA"), Federal Wiretap Act (18 U.S.C. § 2511 and § 18 U.S.C. § 2520) ("FWA"), Computer Fraud and Abuse Act (18 U.S.C. § 1030) ("CFAA"), Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-401, et seq. ("CADA") and common law tort claims.

39.     This Court has personal jurisdiction over all Defendants, based on the fact they all have engaged in business activities in and directed at the State of Colorado, have committed tortious acts within Colorado, have sufficient minimum contacts or are citizens of Colorado.

40.     This Court has original subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

41.     This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. §1367, as such claims arise out of the same case or controversy as Plaintiff's SCA, FWA, and CFAA and claims.

42.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because the conduct alleged to be unlawful occurred in this District.

## V.      FACTUAL BACKGROUND

43.     When Curtis got her first Apple device, an iCloud account was automatically created and the email account julie.adams7@icloud.com was created.

44.     In   2005,   Curtis   created   a   personal   email   account julieadamscurtis@yahoo.com that is hosted by Yahoo.

45.     In   2008,   Curtis   created   a   personal   email   account julieadamscurtis@gmail.com that is hosted by Google.

46.     In 2008, Curtis set up a personal Facebook account.

47.     In 2011, Curtis left her career as an attorney and invented the lightweight, packable shoe that she called Pakems.

48.     Curtis was the founder and CEO of Pakems Inc. which she incorporated in July 2011.

49.     In 2011, Curtis purchased an Apple Macintosh computer (hereinafter referred to as "MAC1") that was used for personal matters and for Pakems business. Pakems did not reimburse Curtis for this computer. This computer has always been and remains her personal computer.

50.     In 2012, Curtis created the email account jadams@apresgear.com that was hosted by Google. This account is tied to a Google GSuite account that Curtis has paid for and currently pays for. This account was used for sending and receiving emails for personal matters and during a limited period of time for Pakems business.

51.     In 2013, Curtis created the email account julieadams@pakems.com that was hosted by GoDaddy. This account was used for sending and receiving emails for personal matters and for Pakems business.

52.     In 2013, Curtis created the email account julieadamspakems@gmail.com that is hosted by Google. This account was used for sending and receiving emails for personal matters and during a limited period of time for Pakems business.

53.     In 2013, Curtis created a personal email account julieadamspakems1@gmail.com that is hosted by Google.

54.     In 2017, Curtis created the email account pakemskickstarter@gmail.com that is hosted by Google. This account was used for sending and receiving emails for Kickstarter-related matters.

55.     Curtis had an AppleID that was used by her and her son, Bodie Curtis, for the purpose of setting up their personal Apple computers and personal Apple iPhones. There was an iCloud account tied to the AppleID with the user ID julieadamscurtis@yahoo.com.  An email account was created within her iCloud account julie.adams7@icloud.com.

56.     Curtis had a personal Apple iPhone with the phone number 303-204-5265 which was tied to her various accounts. Because of Defendants' actions with regard to this personal Apple iPhone, Curtis had to purchase a new Apple iPhone and had to change her personal cell phone number after approximately 22 years.

57.     Curtis used the software Keeper Security to store her personal passwords and Pakems-related passwords. This account can be accessed online and via an application on her computers.

58.     Curtis was the CEO of Pakems Inc. from 2011 until it was dissolved in 2018.

59.     Pakems Inc. never had a policy that Curtis or other independent contractors could not use company-related email accounts for personal matters. In other words, all of

the email accounts she created, she was allowed to use for personal matters and had an expectation of privacy in all of the content within the email accounts she created.

60.     On or about June 13, 2017, Curtis met Defendant Pine at the Go Pro Games in Vail, Colorado and began discussing a potential investment in her company Pakems Inc.

61.     On or about October 19, 2017, Pine let Curtis know that Chasefield Capital was not interested in an investment.

62.     On or about May 9, 2018, Curtis contacted Pine on a matter not related to Pakems. Pine informed Curtis that Chasefield Capital had changed its mind and was now interested in an investment in Pakems Inc.

63.     On or about August 21, 2018, Curtis met with Defendants Pine and van Woudenberg, and Pine informed her later that day that Chasefield Capital was going to invest in Pakems Inc.

64.     On August 30, 2018, Pine signed an agreement obligating Chasefield Capital to purchase inventory for Pakems Inc. and all of the funds received from the sale of the inventory was the property of Chasefield Capital.

65.     From September 7, 2018 through October 3, 2018, Curtis was paid by Chasefield Capital.

66.     On September 7, 2018, Lever Up Inc. was formed.

67.     On October 11, 2018, Pakems LLC was formed.

68.     Lever Up Inc. is the parent company of Pakems LLC and sole member of Pakems LLC.

69.     On October 26, 2018, Pakems LLC purchased Pakems Inc. pursuant to the terms and conditions set forth in the Asset Purchase Agreement.

70.     From October 18, 2018 through December 3, 2018, Curtis was paid a salary by Lever Up. Thereafter, Curtis was paid a salary by Pakems LLC. Employment taxes were taken out of her paychecks.

71.     On or about October 26, 2018, Pine, van Woudenberg, and Curtis signed an Action by Written Consent and became directors of Lever Up. Pine was the Chief Executive Officer and Secretary of Lever Up and van Woudenberg was the President.

72.     On or about October 26, 2018, Curtis signed an Employment Agreement with Lever Up that set forth the terms and conditions of her employment as Chief Executive Officer at Pakems, LLC.

73.     The Employment Agreement made it clear she was to report to the Manager, Lever Up, and was subject to the control, supervision, and oversight of Lever Up (via its board of directors).

74.     The Employment Agreement also provided that her job duties were subject to the control, supervision, and oversight of Lever Up (via its board of directors).

75.     On or about October 26, 2018, Curtis signed a Stock Restriction Agreement whereby she vested in 225 common stock shares of Lever Up and had the opportunity to vest in an additional 225 common stock shares in 48 equal monthly installments over a four (4) year period commencing on the third month anniversary of the Closing Date (October 26, 2018).

76.     The Stock Restriction Agreement also provided that an additional 225 common stock shares would accelerate and vest if she was terminated without cause or quit with good reason, as defined in the Stock Restriction Agreement.

77.     Set forth in paragraph 2 of the Stock Restriction Agreement, entitled Vesting., (d) Option to Purchase Vested Shares, "…(i) Upon the termination of Holder's [Curtis] Business Relationship with the Company for any reason, the Company shall have the option, … to purchase the then Vested Shares."  Pursuant to section (iii), the price of the common stock shares shall be $1,000 if she were to be terminated without cause on or before the first anniversary of the Closing Date.

78.     Initially, van Woudenberg held 450 common stock shares in Lever Up and Pine owned 100 common stock shares. Pine transferred some of his Lever Up shares which resulted in him owning 61 common stock shares, Jordan Pine owning 13 common stock shares, Andrew Pine owning 13 common stock shares, and Beiers owning 13 common stock shares.

79.     Curtis provided passwords to Pine, van Woudenberg, Beiers, and Jordan Pine for Pakems-related accounts to change credit card information, analyze Pakems website, Pakems Facebook page, create a new Pakems website and redirect Pakems DNS to Shopify, and access Digital Marketing data.

80.     For some of Curtis' personal accounts, she used the same or similar passwords that she used for Pakems-related accounts.

A.   **The December 13, 2018 Meeting – To Secretly Spy on Curtis, Everson Installed Unauthorized Software on Curtis' Computers and Changed Settings on her iPhone Without Curtis' Authorization or Knowledge**

81.   In early December 2018, at the request of Pine, Curtis was directed to meet with Chasefield Capital's IT person, Defendant Everson.

82.   Curtis was told the purpose of this meeting was to set up her newer Apple Macintosh computer that had previously been her son's computer (hereinafter referred to as "MAC2") so that the email account julieadams@pakems.com, would be available to her via the software Microsoft Outlook.

83.   Directing Curtis' julieadams@pakems.com email account to Microsoft Outlook would allow Curtis to use her email account in conjunction with the calendar function within Microsoft Outlook. The decision to use Microsoft Outlook for her email platform was to solve the issue Curtis had in that she was not able to view meeting invites sent to her from Chasefield Capital because they used Microsoft Outlook.

84.   Curtis was also told that during the meeting Everson would give her access to a software program named SharePoint that is a cloud-based data storage application.

85.   Curtis was informed that SharePoint would allow her to upload certain Pakems files so the files could be shared with Chasefield Capital employees.

86.   In a December 3, 2018 email entitled "Meeting with IT," Beiers asked Curtis, "Are you able to come in Wednesday, Thursday, or Friday at 9 AM to meet with Seth, our [Chasefield Capital's] IT guy?"

87.   Beiers subsequently sent Curtis a calendar meeting invite entitled "Security Installation." Based on that email, Curtis was notified that security software would also be

installed onto her computer at the direction of Pine and/or van Woudenberg and approved and paid for by Chasefield Capital.

88.     Curtis sent a subsequent email to Beiers asking that the meeting be moved. Beiers responded by asking what time on that following Monday would work for her and also stated, "This stuff always takes longer then (sic) I expect." Beiers was aware that a lot more was going to be accomplished on Curtis' computers than merely downloading Outlook and security software.

89.     On December 13, 2018 at approximately 10:00 a.m., and for approximately two (2) hours, Curtis met with Chasefield Capital's IT person, Defendant Everson, at Chasefield Capital's, Chasefield Real Estate's and Lever Up's offices.

90.     Everson is an agent of Chasefield Capital.

91.     Everson was hired directly by Chasefield Capital.

92.     Everson submitted invoices for the time that he worked at the direction of Chasefield Capital. These invoices were approved by Pine and paid by Chasefield Capital employee, Beiers.

93.     Everson configured Curtis' computers so that Pine, van Woudenberg, and Matthews could spy on Curtis.

94.     Everson relayed information that he discovered to Pine, van Woudenberg and Matthews.

95.     On March 22, 2019, Everson submitted an invoice to Beiers for the purchase of an Office 365 Enterprise account for $204.  Pine approved the invoice and Beiers paid it.

96.     Upon information and belief, Everson remained an agent of Chasefield Capital's at least thru September of 2019.

97.     Curtis provided the MAC2 computer to Everson as the MAC2 computer was to become her primary computer to use for Pakems' business.

98.     Curtis also brought to the meeting her older Apple Macintosh computer that was her personal computer and one she previously used for Pakems' business, the MAC1 computer, so that she could work while Everson was installing Microsoft Outlook and the security software on her MAC2 computer.

99.     After Everson was done with the software installation on the MAC2 computer, Everson asked Curtis if she wanted her email julieadams@pakems.com to also be available to her on her MAC1 computer. Curtis responded that she did, so she provided him the MAC1 computer.  Curtis believed Everson was only installing Microsoft Outlook on her MAC1 computer.

100.    Everson also asked Curtis if she would like him to configure her personal iPhone so that she could access her email julieadams@pakems.com on her personal iPhone. Curtis responded that she did, so she provided him the iPhone.

101.    MAC1, MAC2 and Curtis' personal iPhone contained extremely personal and sensitive information, including but not limited to, personal photos, personal videos, personal text messages, personal documents, including financial information downloaded from her checking account, health information, personal letters, documents containing diary type information such as her thoughts and feelings, personal email accounts and emails, personal iMessages, including WhatsApp messages and Skype messages,

passwords to her personal accounts, personal information regarding her divorce, personal information regarding relationships, and personal family information.

102.    Everson demanded that Curtis use a password for her julieadams@pakems.com email account that he generated from a website that he accessed on his computer and stated that he did not want Curtis to tell him the computer-generated password.

103.    Everson demanded that Curtis change her iCloud password so that it was the same password she used to log into her computer.

104.    When Everson was done reconfiguring Curtis' MAC2 computer, he told her he needed to reboot her computer and he needed the computer password so she gave it to him. This was an intentional act by Everson to obtain her iCloud password.

105.    As the CEO of Pakems, Curtis worked remotely at her residence. During her employment, Curtis lived in two different residences. Because one of her residences was a small apartment, her office (consisting of a desk, filing cabinet and office supplies) was located in her bedroom. Curtis was in the habit of always leaving her computer on and open. She never covered the camera on her computers. Curtis lived in this small apartment from February 1, 2018 to February 28, 2019.

**B.    Pine's and van Woudenberg's Abhorrent Workplace Conduct**

106.    During Curtis' employment, she was subject to extreme and constant verbal abusive and threatening, offensive, intimidating, malicious, insulting, humiliating, and denigrating conduct at the hands of Pine. Curtis was the victim of a workplace bully because of her sex.

107.    On numerous occasions, through email, via telephone and during face-to-face meetings, Curtis complained to van Woudenberg about Pine's abusive conduct. During these discussions, van Woudenberg would state that he had never seen Pine treat someone the way that he was treating Curtis.

108.    On one particular occasion when Curtis and van Woudenberg met for breakfast, Curtis stated that she believed that Pine was a narcissist and that his behavior was directed at her because she was an educated and strong female.

109.    Van Woudenberg continued to be witness to the abusive conduct and never took the appropriate corrective action to stop it, instead telling Curtis he did not want to hear her side of the story because he did not want to take sides and that Pine was his business partner and that was never going to change.

110.    Pine, the Chief Executive Officer and Secretary of Lever Up, was the decision-maker with regards to Pakems for most of Curtis' employment at Pakems and dictated Curtis' job duties. She had to seek approval from board members in regard to the Pakems' budget and to sign contracts.

## 1.    Pine Wishes Curtis to Fail as Pakems CEO and Sabotages Curtis' Efforts to Run Pakems

111.    On numerous occasions, both verbally and in writing, Pine stated to van Woudenberg that Curtis was not "fit" to be a CEO and demanded that she be terminated. He made these statements in emails, dated January 8, 2019, January 13, 2019, February 18, 2019 and March 12, 2019.

112.    On a regular basis, van Woudenberg told Curtis that Pine wanted her to fail in her role as CEO.

113.   On or about November 12, 2019, Curtis met with Pine. Pine started the conversation stating that Beiers and Jordan Pine hated working with her and that he despised working with her. Curtis later learned from Beiers that this was a lie because Beiers told her she had really enjoyed working with Curtis.

114.   On January 7, 2019, Curtis received an email from Pine where he stated, "BTW I was privy to that conversation [between Curtis and Beiers] on the FBA you tube." At the time, Curtis believed that this was because he was in the office where the Chasefield Capital employees could overhear everyone's conversations. Curtis later learned that Pine was on vacation during the conversation, so the only way he could have been privy to the conversation was because he was listening to her conversations she had with others through Curtis' computer.

115.   In the same January 7, 2019 email, Pine stated, "I don't like the blaming [of] others [for] issue[s] for your information. It doesn't matter who fucked up. What matter (sic) is it gets done. My staff owns their fuck ups."

116.   Curtis responded to this email not understanding what Pine was talking about because she had not blamed anyone in the email. Pine's response was, "We'll see."

117.   Curtis did not understand this email or response at the time. Now it is understood that Pine was watching and listening to her complain about him in private conversations she was having in her home and this is why he brought up "blaming others" in an email where Curtis had not blamed anyone.

118.   Pine then said, "We'll see" which meant he will know whether this was the case by continuing to watch her and listen to her.

119.    Curtis had never stated directly to Pine about how frustrated she was with all of Chasefield Capital's missteps because they didn't know anything about the footwear business, she only had those conversations with others, in what she thought was the "privacy" of her own home.

120.    The same morning right after receiving the "We'll see" response, Curtis had a conference call with Pine and van Woudenberg. Unprovoked during the first couple minutes of the call, Pine began yelling and screaming at Curtis and demanded that she be fired. At the end of his long diatribe, Curtis stated to van Woudenberg that this behavior was completely unacceptable and that she wanted to have a meeting with van Woudenberg.

121.    Van Woudenberg spoke for about five (5) minutes and during his speech, he stated that Curtis needed to stop drinking at work. Curtis did not know what he was talking about and just assumed that Pine had lied about her to van Woudenberg that she was drinking during the workday.

122.    Curtis did have the thought of how unusual the comment was because, the night before, she had a glass of wine and had a conversation with her brother about how abusive Pine was towards her, how inappropriate Pine's email was that he sent earlier that day, and about how she had this one chance to make her company successful and Pine was sabotaging her chance.

123.    It is clear that Curtis was being watched and van Woudenberg's comment was in regard to her having a glass of wine some evenings at home while she was still working late and he was either spying on her or being told what Curtis was doing at home in the evenings.

124.    On January 20, 2019, Curtis had questions about the budget Pine put together and van Woudenberg asked Pine to answer Curtis' questions.  Pine responded that he would do this; however, he never did.

125.    Throughout Curtis' employment, she requested to engage five (5) different individuals that had footwear or industry experience to offer advice and assistance to grow the company. Curtis even offered to give up equity in the company to accomplish this. Pine and van Woudenberg said no to all of her requests.

**2.    Pine Threatens Curtis**

126.    Prior to a face-to-face meeting on December 8, 2018, Curtis sent an email to van Woudenberg requesting a meeting with just the two of them to discuss Pine's abusive behavior towards her. Shortly after Curtis sent this email, she had a telephone conversation with Pine, and Pine stated that he knew she wanted to meet with van Woudenberg outside of his presence (which Curtis later discovered was because he was monitoring her email). Then Pine stated that he dared her to complain about him to van Woudenberg because the last person that complained about him, it did not end well for them.

**3.    Van Woudenberg Makes a Promise to Curtis That He Will Not Suddenly Fire Her Without Compensating Her**

127.    During a January 9, 2019, face-to-face meeting with Curtis, Pine and van Woudenberg, the day after the abusive conference call, Pine began the meeting demanding Curtis be fired and that he had advised van Woudenberg not to invest in Pakems. Van Woudenberg later told Curtis that this was a lie because Pine insisted that he invest in Pakems.

128.    Curtis was not following why Pine thought she should be fired and asked van Woudenberg what Pine was talking about. Van Woudenberg stated that Pine felt that she should be fired because she was not taking ownership of the company's issues. Curtis still did not understand this reasoning because she had never had a conversation with anyone at Chasefield Capital blaming them for issues, nor had she ever stated to them that she wasn't at fault for any particular issue. Now looking back at this exchange, the only explanation for Pine to state that she blamed others was because he was listening to her in her own residence because the only time she blamed Pine for issues was in private conversations she had with others.

129.    At the end of the meeting, Curtis asked van Woudenberg if he wanted her to quit. Curtis stated that she needed financial stability because over the course of the prior year, she had made so many financial sacrifices to keep Pakems operational and invested the rest of her entire life savings. Curtis told van Woudenberg that at times she struggled to pay rent and buy groceries for her and her son and she did not want to ever go through that again.

130.    Van Woudenberg responded that he would not just suddenly fire her one day and put her in the same financial position she had recently been in.

131.    Van Woudenberg also stated that he could never get another CEO for what she was being paid. Van Woudenberg then stated, "if there's no Julie, then there's no Pakems because you [Curtis] are Pakems."

132.    Based on that statement, Curtis did not look for another job and continued her employment with Pakems.

133.    The next day, on January 10, 2019, Curtis received an email from van Woudenberg informing her that Pine's conduct caused van Woudenberg to change his mind about Chasefield continuing to partner with Curtis and invest more money. Van Woudenberg demanded that Curtis find a new "more suitable partner capable of taking Pakems to where it deserves to be."

**4.  Pine Tells Lies About Curtis**

134.    Van Woudenberg continued in the January 10, 2019 email,

*"Speaking for myself, I favour a solution that will allow us to extract from Pakems, and leave you with the potential for switching tracks and joining up with a more suitable partner capable of taking Pakems to where it deserves to be.  It seems obvious to us that the deep-seated differences between particularly you and [Pine] do not allow for a fruitful relationship to run and grow the business. … I am prepared to spend time with you to help make that happen.  … I do not want to put a timeline on this process but, I am sure you agree that time is of the essence, as a long disruption will play havoc with your business cycle."*

135.    It is obvious from this email that Pine was telling van Woudenberg lies about the relationship between Curtis and Pine. The real relationship was that Curtis was the victim of Pine's bullying and not that there was a personality conflict which made it seem like Curtis' personality was an issue.

136.    Also, based on van Woudenberg's statement that he did not want to put a timeline on the process, Curtis did not spend all day everyday looking for a new business partner like she would have done if there was a deadline on the process.

137.    Pine stated to Matthews that he had a conflict with Curtis, that Curtis was performing badly, and Curtis was not receptive to advice or criticism.

138.   In a February 18, 2019 email, Pine stated to Curtis and van Woudenberg that, "[Curtis] clearly doesn't want to be accountable and has demonstrated it by not providing the requested information or by blaming others, obfuscating or deflecting."

**5.   Pine's Hostile Behavior and Actions Towards Curtis Was Sexual Discrimination**

139.   During one conversation between Pine and Curtis, Pine stated to her that she was "one of those girls that lies in bed at night and makes stuff up."

140.   Pine told Curtis that he told his business coach that he thought Curtis was "one of those people" that was too afraid to sell.

141.   On February 13, 2019, Curtis received a derogatory email from Pine telling her that she needed to learn to read the year-end balance sheet and income statement insinuating that she was not competent enough to understand the year-end balance sheet and income statement.

142.   On February 14, 2019, Curtis sent an email to Beiers. Beiers responded that Curtis had to include Pine on every email. Curtis responded that she "was once again hoping to limit the verbal abuse because [she] didn't think that [Pine] needed to be involved. Curtis further stated that, "[t]his issue caused [Pine] to send [Curtis] yet again another email lambasting [Curtis] – he doesn't cc anyone on those emails" and that Curtis hoped Beiers could understand why she was trying to work with just her on that particular issue.

**6.   Others Found Pine's Behavior "Bizarre" and "Abusive"**

143.   During a conversation with Beiers about the way Curtis was being treated, Beiers stated that Pine's behavior towards Curtis was "bizarre."

144.    Angela Miles, an independent contractor who assisted with Pakems' marketing efforts, witnessed Pine's behavior toward Curtis and stated to Curtis that she believed Pine's conduct towards Curtis was "abusive" and that Pine's behavior really upset her to the level that she no longer wanted to be on Pakems' conference calls.

145.    Van Woudenberg stated to Curtis on various occasions that he had never seen Pine treat anyone the way that he was treating Curtis and that he unfortunately could never invest in another company like Curtis' because of what he had witnessed - Pine's abusive behavior towards Curtis.

146.    During a March 11, 2019 telephone call, Pine immediately began the call by telling Curtis she was on thin ice and began yelling and screaming at her that he was coming after her, threatened her that she was going to be fired, and that she needed to stop playing stupid about a meeting she had scheduled with his accountant regarding the incorrect financial statements that changed three (3) times that Pine provided to Curtis.

147.    Curtis did not raise her voice during this conversation. Curtis' operations assistant, Stephanie Childers ("Childers"), overhead the telephone conversation.

148.    Curtis spent much of the call trying to figure out why he had called her out of the blue and had begun the conversation by threatening her and was so irate and yelling and screaming at her.

149.    It now makes sense that this call was not out of the blue; Pine called Curtis because he was listening to her complain about him and he was extremely livid and that's why he began the conversation "you're on thin ice" and "I'm coming after you" and "you better watch your back."

150.   When Curtis kept asking why Pine was stating this to her, Pine responded that he did not need to explain himself. The reason for this response was he was listening to her and he could not respond to Curtis' questions with the truth.

151.   Pine's behavior on this telephone call was so threatening, it left Curtis physically shaking.

152.   Childers was so alarmed by what she heard she stated that Curtis should be afraid of Pine, to never meet with Pine by herself and that he seemed very unstable.

153.   Curtis immediately closed all the blinds to her house, checked to make sure that all of her doors and windows were locked, and has not felt safe since that telephone call on March 11, 2019, especially in light of all of the other conduct that she has uncovered that has been directed toward her.

154.   The next day, on March 12, 2019, Pine sent an email to van Woudenberg and Curtis stating,

> *"Yesterday was most unpleasant which seems to be a recurring theme for Julie and me. Considering that, I have decided that I will remove myself 100% from Lever Up and Pakems. I have some very strong opinions about the direction and management of the firm that conflict with Julie."*

155.   Pine again mischaracterized what had occurred on this phone call and made it appear that Curtis was confrontational or raised her voice during the meeting which was not the case at all.  Curtis never once raised her voice and merely kept asking why she was on thin ice, why she needed to watch her back, and why he kept stating that he wanted her fired because she knew this already from countless conversations and emails.

156.   After Pine resigned on the board of Lever Up, Curtis was told that Matthews would replace him.

157.   On March 21, 2019, Pine sent an email to Everson instructing him to "disconnect Chasefield internal drives and separate Pakems as its own entity as of 4.15.2019. Contact Julie as to how she wants to handle IT she may choose someone else or no one. The drives were never separated, and Curtis never contacted Everson as she did not have a need for an IT person.

158.   After every face-to-face meeting with van Woudenberg and Matthews, van Woudenberg would tell Curtis that they were going to meet with Pine afterward.

159.   Curtis was in constant fear that Pine would get his way and she would be fired.

**7.   Pine Falsified Pakems' Tax Returns to His Personal Benefit**

160.   After Pine resigned from the board of Lever Up, he was permitted to continue working with his accountant to file Pakems' 2018 taxes and create the monthly Balance Sheets and Income Statements.

161.   On April 3, 2019, Curtis met with van Woudenberg to let him know that she had accidentally uncovered the fact Pine tried to hide that Chasefield Capital owed Pakems over $9,000 and that the revised Profit & Loss Statement and Balance Sheet Pine submitted to them were wrong because of the cover-up.

162.   The next day, on April 4, 2019, Curtis received an email from Pine letting her know that he was still in charge of handling accounting going forward and that Curtis would not be able to write checks on behalf of Pakems.

163.   This directive from Pine was offensive in that Curtis, the CEO of Pakems, was being treated as a person that could not be trusted with the Pakems' bank account.

164.   On April 24, 2019, van Woudenberg sent an email to Curtis stating,

> "*Julie, I also suggest that you give up on trying to adjust 2018 accounting. The small adjustments resulting from an expensive and time-consuming effort are just not worth it, and are a major distraction from your sales efforts. Our focus needs to be on generating revenues and margins.*"

165.    On April 30, 2019, Pine sent an email to Curtis and van Woudenberg in an attempt to explain why the Balance Sheet that he submitted to them was wrong.  In this email, Pine stated, "It has been her since 12.31.2018 and my accountant failed to mention, and I only focused on the income statement for Chasefield at year-end. Between the two of us, we miscommunicated" and that he will send the funds totaling $9,217.18 to Pakems. This explanation was unintelligible.

166.    In this email, Pine appeared to blame his accountant for the almost $9,000 discrepancy even though Pine submitted an invoice to Pakems for $9,000 on January 31, 2019, the same day the accountant revised Pakems financials to reflect this invoice. Further, this invoice dated January 31, 2019, was reflected as an account payable in the 2018 Pakems' financials that were done using cash basis accounting, meaning this was a mistake to include any accounts payable information and should only be reflected in the year it is paid.

167.    As of June 24, 2019, Pine had not transferred the funds from Chasefield Capital to Pakems.

## 8.    Curtis Ends Up in Hospital

168.    On May 31, 2019, Curtis went to the hospital with heart attack symptoms.

169.    On June 4, 2019, Curtis told van Woudenberg and Matthews that she went to the hospital with heart attack symptoms and that the doctors told her that the symptoms were more than likely caused by stress.

170.   On June 4, 2019, Curtis, van Woudenberg and Matthews met with a third-party to discuss a strategy for finding a more suitable partner.

171.   Curtis was told she was on the right track with finding a new partner, so she continued to rely on van Woudenberg's promise that she had time to find a new partner. Thus, Curtis continued spending the majority of her time running the company instead of all of her time trying to find a new partner.

172.   On June 18, 19, and 20, 2019, Curtis attended the Outdoor Retailer Trade Show where she made several potential business opportunities.

173.   On June 19, 2019, when Curtis saw van Woudenberg and Matthews at the trade show, she told them about some of the business opportunities she had made at the trade show and that L.L. Bean loved the samples she provided and wanted additional samples made in its plaid pattern.

## C.   Curtis Terminated for Health Issues and Pakems Left to Fail

174.   Less than three weeks after her trip to the hospital, on Saturday, June 22, 2019, Curtis received an email from van Woudenberg stating that she needed to be at a meeting with him and Matthews at Matthews' office on Monday, June 24, 2019.

175.   Van Woudenberg told Curtis that Matthews and he had decided to remove Curtis from the board of directors and to terminate her employment.

176.   Curtis asked why she was being terminated. One of the reasons van Woudenberg stated was that it was in the company's best interest because of Curtis' health issues.

177.   Curtis asked who was going to run the company now that she had been terminated. Van Woudenberg stated that Chasefield Capital would run the company.

28

Curtis gasped because on several occasions, including emails, Pine admitted that Chasefield Capital had negatively impacted Pakems, that they didn't have the requisite experience to operate a shoe company, they didn't understand the process to send shoes to Amazon as a FBA (Fulfilled By Amazon) vendor, were very busy running three (3) other companies and on multiple occasions had stated that Chasefield Capital was not a suitable partner.

178.   Curtis stated that she did not want to remain partners with them and no longer wanted her ownership interest in Pakems and wanted them to buy her 450 shares (her unvested shares vested since she was terminated without cause) for $450,000 as set forth in her Stock Restriction Agreement.

179.   Van Woudenberg stated that he would not exercise this option unless he absolutely had to.

180.   Curtis stated to van Woudenberg that it appeared that it was not ending well for her just like Pine had threatened and, thus, Pine would get his way in that his son, Andrew Pine, who was in the footwear industry, would run the business. Interestingly, Van Woudenberg did not deny but rather responded that Curtis could not prove this.

181.   At the termination meeting, Curtis was given an Option Agreement that set forth she had until July 1, 2020, to purchase all of the common stock in the corporation not held by her in the amount of the greater of $2,000,000 or nine times (9x) the company's EBIDA for the trailing twelve months prior to giving written notice of her intent to exercise the option, as determined by the Board of Directors in good faith, divided by the company's equity capitalization immediately prior to the closing date. Within this

document she discovered that van Woudenberg now owned 754 shares of Lever Up common stock.

182.   After Curtis was terminated, she discovered that they cut off her access to julieadams@pakems.com and did not set up an automatic reply letting individuals who sent Curtis an email that Curtis was no longer with Pakems. Curtis was never asked what her password was to her email account.

183.   Curtis was not given a warning that she needed to change anything she was doing, or she would be fired.

184.   Curtis had been following the strategy for Pakems van Woudenberg and Matthews had approved.

185.   Upon information and belief, Matthews became a part-time CEO of Pakems. Matthews did not have any prior footwear industry experience.

186.   Due to Curtis' termination, Pakems' lost sales and potential sales opportunities that Curtis was cultivating, either directly or through sales representatives, including but not limited to, Uncharted Supply Company, L.L.Bean, Dick's Sporting Goods, REI, Dunham's, Camping World, Vail Resorts, Alterra, Gorsuch, Steamboat Resort, Summit Sports, Gabe's, a UK Distributor, and Sinner.

187.   Curtis submitted a weekly report that set forth the opportunities she was working on and several of these opportunities were discussed on weekly conference calls with Matthews and van Woudenberg.

188.   On June 25, 2019, Curtis returned Hamish Lorimer's, Stepping Out Footwear, phone call from the previous day. Mr. Lorimer was an Australian distributor. He stated that he had received an email from Matthews stating that Curtis was no longer with

Pakems and that Mr. Lorimer would be working directly with him and that Matthews was in the process of making a decision on new management.

189.    On July 2, 2019, Lorimer sent an email to Matthews stating,

> *"I have decided to hold off ordering Pakems stock for my current winter. I was a little taken back that [Curtis] has been removed from the business, especially as she is the Founder of the Pakems brand. She has also been instrumental in supporting me to set up the brand for web & Amazon sales down under. So I am a little nervous investing funds now in the brand until I can see what your management teams plans are moving forward."*

190.    Matthews sent this unsolicited email to Hamish Lorimer because Curtis told Matthews and van Woudenberg that Hamish Lorimer planned to place an order. Van Woudenberg had even sent Curtis an email about popping champagne once the order was placed.

191.    Every single future order that Curtis obtained and potential sales opportunities she was working on went away because she was terminated.

192.    Neither Matthews nor van Woudenberg reached out to Curtis after they fired her to find out what additional potential opportunities, she had from the trade show or who had requested samples. They must have believed they knew everything she was working on because she was being listened to and her emails were being monitored.by listening to all of her conversations or through hacking into her computers.

193.    After Curtis was terminated, the revenue realized over the latter part of the year was less than it was while Curtis was employed.

194.    One of the reasons Defendants gave as the reason Curtis was terminated in their CCRD response was that Pakems' gross profit was not enough to cover Curtis' salary.

195.    After Curtis was terminated, Pakems' gross profit went down and was not enough to cover Matthew's salary. The average monthly total income during Curtis' tenure was $7,135.16 per month and during Matthews' tenure it was $55.36 per month.

196.    Upon information and belief, Matthews did not procure one single opportunity for Pakems.

197.    Upon information and belief, Matthews, a male, has not been fired and his performance was dismal compared to Curtis' performance.

198.    Upon information and belief, Matthews' computers were not being hacked, his personal accounts and personal email accounts were not being hacked, he was not being watched or listened to through his computer, nor were his emails being monitored.

199.    On March 13, 2020, Patrick Bernal, counsel for certain Defendants, stated in a letter, "In January and early February 2020, I exchanged a series of emails with Ms. Curtis, concerning the potential dissolution, or sale, of Pakems, LLC, and its holding company, Lever Up, Inc."

200.    Upon information and belief, Defendants conducted a liquidation sale and have currently shut the doors on Pakems and are not making Pakems available for sale.

201.    Curtis will lose the over $1 million that she invested in Pakems if the company is dissolved and no efforts are made to attempt to sell the company.

202.    On July 25, 2019, Curtis gave written demand to inspect and copy certain documents pursuant to Colo. Rev. Stat. Ann. § 7-116-102.

203.    To date, Curtis has not received minutes of shareholders' meetings, records of actions taken without a meeting, minutes of meetings of the board, waivers of notice of meetings, or the names and business addresses of all of the current officers and directors.

204.    Further, Curtis has requested specific information regarding the company's inventory.  Curtis has not received the requested information.

**D.    Curtis' MAC1 and MAC2 Personal Computers Were Configured and Hacked to Secretly Spy on Curtis and Read Her Private Information**

205.    Soon after Curtis was terminated, she began noticing unusual things going on with her MAC1 and MAC2 computers and her personal iPhone.

206.    The unusual things first began with noticing that there were several emails on her iPhone that were from someone named "Stupid."

207.    Curtis noticed, including, but not limited to:

(a) files on her MAC1 and MAC2 computers that were not files that she created or modified;

(b) she discovered a hidden library on her MAC2 computer with various folders that she did not create or modify;

(c) she began noticing that there were files and applications opened on her computers that she had not opened;

(d) she noticed that when she stepped away from her MAC2 computer, the programs and files visible on the screen were not the same when she returned;

(e) she noticed that software programs were installed on her MAC2 computer that she did not install; and,

(e) she noticed that software programs were removed from her MAC2 computer that she did not remove.

33

208.   Ultimately, all of these observations led to the following extremely disturbing, exceptionally shocking, and particularly offensive and disgusting discoveries.

209.   When Curtis met with Everson on December 13, 2018, he downloaded and installed much more than Chasefield Capital or Everson informed Curtis Everson was installing.  He set in motion a way to obtain thousands of personal bits of information that belonged to her, including what was being said and done in her own home.

210.   At the meeting in Chasefield Capital's offices, at 11:28 a.m., Everson installed a software package entitled chasefieldcapitalmainoffice.4.0.4889-installer(1).pkg@base.pkg onto Curtis' MAC2 computer.

211.   This software package contained the spyware software entitled NinjaRMMAgent 4.0.4889 ("Ninja Spyware").

212.   Below is a screen shot of a log file from Curtis' MAC2 computer.

213.    The Ninja Spyware account belonging to Everson and password protected by him was used to remotely access Curtis' personal computer whenever Everson wanted to and without her authorization or knowledge.

214.    Rather than merely setting up Curtis' email julieadams@pakems.com to also be available to her on her MAC1 computer, Everson installed the same chasefieldcapitalmainoffice.4.0.4889-installer(1).pkg@base.pkg software package, including the Ninja Spyware, onto Curtis' MAC1 computer.

215.    The Ninja Spyware log file indicates that Everson granted access to the Ninja Spyware to four individuals; thus, Everson is directly linked to and responsible for the others he allowed to access her computers whenever they wanted.

216.    On December 13, 2018, at 11:41 a.m., Everson downloaded and installed software called TeamViewer on Curtis' MAC2 computer that was also an account he controlled and was password protected by Everson.

217.    Below is a screen shot of a log file from Curtis' MAC2 computer.



218.    This TeamViewer software can be used in conjunction with the Ninja Spyware and enabled Everson remote access to Curtis' MAC2 computer whenever he wanted and have the ability to remotely "control" her computer.

219.    Similarly, Everson installed the TeamViewer software on Curtis' MAC1 computer.

220.    Everson assigned Curtis' MAC1 and MAC2 computers to his TeamViewer account so that the devices could be remotely managed and monitored by him.

221.    Everson also customized the settings within the TeamViewer software so that the TeamViewer software would automatically launch every time Curtis logged into her computers and, unbelievably, **Everson turned off the logging function so that this application would not create log files when the application was used**.

222.    This is not something that an IT person concerned about computer security would do. However, this is something that an IT person would do to cover up who was logging into her computers and how often. The installation of TeamViewer was for unscrupulous purposes.

223.    Everson also hid the TeamViewer software on Curtis' MAC1 and MAC2 computers as evidenced by the file path on her computers, which was /Applications/.TeamViewer/TeamViewer.app – the "." in front of "TeamViewer" indicates a hidden folder.

224.    Not only did TeamViewer allow Everson remote access to Curtis' personal computers without her knowledge, but he configured the TeamViewer software so that he could send himself files from Curtis' computer.

225.   On December 17, 2018, at 1:21 p.m., Everson, without Curtis' authorization or knowledge, reconfigured the TeamViewer software he had installed so that the main window on her MAC2 computer could be remotely controlled and gave himself the capability to clip images from the folder /user/bodiecurtis/pictures/photoslibrary which was where he uploaded the photos and videos from her iPhone via iCloud and gave himself the ability to view the images placed in that file, videos placed in that file and selected the option to also hear the audio from the videos he viewed.

226.   TeamViewer software can also access the camera and microphone on her computers, thus, this was one method Everson set up so he could secretly spy on Curtis; by accessing the camera and microphone on her computer when he was using the TeamViewer software he installed, capture screen shots of her, view the screen shots, video her and listen to the audio.

227.   Below is a screen shot of a log file from Curtis' MAC2 computer.



228.    Everson, without Curtis' authorization or knowledge, changed the Administrator settings on Curtis' MAC2 computer and added additional Administrators within a Group called "Administrator's Public Folder" and another Group called "Bodie Curtis's Public Folder." Within these Groups, Everson selected "Everyone" so that he could access her computer.

229.    Below is a screen shot from Curtis' MAC2 computer.



230.    The result of this was that when the Everson accessed Curtis' MAC2 computer, without Curtis' permission or authorization, and download applications, folders, files, saved information to /var/ files, etc., Everson would do so by accessing the computer using the "bodiecurtis" Library that was hidden on Curtis' MAC2 computer.

231.    Below are screen shots from Curtis' MAC2 computer.



232.    Most of the actions and conduct described below was discovered in the folder entitled "Library" that had been hidden on Curtis' MAC2 computer or within the log information on the back end of her MAC2 computer.

233.   At the December 13, 2018 meeting, Everson installed the security program Webroot on Curtis' MAC2 computer.

234.   After the December 13, 2018 meeting, Everson, without Curtis' authorization or knowledge, accessed Curtis' computer on various occasions to change parameters of the Webroot security program he installed. For example, Everson accessed Curtis' MAC2 computer on January 10, 2019, at 10:50 a.m., and on February 17, 2019, at 6:52 a.m. to make changes within Webroot. And, as set forth below in more detail, Everson later hacked into Curtis' MAC2 computer after she was terminated and deleted Webroot from her MAC2 computer.

235.   Everson, without Curtis' authorization or knowledge, changed the settings on Curtis' MAC1 computer, MAC2 computer and personal iPhone so that all of the devices were connected to Curtis' personal iCloud account.

236.   As noted by the time stamp, Everson, at the December 13, 2018 meeting, added or changed the accounts related to Curtis' iCloud account, namely julie.adams7@icloud.com and julieadamscurtis@yahoo.com. This was done without Curtis' authorization or knowledge.

237.   Below are screen shots from Curtis' MAC2 computer.



238.   At this same exact time, Everson migrated Curtis' personal iCloud account that was assigned the number 214253806.

239.   Below is a screen shot of the log file on Curtis' MAC2 computer.



240.   Months after Curtis was terminated, on August 14, 2019 at 3:44 p.m., Everson hacked into Curtis' MAC2 computer and created and modified her iCloud account with the identifier "214253806."

241.   Below is a screen shot from Curtis' MAC2 computer.



242.   At the December 13, 2018 meeting with Everson, without Curtis'
authorization or knowledge, the contacts and images from what appears to be from Curtis'
personal iPhone were downloaded to the hidden folder on her MAC2.

43

243.    Below is a screen shot from Curtis' MAC2 computer.



244.    One minute later, Everson, without Curtis' authorization or knowledge, downloaded Curtis' calendar associated with her personal email account julieadamscurtis@yahoo.com. Everson would have used Curtis' password to this email account to cause this to happen.  The result of this was that Everson could review every meeting that Curtis had scheduled within that calendar dating back to 2004.

245.    Below is a screen shot from Curtis' MAC2 computer.



246.    Within the Photos application on Curtis' MAC2 computer, the settings were altered so that all of the approximately 15,300 photos and videos on her iPhone that were now in her iCloud downloaded onto her MAC2 computer to the hidden file path /user/bodiecurtis/pictures/photoslibrary, and at 12:41 p.m. on December 13, 2018, after Curtis left the office, Everson configured, without Curtis' authorization or knowledge, the "photoanalysisd" so that the "Favorites" photos were set to photos and videos of Curtis and her son and would automatically be sent to the "Favorites Folder." Further, the changes made to the settings on her personal devices resulted in Curtis' photos and videos to download to her son's phone and vice versa. Because Curtis was not informed that Everson was reconfiguring her personal iCloud account, Curtis and her son did not understand why this populating of photos and videos on their iPhones suddenly

45

happened. They spent hours trying to remedy this and ultimately, Curtis' son lost every photo and video on his iPhone.

247.   At the December 13, 2018 meeting with Everson, without Curtis' authorization or knowledge, Everson installed a "MobileDeviceKitLite" framework so that all of the content on Curtis' personal iPhone would upload to her MAC2 computer. This included all of her personal photos, videos, text messages and voicemail messages.

248.   Once uploaded to her MAC2 computer, this voluminous amount of personal and private content was stored in a folder entitled "Mobile Documents" on Curtis' MAC2 computer. Everson would synchronize Curtis' personal iPhone through the Bluetooth technology on both her MAC2 computer and her personal iPhone in order to gain access on a periodic basis to her personal photos, videos, text messages and voicemail messages.

249.   This "Mobile Documents" folder was modified and opened by Everson the day before Matthews and van Woudenberg fired Curtis, on June 23, 2019 at 9:57 a.m. Everson would have been notified by van Woudenberg and/or Matthews about their decision to terminate Curtis, thus this particular access into her computer, without Curtis' authorization or knowledge, was at the direction of van Woudenberg and/or Matthews.

250.   Below is a screen shot from Curtis' MAC2 computer.



251.   On July 29, 2019, more than a month after Curtis was fired, computer logs indicate that Everson hacked into her MAC2 computer and launched the application AppleMobileDeviceHelper within Sync Services to further cause her phone to be synchronized to her computer.

252.   The security and privacy settings on both MAC1 and MAC2 were changed to allow for all incoming connections from com.apple.webkit.networking.wpc.

253.   On February 27, 2019 at 2:02 p.m., Everson hacked into Curtis' MAC2 computer to add a WebKit.Plugin.32.

254.   Then on August 14, 2019, about two months after they fired Curtis, at 9:06 a.m., Everson hacked into her computer and changed the preferences associated with com.apple.webkit.networking.

255.   At the December 13, 2018 meeting with Everson, without Curtis' authorization or knowledge, Everson also changed settings on Curtis' personal iPhone so that all of the notes on her personal iPhone were sent to her personal email account julieadamscurtis@yahoo.com.

256.   These notes contained extremely personal and sensitive information, including, but not limited to, passwords to various personal accounts and her son's social security number.

257.   Everson, without Curtis' authorization or knowledge, accessed this email account and all of the notes were read within her Yahoo email account.

258.   At the December 13, 2018 meeting with Everson, without Curtis' authorization or knowledge, Silverlight was installed on Curtis' MAC2 computer. This software program compresses very large files to be sent over the network and is usually used for sending video files.

259.   At the December 13, 2018 meeting with Everson, without Curtis' authorization or knowledge, Everson used Curtis' AppleID to download the OneDrive application to her MAC2 computer.

260.   Curtis was tricked into providing her AppleID password to Everson and was never told that OneDrive was going to be installed on her computer. She was under the impression that SharePoint was going to be the cloud storage solution that she would be in control of what documents she wanted to upload to SharePoint.

261.    Below is a screen shot from Curtis' Yahoo email account.



262.    Within the OneDrive software, without Curtis' authorization or knowledge, two folders were created by Everson entitled "Personal" and "Business1."

263.    Below is a screen shot from Curtis' MAC2 computer.



264.   Without Curtis' authorization or knowledge, the OneDrive's synchronization function was set by Everson so that all of the content in both the Personal and the Business1 folders on Curtis' MAC2 computer would be copied and uploaded to the Chasefield Capital SharePoint drive. The Personal folder contained all of the personal documents and photos within Curtis' Microsoft account that she shares with her son were also uploaded to the Chasefield Capital SharePoint drive.

265.   Below are screen shots of log files from Curtis' MAC2 computer.



266.    After the December 13, 2018 meeting with Everson, at 4:37 p.m., Everson emailed Curtis with directions on how to finish the installation of the Webroot security software. She responded that she could not figure out how to do this. Because Webroot was ultimately installed, Everson hacked into her computer to accomplish this.

267.    Also, after the December 13, 2018 meeting with Everson, later that evening after Curtis was home with her computers in her possession, her MAC2 computer, without Curtis' authorization or knowledge, was remotely accessed at 6:58 p.m. by Everson and the OneDrive application that was installed earlier in the day by Everson using her AppleID and password was deleted by him and another OneDrive application was uploaded and installed.

268.    The new version of OneDrive was set to automatically open every time Curtis logged into her MAC2 computer. Additionally, Everson selected to hide the OneDrive software on Curtis' MAC2 computer.

269.    Below is a screen shot from Curtis' MAC2 computer.



270.    Further, Everson created a Skype for Business account for Curtis and set it to automatically open every time she logged into her computer as set forth in the above screen shot.

271.    After the December 13, 2018 meeting with Everson, without Curtis' authorization or knowledge, at 3:45 p.m., the software program StellarPhoenixMacRecovery was downloaded and installed by Everson on Curtis' MAC1 computer. This was well after Curtis left the Chasefield offices with her MAC1 and MAC2 computers.

272.    The StellarPhoenixMacRecovery software was used to access all deleted files, photos, videos, and/or documents on Curtis' personal MAC1 computer.

273.    At the December 13, 2018 meeting with Everson and afterwards, without Curtis' authorization or knowledge, about thirty (30) folders were created by Everson on Curtis' MAC2 computer in order for various applications on the MAC2 computer to interact with other applications.

274.    On January 4, 2019 at 2:19 p.m., Everson, without Curtis' authorization or knowledge, remotely accessed Curtis' MAC2 computer and the application BlueJeans was secretly installed and hidden on Curtis' MAC2 computer.

275.    BlueJeans is a software program used for remote web video conferencing, similar to Zoom.

276.   Below is a screen shot of a log file from Curtis' MAC2 computer.



277.   After downloading the BlueJeans software, without Curtis' authorization or knowledge, Everson created and scheduled a queue of "meetings." On the same day, the settings of the BlueJeans software were deliberately changed so that when the scheduled "meetings" occurred, access was granted to auto-select the computer's camera ("FaceTime HD Camera"), the built-in internal microphone, and built-in internal speakers. The video capabilities within the application was deliberately set to "local video stream" so that Everson could stream the video recordings of the scheduled "meetings."

278.   Curtis was not invited to nor aware of the scheduled meetings within the BlueJeans software.

279.   On January 4, 2019, at 2:23 p.m., Everson began secretly capturing video of Curtis through her MAC2 computer's camera via the BlueJean software.

280.   Below is a screen shot from Curtis' MAC2 computer.



281.   Furthermore, the device VirtualVideoCapture [BJN] was opened by Everson and enabled to be streamed and the device VirtualScreenCapture [BJN] was also opened and enabled to be streamed. The video device was enabled to RenderLocalView to the drivername BJN.

282.   On January 4, 2019, at 2:23 p.m., according to BlueJean log files, Everson posted "messages" to postToClient@/users/luke/jenkins2/workspace/Furiosa_2.9.0-RZT4NGT4SN2SSME2CHEYO6ZV35WEVAZL3WGMCXKLJAE577W3Z6HQ/Carthage /Checkouts/app/sipmanager/skinnysipmanager.h:241.

283.   Without Curtis' authorization or knowledge, the "security profile" for the BlueJeans software was set up using Curtis' email address julieadams@pakems.com.

284.   After installing BlueJeans on January 4, 2019, Everson began accessing the software the next day and repeatedly accessed BlueJeans on at least twenty (20) occasions over the next forty-five (45) days.

285.    On several occasions, Everson remotely accessed Curtis' MAC2 computer, without Curtis' authorization or knowledge, to launch the BlueJeans software to secretly capture video of Curtis in the evening or at night. For example, Everson used the BlueJeans software on January 17, 2019 at 9:27 p.m., January 27, 2019 at 12:36 a.m., February 6, 2019 at 8:20 p.m., and on February 8, 2019 at 9:21 p.m. and 9:54 p.m. On February 8, 2019, between the times Everson used the BlueJeans software, which was at 9:21 p.m. and 9:54 p.m., at 9:53 p.m., Everson modified the TeamViewer application cache settings.

286.    During this time period, Curtis lived in a small apartment.  Her office was located in her bedroom and the bathroom was attached to her bedroom. As stated above, Curtis was in the habit of always leaving her computer on and open.  She never covered the camera on her computer.  Curtis used her bedroom to dress, undress and for private intimate moments. It is very likely that the videos and/or images taken by Everson from Curtis' computer would have captured Curtis nude and/or during those private intimate moments. Curtis is absolutely sickened, mortified, disgusted, and repulsed thinking about Everson's unlawful and morally offensive actions.

287. On February 14, 2019 at 5:28 p.m., Everson changed the CalendarAuthManagerStartListeningForInterAppCommunication application. At 6:17 p.m., Everson accessed the Calendar applications within her computer and created calendar events tied to her iCloud that Everson migrated and scheduled "EventAllDay" meetings.

288.    At the exact moment, on February 14, 2019, at 5:28 p.m. that Everson made the changes within the calendar application, he also was making changes within the BlueJeans software.

289.    Below is a screen shot of Curtis' MAC2 computer.



290.    On December 20, 2018 at 8:38 p.m., April 26, 2019 at 9:32 a.m., May 12, 2019 at 12:04 p.m., and on June 9, 2019 at 10:25 p.m., approximately 500 personal text messages sent to and from Curtis' son's iPhone were read by Everson. Unbeknownst to Curtis, these text messages were automatically saved on Curtis' MAC2 computer because Curtis' son's iPhone was somehow tied to the MAC2 computer.

291.    Some of these text messages had been sent or received a year prior to when Chasefield Capital purchased Pakems Inc. and were from the time Curtis' son was twelve and thirteen years old. These personal text messages included texts from Curtis, the boy's father, his grandparents, his uncle, and his friends. Curtis' son is aware of this

invasion of his privacy and the other spying that occurred and no longer feels safe staying at Curtis' house.

292.    On June 11, 2019, Everson was very busy with Curtis' MAC2 computer.  All of the unauthorized access into her MAC2 computer during this time period and the changes made to her Skype, WhatsApp and Keeper Security accounts are directly linked to Everson being told by Van Woudenberg and/or Matthews and/or Pine that Curtis was going to be fired.  By June 11, 2019, van Woudenberg and Matthews would have determined that they were going to fire Curtis as this day was seven (7) days after Curtis told van Woudenberg and Matthews that she was in the hospital because of stress and twelve (12) days until she would be fired without warning on June 24, 2019.

293.    On June 11, 2019, Everson, without Curtis' authorization or knowledge, remotely accessed Curtis' MAC2 computer and, specifically her personal WhatsApp account. Curtis used the WhatsApp software to send and receive text messages.

294.    On June 11, 2019, Everson, without Curtis' authorization or knowledge, remotely accessed Curtis' MAC2 computer and, specifically her Keeper Security Password account. Curtis used the Keeper Security Password software to securely save all of her personal passwords in one place.

295.    On June 11, 2019, Everson, without Curtis' authorization or knowledge, remotely accessed Curtis' MAC2 computer and, specifically her personal Skype account. Curtis used the Skype software for scheduling remote video conferencing meetings. Skype utilizes a computers' camera and microphone.

296.    On June 11, 2019 between 8:39 a.m. and 9:54 a.m., Everson, without Curtis' authorization or knowledge, remotely accessed Curtis' MAC2 computer and made

changes to the WhatsApp software, the Keeper Security Password software, and the Skype software on Curtis' MAC2 computer.

297.    Below is a screen shot from Curtis' MAC2 computer.



298.    Later the same day, June 11, 2019 at 2:28 p.m. and 2:29 p.m., Everson, without Curtis' authorization or knowledge, retrieved data that was saved in the WhatsApp software, the Keeper Security Password software and the Skype software.

299.   Below are screen shots from Curtis' MAC2 computer.





300.   In or about 2013, Curtis created a Skype account called "julieadams303" that she used for personal Skype calls and for business calls.

301.   From June 12, 2019 to June 17, 2019, Curtis did not have any remote meetings or calls that required her to use her personal Skype account or the Skype for

Business account that Everson created. Being that Curtis' personal Skype account had been set-up years prior, Curtis had no reason to be making changes to her personal Skype account during this time period.

302.   However, on June 14, 2019 at 7:14 a.m., Everson, without Curtis' authorization or knowledge, created a second Skype handle within Curtis' personal Skype account entitled "live#3Ajulieadams_13."

303.   Below are screen shots from Curtis' MAC2 computer.



304.   A Skype handle that has the word "live" at the beginning indicates that the Skype handle is tied to an email address. Curtis' original account is tied to her telephone number. Everson tied this newly created "live#3Ajulieadams_13" handle to an email address in an attempt to schedule meetings and access her computer camera and microphones and to conceal his actions.

305.    Beginning on June 12, 2019, and continuing until June 17, 2019, Everson, without Curtis' authorization or knowledge, created and/or modified within the Skype software numerous folders, files, logs and plist files. Notably the first configuration changes made started on June 12, 2019 at 3:19 a.m.

306.    On June 12, 2019, at 6:22 a.m., Everson, without Curtis' authorization or knowledge, accessed Curtis' julieadams303 Skype account and added contacts to her account from the contacts in her personal iPhone that he had uploaded to her computer on December 13, 2018.

307.    Below is a screen shot from Curtis' Skype account.

| | | | | |
|---|---|---|---|---|
| Joseph | V. | live:joseph_5870 | AcceptInvite | 2017-03-27 16:14:49Z |
| Jocelyn | Thomas | jocelyniscasting | AddContact (T1) | 2017-05-03 17:24:44Z |
| Colton Bybee - Cross collaborations & B | unitonbybee | | AcceptInvite | 2017-06-08 17:22:31Z |
| Chris | Martin | martincjm9 | AcceptInvite, AddContact (T1) | 2017-11-23 04:02:52Z |
| Skype | Skype | concierge | | 2017-11-24 14:01:09Z |
| Skype Transl Microsoft | | 0d5d6cff-595d-49d7-9cf8-973173f5233b | | 2018-01-15 16:01:11Z |
| Richard Blues | | timetoskypeit | AcceptInvite, AddContact (T2) | 2018-03-07 17:20:17Z |
| s Luis | Carrega | axionllc | AcceptInvite, AddContact (T2), Scd, | 2018-03-08 00:03:12Z |
| Cortana | Microsoft | cece905d-8137-4f70-8cbc-e94e16211a46 | | 2018-10-01 20:32:37Z |
| | | rogest1053 | AcceptInvite, AcceptConversation | 2019-01-12 02:14:01Z |
| Stephanie | M Childers | live:stephmchilders | AcceptInvite, AcceptConversation | 2019-02-21 18:29:01Z |
| Michael | Lauwers | michael.lauwers.be | AcceptInvite, AcceptConversation | 2019-02-27 15:24:58Z |
| Jack | adams | live:a61ac836275a6758 | AcceptInvite, AddContact, S | 2019-03-07 19:37:51Z |
| Hamish | Lorimer | live:hamish.lorimer_1 | AcceptInvite, AcceptConversation | 2019-03-13 21:58:40Z |
| Ivan | Granelli | live:ivan.granelli | InitConversation | 2019-06-10 23:55:37Z |
| David | Dustin | live:daviddustin | Scd | 2019-06-12 06:22:19Z |
| Jennifer Kamalei Casani | | j-kamalei | Scd | 2019-06-12 06:22:19Z |
| Katie Collins | | snilloceitak | Scd | 2019-06-12 06:22:19Z |
| | | live:annikellner | Scd | 2019-06-12 06:22:19Z |
| John | Chouinard | j.vince.chouinard | Scd | 2019-06-12 06:22:19Z |
| Allie | Kellner | live:aa492a828546775b | Scd | 2019-06-12 06:22:19Z |
| rusty | hogan | live:aae3b80d4d531c4c | Scd | 2019-06-12 06:22:19Z |
| | | live:109adc85232f5b62 | Scd | 2019-06-12 06:22:19Z |
| | | live:1d69f1c2f46f25e5 | Scd | 2019-06-12 06:22:19Z |
| Kid Hampton | | hampton2399 | Scd | 2019-06-12 06:22:19Z |
| | | nickkirk23 | Scd | 2019-06-12 06:22:19Z |
| Scott | Wirth | scott_wirth | Scd | 2019-06-12 06:22:19Z |
| Courtney | Kerckhoff | live:998f153919b5543 | Scd | 2019-06-12 06:22:19Z |
| Leslie | Dy | lesliecdy2 | Scd | 2019-06-12 06:22:19Z |
| Laura  Reid | | laurathetwin | Scd | 2019-06-12 06:22:19Z |
| Andrew H Rutledge | | andy_rutledge | Scd | 2019-06-12 06:22:19Z |
| Kelly Gray | | kellymgray | Scd | 2019-06-12 06:22:19Z |
| C | J | cjdude48 | Scd | 2019-06-12 06:22:19Z |
| Jen | Riley | live:rileyje | Scd | 2019-06-12 06:22:19Z |
| Damian | Quinn | live:damian_3942 | Scd | 2019-06-12 06:22:19Z |
| Dione | McCollum | live:dionemccollum | Scd | 2019-06-12 06:22:19Z |
| Matthew | Austin | live:austin_1830 | Scd | 2019-06-12 06:22:19Z |
| Mark | Gershien | live:mgershien | Scd | 2019-06-12 06:22:19Z |
| thomas | kolicko | live:thomaskolicko | Scd | 2019-06-12 06:22:19Z |
| Kim | Kennedy | live:kimmariekennedy | Scd | 2019-06-12 06:22:19Z |
| Kim | Kennedy | live:kimk_110 | Scd | 2019-06-12 06:22:19Z |
| Barb | Miller | live:b.miller62 | Scd | 2019-06-12 06:22:19Z |
| Erik | Specht | spechtman | Scd | 2019-06-12 06:22:19Z |
| Todd | McWhirter | live:mcwtodd | Scd | 2019-06-12 06:22:19Z |
| Jv | | live:javecch | Scd | 2019-06-12 06:22:19Z |
| Gerri | Contreras | live:gerridenver | Scd | 2019-06-12 06:22:19Z |
| doug | curtis | live:curtis46_9 | Scd | 2019-06-12 06:22:19Z |
| Arno | Derre | live:arno_derre | Scd | 2019-06-12 06:22:19Z |
| Margy McKenna | | margy.mckenna | Scd | 2019-06-12 06:22:19Z |
| Bradley | Shafer | bks-wv | Scd | 2019-06-12 06:22:19Z |
| nicki | morrone | live:cleanwoman | Scd | 2019-06-12 06:22:19Z |
| Kristie | Churchley | live:kmitton_1 | Scd | 2019-06-12 06:22:19Z |
| Jim | MacLeod | live:jim_macleod1 | Scd | 2019-06-12 06:22:19Z |
| Korene | Dahl | live:kmbaldi | Scd | 2019-06-12 06:22:19Z |
| BODIE | Adam | live:julieadams_13 | Scd | 2019-06-12 06:22:19Z |
| Rob | Ellwood | live:rdigel | Scd | 2019-06-12 06:22:19Z |
| Beth | Fulkerson | live:bethfulkerson | Scd | 2019-06-12 06:22:19Z |
| kristen | padberg | live:kpadberg_3 | Scd | 2019-06-12 06:22:19Z |

308.    Curtis was not invited to nor aware of these scheduled meetings within the Skype software.

309.    On June 23, 2019, the day before Curtis was fired, Everson, without Curtis' authorization or knowledge, was very busy copying and collecting significant amounts of Curtis' personal information. Everson accessed numerous personal folders on Curtis' MAC2 computer and accessed and created numerous non-business related files and folders. Again, this computer activity is directly related to the information given to Everson by van Woudenberg and/or Matthews and/or Pine that Curtis would be fired the next day.

310.    For example, on June 23, 2019 at 9:57 a.m., Everson, without Curtis' authorization or knowledge, accessed a hidden folder on Curtis' MAC2 computer entitled "Mobile Documents."

311.    Below is a screen shot from Curtis' MAC2 computer.



312.    On June 23, 2019, the date before Curtis was fired, there were numerous changes that Everson made to Curtis' MAC2 computer, without Curtis' authorization or knowledge, as evidenced by accessing folders and .plist files that were created, including, but not limited to, CloudDocs, com.apple.shoebox.plist, com.apple.mobilemail.plist, iCloud.com.google.container.plist,                iCloud.com.microsoft.skype.teams.plist, com.apple.icloud_fmfd,              com.apple.keyboardservicesd,              and iCloud.com.apple.iBooks.iTunesU.plist.

313.    Curtis was never told nor provided a policy that alerted her to the fact that her personal MAC1 and MAC2 computers would be remotely accessed, and she never gave consent nor was she aware that her personal computers were being remotely accessed.

314.   After the December 13, 2018 meeting with Everson, on an almost daily basis, Curtis spent an inordinate amount of time trying to accomplish simple tasks because her MAC2 computer was always out of memory or was crashing.

315.   Curtis' computer issues were caused by all of the Defendants' concerted efforts to secretly spy on her and gain access to every bit of personal information that could be found or gleaned from her personal MAC1 and MAC2 computers, Curtis' personal iPhone, her son's personal text messages, and every single conversation or any other conduct that occurred in the "privacy" of her personal residence.

## E.   The' Unlawful Actions Did Not Cease After Curtis Was Terminated

316.   Shortly after Curtis was terminated, she began noticing emails and text messages related to actions she knew nothing about.

317.   For example, on or about June 27, 2019, Curtis discovered an email in her personal Yahoo email account that indicated that the security software company Webroot had been contacted and the message sent to them stated, "I am trying [to] open up Webroot."

318.   Below is a screen shot from Curtis' personal Yahoo account.



319.   Curtis did not contact Webroot, nor was she trying to open up Webroot on her computer.

320.   Curtis was very alarmed that her personal email was somehow involved with Webroot and someone else had reached out to their customer care department.  She learned that there had been a phone call made to Webroot and that the person who contacted Webroot, Everson, had the audacity to give Webroot Curtis' personal email address as if it was his own.

321.   Furthermore, on July 13, 2019, when Curtis finished a run, she looked at her iPhone to turn off her music and there was a text message that someone was trying to use her AppleID. Considering the fact Everson had tricked her into giving him her AppleID, Curtis figured it was Everson who was trying to access or had accessed her iCloud account.

322.   Below is a screen shot from Curtis' personal iPhone.



323.   Recently, Curtis has discovered that Everson was receiving these Apple ID Verification text messages with the login access codes because Everson turned on Bluetooth on her computer and paired it with her personal iPhone. Thus, Curtis' attempts to keep Everson out of her personal accounts by using two-factor authentication was not working.

324.   When Curtis returned home after her run, there was evidence that made her believe that her MAC1 computer had been accessed without her authorization or knowledge. When Curtis left on her run, she was working on a Microsoft Word document entitled "Causes of Action Chasefield" that was created in anticipation of this litigation and covered by privilege because Curtis is an attorney.

325.   However, what was open on her MAC1 computer was her newly created personal Dropbox account.

326.   Below is a screen shot from Curtis' MAC1 computer.



327.   Curtis checked to determine if Microsoft Word had somehow quit or crashed and was therefore the cause of the different window open. Microsoft Word was still running.

328.   That day, July 13, 2019, Curtis spent the next several hours trying to figure out what was going on with her MAC1 and MAC2 computers and whether any of the Defendants were truly accessing her computers – which was something she did not want to be true. She was already devastated by the fact she had been fired from the company she founded, and now she was feeling stalked by these same men.

329.   Curtis did not know where to begin trying to figure out what was going on or how to prove her computers were being hacked into, so she just started taking screen shots of her computer to see if something raised a red flag.

330.   One screen shot Curtis took on July 13, 2019 at 6:47 p.m. was of the applications on her MAC2 computer.

331.   Below is a screen shot from Curtis' MAC2 computer.



Screen Shot 2019-07-13 at 6.47.33 PM.png

PNG image - 452 KB
Created   Saturday, July 13, 2019 at 6:47 PM
Modified   Saturday, July 13, 2019 at 6:47 PM
Last opened   --

332.   This screen shot indicated on the bottom row of icons that on July 13, 2019, the security software Webroot installed by Everson was an application on Curtis' MAC2 computer.

333.   Not only had her computers become her nemesis, but the attempts to access accounts meant Curtis was constantly getting text notifications on her iPhone.

334.   For example, on June 26, 2019, two (2) days after Curtis was terminated, she received a notification on her personal iPhone that Google blocked someone from

69

signing in with the password for the email account pakemskickstarter@gmail.com. This was not Curtis as she had no reason or desire to log into this email account.

335.    Again, on July 29, 2019, Curtis received notification on her personal iPhone that Google blocked someone from signing in with the password for the email account pakemskickstarter@gmail.com.

336.    And, yet again on July 31, 2019, much to Curtis' frustration, she received another notification that Google blocked someone from signing in with the password for the email account pakemskickstarter@gmail.com.

337.    When Curtis investigated the July 31, 2019, log in attempt, she was able to capture the IP address for the computer that was attempting to log into this email account. The IP address was 71.218.51.224.

338.    Below is a screen shot from Curtis' MAC2 computer.



339.    This was actually the IP address of Curtis' computers used in her house; thus, indicating that someone related to Chasefield Capital accessed her personal computer, without Curtis' authorization or knowledge, on July 31, 2019, more than a

month after she was fired, and were accessing her computer in an attempt to log into the email account pakemskickstarter@gmail.com.

340.   Curtis knew that the unauthorized access had to be related to Chasefield Capital because she had given them the password to the email account.

341.   On Curtis' MAC2 computer, she found a document entitled "Pakems Passwords – CF – HPINE ("CF" standing for Chasefield and "HPINE" being Harold Pine) within the OneDrive account set up by Everson called Chasefield Capital Inc.

342.   Below is a screen shot from Curtis' MAC2 computer.



343.   This document was authored by Jordan Pine, and uploaded to the OneDrive account by Beiers on October 25, 2018.

344.   Below are screen shots from Curtis' MAC2 computer.





345.   Within this document, it was documented that the password for pakemskickstarter@gmail.com was Pakems2011.

346.   Below is a screen shot from Curtis' MAC2 computer.



| Passwords | user | password | security questions |
|---|---|---|---|
| Authorize Account | julieadams@pakems.com | Pakems2011II | |
| BackerKit | julieadams@pakems.com | Pakems2011 | |
| | | | |
| Constant Contact | julieadams@pakems.com | Bodie929 | |
| DHL Account | kellie@chasefield.co | ship1234 | |
| DHL Account - billing site | kellie@chasefield.co | Park3018 | |
| Gmail Account | pakemshelp@gmail.com | Park3018 | |
| GoDaddy | contact@pakems.com | Pakems2011 | |
| GoDaddy | support@pakems.com | Chasefeild | |
| Kickstarter | pakemskickstarter@gmail.com | Pakems2011 | |
| Newglistics Billing | Pakems | Wbv0.mh077 | |
| Newglistics | kellie@chasefield.co | Pakems2011 | |
| OldWebsite | pakemsadmin | Shoes123! | |
| OldWebsite | pakemsmasteradmin | Sh0esP@kms2014! | |
| PayPal | kellie@chasefield.co | Park3018 | |
| ShipStation | julieadams@pakems.com | Pakems2011 | |
| Shopify - Admin | jordan@chasefield.co | 2Theright! | |
| Shopify | kellie@chasefield.co | Park3018 | |
| Shopify | julieadams@pakems.com | Pakems2011 | |
| Stripe Account | julieadams@pakems.com | Pakems2011 | |
| WooCommerce | shippingreceiving | Shoes123! | |
| WooCommerce | juliepakems | Pakems2011 | |
| Amazon Seller Central | julieadams@pakems.com | Pakems2011 | |
| Amazon Seller Central | jordan@chasefield.co | KonaDog123 | |
| Facebook | jadams@apreswear.com | Pakems2011 | |
| UPS | julieadamscurtis | Bodie929 | |
| FedEx | julieadamscurtis | Bodie929 | |
| DropBox | julieadams@pakems.com | pakems2011 | |
| CubeSmart | julieadams@pakems.com | Park3018 | |
| GoDaddy Domain Account | 47664353 | Julie1965 | |
| Adobe | julieadams@pakems.com | Pakems2011 | |
| Health Insurance | ? | ? | |
| Small PDF | julieadams@pakems.com | Pakems2011 | |

347.   Thus, the IP address 71.218.51.224 that belongs to Curtis' personal computer proves that either Jordan Pine, Beiers, or Pine accessed Curtis' computer using Everson's TeamViewer and/or Ninja Spyware accounts, over a month after she was terminated, or that one or more of these Chasefield employees gave Everson the password for him to attempt to log into this email account, but to do so by accessing Curtis' computer.

348.   During this period in time after Curtis was fired from Pakems, Curtis' thoughts were filled with trying to stay one step ahead of the hacking into her accounts and computers and was so upset by what was being done to her. Curtis was desperate to keep the hackers out of her MAC1 and MAC2 computers and she was not able to make it stop. She tried to change all of the passwords to all of her accounts and to her computers and set up two-factor authentication, but nothing worked, and she was seeing so many things going on with her computers that were extremely alarming.

349.   On August 10, 2019, Curtis checked to see if Webroot was still on her computer. Curtis went to her loathed computer and checked the applications on her computer. Much to her surprise, disgust, and fright, the Webroot application was no longer on her computer.

350.    Below is a screen shot from Curtis' MAC2 computer.



Screen Shot 2019-08-10 at 4.22.52 PM.png

PNG image - 446 KB
Created    Saturday, August 10, 2019 at 4:23 PM
Modified   Saturday, August 10, 2019 at 4:23 PM
Last opened    --

351.    Curtis called Webroot to ask how a Webroot application could be removed from her computer and the customer service person stated that the only way it could be removed was by someone physically being in her computer and uninstalling it.

352.    Pine and van Woudenberg are directly responsible for this computer access, without Curtis' authorization or knowledge, because it was Chasefield Capital who directed Everson to install security software and arguably it was uninstalled because Chasefield Capital no longer wanted to pay for the software.

353.    After discovering this and after seeing so much suspicious activity, Curtis started making sure she was more deliberate with her investigation into her MAC1 and MAC2 computers.

354.    At that time is when Curtis started making sure that she shut down all applications on her computer before going to bed so when she saw an application was opened the next time she got on her computer, she was certain it was not something that had been opened by her.

355.    Also, because Curtis did not know how her MAC1 and MAC2 computers were being hacked, she thought quitting all applications at night before going to bed would somehow prevent the hacking while she was asleep.

356.    One night, when Curtis was ready to call it quits for the day of trying to determine what was going on with her MAC1 and MAC2 computers, she took a screen shot of the computer's request whether she really wanted to quit all computer applications.

357.    On August 14, 2019, at 11:31 p.m., she took a screen shot of this before clicking the button to quit all computer applications.

358.    Below is a screen shot from Curtis' MAC2 computer.



359.  Next, Curtis went to the Terminal Application to see if there was still someone logged into her computer – by this time she had noticed a "ttys000" in the terminal logs and her research informed her that this indicated there was someone else "networked" into or connected to her computer.

360.  Below is a screen shot from Curtis' MAC2 computer.

```
wtmp begins Tue Aug  7 18:18
Bodies-MacBook-Air:~ julieadams$
[ [Restored Aug 14, 2019 at 11:47:22 PM]
Last login: Wed Aug 14 23:46:09 on console
Restored session: Wed Aug 14 23:29:31 MDT 2019
[Bodies-MacBook-Air:~ julieadams$ last
julieadams  ttys000                    Wed Aug 14 23:47   still logged in
julieadams  console                    Wed Aug 14 23:46   still logged in
reboot      ~                          Wed Aug 14 23:45
shutdown    ~                          Wed Aug 14 23:31
julieadams  ttys000                    Wed Aug 14 22:29 - 22:29  (00:00)
julieadams  console                    Wed Aug 14 22:29 - 23:31  (01:01)
reboot      ~                          Wed Aug 14 22:29
julieadams  ttys000                    Wed Aug 14 17:06 - crash  (05:23)
julieadams  console                    Wed Aug 14 17:06 - crash  (05:23)
reboot      ~                          Wed Aug 14 17:05
julieadams  ttys000                    Wed Aug 14 16:28 - crash  (00:37)
julieadams  console                    Wed Aug 14 13:15 - crash  (03:50)
reboot      ~                          Wed Aug 14 13:15
julieadams  console                    Wed Aug 14 08:57 - crash  (04:17)
reboot      ~                          Wed Aug 14 08:57
julieadams  console                    Tue Aug 13 19:05 - crash  (13:51)
reboot      ~                          Tue Aug 13 19:05
julieadams  console                    Tue Aug 13 17:29 - crash  (01:36)
reboot      ~                          Tue Aug 13 17:28
julieadams  console                    Tue Aug 13 11:54 - crash  (05:34)
reboot      ~                          Tue Aug 13 11:54
julieadams  console                    Tue Aug 13 10:02 - crash  (01:52)
reboot      ~                          Tue Aug 13 10:02
julieadams  console                    Mon Aug 12 23:53 - crash  (10:08)
reboot      ~                          Mon Aug 12 23:53
julieadams  console                    Mon Aug 12 19:41 - crash  (04:11)
reboot      ~                          Mon Aug 12 19:41
julieadams  ttys000                    Mon Aug 12 19:30 - 19:30  (00:00)
julieadams  console                    Mon Aug 12 19:19 - crash  (00:21)
reboot      ~                          Mon Aug 12 19:19
julieadams  console                    Mon Aug 12 18:46 - crash  (00:32)
reboot      ~                          Mon Aug 12 18:46
julieadams  console                    Mon Aug 12 18:32 - crash  (00:14)
reboot      ~                          Mon Aug 12 18:31
julieadams  console                    Mon Aug 12 14:25 - crash  (04:06)
reboot      ~                          Mon Aug 12 14:24
julieadams  console                    Mon Aug 12 13:13 - crash  (01:11)
reboot      ~                          Mon Aug 12 13:13
julieadams  console                    Sun Aug 11 19:29 - crash  (17:44)
reboot      ~                          Sun Aug 11 19:28
julieadams  console                    Sun Aug 11 16:00 - crash  (03:28)
reboot      ~                          Sun Aug 11 16:00
julieadams  console                    Sat Aug 10 21:22 - crash  (18:37)
```

361.  The next morning, Curtis logged into her computer at 6:40 a.m.

362.  When Curtis logged into her MAC2 computer, the first screen that popped up showed that the "Audio Devices" settings were open.

363.    Below is a screen shot from Curtis' MAC2 computer.



364.    This was especially alarming to Curtis because she knew that she closed out of all applications before she went to bed. What else was especially mortifying to her was that the word "audio" was in the name of this setting. The first thing that crossed her mind was whether this meant "listening" and could this mean that someone was listening to her.

365.    Curtis began researching what this setting was used for and discovered that it could be used with allowing her computer to dictate what was spoken into the computer or what was showing on the computer screen.

366.    Next, Curtis looked at the "Recent Items" that had been opened on her computer and the last applications opened were Audio MIDI Setup.app, Digital Color Meter.app, Disk Utility.app, Keychain Access.app, Microsoft Error Reporting.app, Safari.app, System Preferences.com, Terminal.app, and VoiceOver Utility.app.

367.    Below is a screen shot from Curtis' MAC2 computer.



368.    Curtis began researching all of these applications on her computer. She kept taking screen shots of what she discovered.

369.    The System Information.app was last opened at 12:14 a.m., after she went to bed.

370.    The Digital Color Meter.app showed it was opened at 12:14 a.m. after she went to bed.

371.    The Desk Utility.app was opened at 12:11 a.m. after she went to bed.

372.    The Audio MIDI Setup.app was last opened at 12:08 a.m. after she went to bed.

373.    The Keychain Access.app was opened at 12:03 a.m. after she went to bed.

374.    The Terminal.app showed opened at 11:47 p.m. which made sense to Curtis because she knew she opened this application right before she went to bed.

375.   The Voice Over Utility.app was opened at 11:49 p.m. after she went to bed.

376.   What all this meant was unknown to Curtis until very recently.

377.   Everson changed the settings on her MAC2 computer to get information Pine, van Woudenberg and Matthews wanted in a different way. Everson changed the settings on Curtis' MAC2 computer so that every word spoken in front of her MAC2 computer would be typed out for Everson, Pine, van Woudenberg, and Matthews to read at a later time and for everything on her screen to be typed out for them to read at a later time.

378.   Curtis discovered the Preferences folder in the hidden "bodiecurtis" library on her computer that not only was the Voice Over Utility application opened on her computer, but Everson enabled the trackpad and set the default preference for the audio output selection device to be in "braille" mode.

379.   Below is a screen shot from Curtis' MAC2 computer.



380.    Everson then changed the System Preference settings for the display on her computer to default to "Airplay." This allows for videos to be shared and is a way to mirror your entire computer screen. Another .plist file shows that Everson created a cache to "show braille verbosity detail."

381.    Below is a screen shot from Curtis' MAC2 computer.



382.    Later that morning, on August 15, 2019 at 7:11 a.m., a change was made to a .plist file created at 12:08 a.m. that same morning to change the order of the windows on Curtis' MAC2 computer.

383.   Below is a screen shot from Curtis' MAC2 computer.



384.   Another way to spy on Curtis was now in place to continue the violation into Curtis' entire personal life.

385.   On August 29, 2019, Curtis discovered another outrageous thing that Everson had done to her. When she turned on her MAC1 computer, she saw a window indicating that the computer had been copied via Passport for Mac sixty-six days prior. This was perplexing to her since this was her older Macintosh computer and she did not have a reason to save it, nor did she save it.

386.   Sixty-six days prior to when Curtis saw this on her MAC1 computer was June 23, 2019, **the day before she was fired**.

387.   Below is a screen shot from Curtis' MAC1 computer.



388.   Unfortunately for Curtis, Everson hacked into her MAC1 computer to remotely save a copy of the entire computer using Passport for Mac. Seven (7) years of her personal life were stolen with the click of a single computer button and was now in the unclean hands of Everson, van Woudenberg, Pine, and Matthews.

389.   Another shocking thing that Everson did well after her termination of employment, was to hack into her MAC1 and computer and cause a "Google Takeout" archive to happen. Google Takeout is a way to gain access to all of the Google information on a computer, including Gmail email accounts, Google photos, Google voicemail, YouTube searches, Google searches, and Google Drive documents. Everson caused a Google Takeout to occur on August 6, 2019 and on August 9, 2019.

390.   Below are screen shots from Curtis' MAC1 computer.



391.    Even more appalling is that Everson made sure that her brand new Gmail

account, adams.juliekay@gmail.com, was synced with her Apple Mail application before

the Google Takeout was done. This meant that Everson was able to capture many more personal emails after her termination and several Attorney/Client Privileged emails.

392.   There are very few individuals that have this email address. Matthews has the email address and uses it to send Curtis quarterly financial information. Also, Chasefield Capital's lawyers have this email address and could have easily forwarded an email Curtis sent to them to Pine and van Woudenberg. Everson would have no way of knowing about this email account apart from Chasefield Capital's lawyers, Matthews, or someone related to Chasefield Capital. Chasefield Capital and Matthews are directly involved with this Google Takeout.

393.   The following are screen shots of examples of the personal information obtained from the Google Takeout.







**F.   Everson Unlawfully Accessed Curtis' MAC1 Computer Within the "Houseandhomerealastate" User Account After She Was Terminated**

394.   It has recently been discovered that Everson accessed Curtis' MAC1 computer, without Curtis' authorization or knowledge, in order to launch Skype and Teams meetings in order to spy on her.

395.   In order to hide this activity, it was done within a user account on her computer that she created in 2014 for her son. The user account was called "house and home realaste (sic)." Curtis' son has not used this account since 2014 and she has never used this account. Therefore, whatever files and folders were created and reconfigured within this user account after 2014 can 100% be attributed to Everson accessing this computer via TeamViewer and/or Ninja Spyware.

396.   Below is a screen shot of the user accounts on Curtis' MAC1 computer.



397.   Everson accessed Curtis' personal MAC1 computer, without Curtis' authorization or knowledge, on August 20, 2019, almost two (2) months after Chasefield

fired her and set in motion a way to spy on her using the same methods he used on her MAC2 computer, with the Skype, iCloud and Calendars applications.

398.   Below   are   screen   shots   of   Curtis'   MAC1   computer   within   the "houseandhomerealastate" user account showing the folders created and/or accessed on or after August 20, 2019.





399.   Calendar folders were created on August 20, 2019 and tied to her iCloud account.

400.   This screen shot is from Curtis' MAC1 computer.



401.    On August 20, 2019, at 7:08 p.m., Everson installed a Microsoft Office installer package that contained Skype and Teams applications. These applications allow access to her camera and microphones on her computer.

402.    Below is a screen shot of Curtis' MAC1 computer.



403.    That same day, Curtis' computer was configured to set in motion several cache files, including Adobe, Cloudkit, Safari Safe Browsing, OneDrive, Microsoft Skype and Teams, so that Everson could continue to capture her personal information and to spy on her using Skype and Teams.

404.    Below is a screen shot of Curtis' MAC1 computer.



405.    Just like on her MAC2 computer, Everson set All Day Alarms in order to schedule meetings within the Skype application and he linked certain Calendar folders to the iCloud account he migrated so that he could launch Skype and Teams meetings.

406.    Below is a screen shot of Curtis' MAC1 computer.



407.   A cache of Skype occurred on July 18, 2020, the day she discovered this activity within the "houseandhomerealastate" user account, and Everson was able to capture it via the Skype Shipit folder. Curtis continues to be spied on in her own home and continues to suffer immense permanent emotional distress because of this.

408.   Below is a screen shot of her MAC1 computer.



### 1.   Curtis' Personal Account Was Unlawfully Accessed Prior to Chasefield Capital's Purchase of Pakems Inc.

409.   Upon information and belief, Pine guessed the password and accessed the julieadams@pakems.com email account hosted by GoDaddy, including Attorney/Client Privileged communications and other investment offers that were being considered by Curtis, prior to October 26, 2018, to gain an unfair negotiation advantage in regard to Curtis' employment and the sale of Pakems. Pine made comments to Curtis that suggested he had Attorney/Client information during the negotiation of Pakems.

410.    Everson, without Curtis' authorization or knowledge, attempted to sign in and use Curtis' password for the personal email account julieadamscurtis@gmail.com on September 16, 2018 at 9:38 p.m., September 19, 2018 at 7:28 a.m., and September 19, 2018 at 6:53 p.m.

411.    Below is a screen shot from Curtis' MAC2 computer.



412.    Curtis had forgotten that this account was ever created as it had been created in 2008 and Curtis never sent emails from this account. The recovery email for this account is julieadamscurtis@yahoo.com so an email had been sent to this account when the original julieadamscurtis@gmail.com had been set up. Because Everson hacked into Curtis' Yahoo account, he was the individual that tried to access Curtis' personal Gmail account.

**2.      Jordan Pine, Beiers, and/or Pine Were Involved with the Access into Curtis' Personal Facebook Account While She Was Employed as CEO of Pakems**

413.    On December 4, 2018, a Chasefield Capital employee or Everson, without Curtis' authorization or knowledge, accessed Curtis' personal Facebook account and changed the primary email for Facebook notifications to julieadams@pakems.com.

414.   As noted on the document entitled "Pakems Passwords – CF – HPINE," Chasefield Capital employees had the password to the Pakems' Facebook account which also gave them access to Curtis' personal Facebook account.

415.   Below is a screen shot from Curtis' MAC2 computer.



416.   On December 17, 2018, at 2:17 p.m., the julieadams@pakems.com email account was accessed by Everson, without Curtis' authorization or knowledge, and the DNS settings were changed so that Curtis' entire email account which contained over 113,482 emails dating back to 2013, including thousands of personal emails and Attorney/Client privileged emails, were downloaded to the Microsoft 365 account controlled by Everson and paid for by Chasefield with the IP address 104.47.40.36. Thousands of personal emails were opened, including emails that had never been opened by Curtis, and read.

417.    Below is a screen shot from Curtis' MAC2 computer.



418.    However, the other GoDaddy email accounts support@pakems.com, contact@pakems.com, info@pakems.com, and jackadams@pakems.com were not downloaded to the Microsoft 365 account suggesting Everson was only interested in the personal information contained within julieadams@pakems.com email account. Chasefield Capital employees were in charge of the customer care emails sent to support, contact, and info@pakems.com, thus, the only accounts that arguably should have been downloaded were those accounts.

419.    Earlier in the day on December 17, 2018, according to an email sent to Curtis from Michael Lazarus, Jordan Pine had provided the GoDaddy password to Everson.

420.    Jordan Pine, Beiers, and/or Pine began monitoring the email account julieadams@pakems.com and read emails. Within the Chasefield Capital OneDrive folder that she discovered on her computer, there are several attachments to emails that Curtis

sent or received, however, these emails were not sent to or received by anyone at Chasefield Capital. Thus, the only way these attachments would have been uploaded to the Chasefield Capital OneDrive is from reading all of Curtis' emails and giving themselves access to various attachments.

421.   On February 5, 2019, February 22, and March 23, 2019, without Curtis' authorization or knowledge, Everson changed the password to Curtis' personal email account julieadamspakems@gmail.com to gain access to and intercept emails in this email account by sending them to the Microsoft 365 account he purchased and then was later reimbursed by Chasefield Capital. The password to this account was on the password document created by Jordan Pine, uploaded to the Chasefield OneDrive by Beiers, and named Pakems – Passwords – CF - HPINE so Everson could have guessed what the password was.

422.    Below is a screen shot from Curtis' MAC2 computer.



423.    After Everson changed the email account password on February 5, 2019, Curtis sent a text message to Angela Miles stating "My password was changed 3 days ago – weird.  I'm getting emails now. I got it.  Thanks."

424.    After the password was changed on March 23, 2019, an email sent to this account stated that there was a sign-in from Microsoft Edge on Windows. Curtis did not own a device that was on a Windows platform. Pine, Jordan Pine, and Beiers all have Windows computers. Whenever Curtis was forced to change the email account password because her password no longer worked, shortly thereafter the password was changed so that her personal email could continue to be intercepted.

425.    On or about February 11, 2019, Everson, without Curtis' authorization or knowledge, changed the IMAP settings in the julieadamspakems@gmail.com personal

Gmail account so that new sent and received emails would be intercepted by going to the Microsoft 365 Outlook account set up by Everson.

426.    Below is a screen shot from Curtis' MAC2 computer.



427.    On or about February 11, 2019, without Curtis' authorization or knowledge, Everson changed the password and settings to the jadams@apresgear.com personal Gmail account. Everson also changed the POP settings so that all of the emails in that account since November 15, 2012 were downloaded to the Microsoft 365 Outlook account set up by Everson at the direction of Pine and paid for by a Chasefield Capital employee. Everson also changed the IMAP settings so that any new emails sent or received would be intercepted. The change to the IMAP settings prevented emails from going into the jadams@apresgear.com email account from February 11, 2019 through August 1, 2019. This means that Everson intercepted Curtis' emails from June 25, 2019 through August 1, 2019, which was after Curtis' termination. There are 20,954 emails in that account, including thousands of personal emails.

428.    Everson, without Curtis' authorization or knowledge, accessed her jadams@apresgear.com Gmail account, went to the Contacts tab, selected the contact information for Curtis, and added the nickname "Stupid" to her contact.  In the response to Curtis' CADA complaint, van Woudenberg, Pine and Matthews argued they did not do this because they wouldn't know how to do this. Thus, Everson added the offensive nickname "Stupid" to her contact.

429.    Below is a screen shot from Curtis' MAC2 computer.



430.    This is why Curtis' name on sent emails from julieadamscurtis@yahoo.com changed from her name to Stupid on her iPhone.

431.    There are several IP addresses from various ISP's not used by Curtis during the time period in question that have logged into her various Personal Accounts and Email Accounts. These ISP's used include Comcast, Verizon (Chasefield Capital uses Verizon for its employees' phone plan), University Corporation Atmospheric Research, Micfo, Denver Cloud Network, Global Telehost, Amazon, and Hughes Network Systems.

Further, several IP address locations are in Greenwood Village, Boulder, Broomfield, Westminster and Littleton.

### 3. Curtis' Personal Account Was Unlawfully Accessed After She Was Terminated

432.    On July 13, 2019, at 12:01 p.m., Curtis received an "AppleID verification" notification on her iPhone that requested that she enter her AppleID so that her iCloud or iTunes account could be accessed.  Curtis had been on a run, so this was not her trying to access either her iCloud or iTunes accounts.  Everson had the password to her iCloud and iTunes accounts.

433.    On September 19, 2019, at 2:30 p.m., Curtis was preparing for a job interview when she received an email that a password reset was requested and a request to recover her julieadamspakems@gmail.com personal email account.  This was extremely upsetting to Curtis that there continued to be attempts to access her personal email accounts and was a major distraction right before a very important job interview with a large Denver law firm.  Curtis did not get the job.

434.    On October 24, 2019, Curtis was on a business trip after finally procuring employment.  She was alarmed when she got a notification on her cell phone stating "Did you ask Google to recover access for julieadamspakems1@gmail.com.

435.   Below is a screen shot from Curtis' personal iPhone.



436.   By this point, she had a new cell phone because of what she had discovered about syncing her old cell phone to her computers. She was able to access this email and discovered that at 8:11 a.m. on October 24, 2019, a Chasefield Capital employee or Everson attempted to change the password and recover the personal email account julieadamspakems1@gmail.com.

437.   Below is a screen shot from Curtis' MAC2 computer.



438.    There was an email sent to julieadams@pakems.com in 2013 that was in her GoDaddy account and subsequently downloaded to the Microsoft 365 account stating that this email account was created. Curtis had forgotten that this account was ever created. Thus, Everson or a Chasefield Capital employee was involved with the attempt to access this personal Gmail account.

439.    Below is a screen shot from Curtis' computer.



440.    Everson (he had the password), without Curtis' authorization or knowledge, accessed Curtis' personal iCloud account and connected his device to this account.

441.    Below is a screen shot from Curtis' MAC2 computer.



442.   On December 19, 2019, almost six (6) months after Curtis was terminated, she discovered that a suspicious device was connected to her iCloud account. She locked the device "iPhone" and provided a phone number for the owner of the device to call. Later that day, a telephone call was received from a blocked telephone number, but the caller immediately hung up. Everson's device was linked to her iCloud account after she was terminated, and he had access to personal documents, photos, and videos that were created or taken after she was terminated and sent to her iCloud.

443.   On January 4, 2020, Everson accessed Curtis' personal computer and researched how to remove unusual activity in her Yahoo account as recorded in a Yahoo log entry "/kb/account/find-remove-unusual-activity-yahoo-account-sln2073.html".

444.   Below is a screen shot from Curtis' MAC2 computer.

"page_uri": "/kb/account/find-remove-unusual-activity-yahoo-account-sln2073.html",
"user_device_info#device_type": "desktop",
"ip_address": "199.88.135.211",
"ip_geo_info#zip": "80209",
"dt": "20200114",
"browser_name": "google chrome",
"page_domain": "help.yahoo.com",
"ip_geo_info#state": "colorado",
"user_device_info#make": "Virtual",
"referrer_domain": "help.yahoo.com",
"is_logged_in": "true",
"ip_geo_info#city": "denver",
"user_privacy_info#dnt": "!",
"logged_event_timestamp": "1579020977358",
"browser_version": "79",
"user_device_info#model": "Desktop Browser",
"event": "link",
"ip_geo_info#country": "us",
"user_agent": "Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/79.0.3945.88 Safari/537.36"

445.   Chasefield Capital's lawyer received a Preservation of Evidence letter immediately after they fired Curtis. Therefore, the egregious spoliation of evidence in Curtis' own personal account in an effort to hide unlawful behavior after all of the Defendants were under a legal obligation not to destroy evidence is problematic to all of the Defendants' and their potential available defense of this litigation.

446.    Almost eight (8) months after Curtis was terminated, on February 28, 2020, she was with her friends in Steamboat Springs, Colorado when she received a notification on her new cell phone with a security code for her personal PayPal account.

447.    Below is a screen shot from Curtis' personal iPhone.



448.    A couple days later, on March 2, 2020, she received a notification on her old cell phone with a security code for her personal PayPal account.

449.    Below is a screen shot from Curtis' personal iPhone.



450.    Curtis tried to recreate how this occurred and in order for PayPal to send this notification, a person needed to input both of her cellular telephone numbers into the

PayPal website. Very few people had her new cell phone number. Unfortunately, she had sent Chasefield Capital's lawyers emails that included her new cell phone number. Thus, Chasefield Capital employees' and/or Matthews (or Everson if Chasefield Capital employees or Matthews passed this new cell phone number to him) attempted to or were able to hack into her PayPal account in order to access her personal financial information.

451.   Curtis was continuing to be stalked through every means possible. Thus, because of all that Curtis has learned that all of the Defendants have done to her, she has to live every day with a pit in her stomach that the Defendants now have compromised all of the personal data in her new cell phone.

452.   Plaintiff's personal Facebook, iCloud, Dropbox, Keeper Security, PayPal, Skype, Microsoft and WhatsApp accounts that were attempted to be accessed or were accessed by one or more Defendants will be referred to as "Personal Accounts."

453.   Plaintiff's email accounts julieadamscurtis@yahoo.com hosted by Yahoo, jadams@apresgear.com hosted by Google, julieadamspakems@gmail.com hosted by Google, julieadamspakems1@gmail.com hosted by Google, julieadamscurtis@gmail.com hosted by Google, julieadams@pakems.com hosted by GoDaddy and Microsoft, adams.juliekay@gmail.com hosted by Google, and Julie.adams7@icloud.com hosted by iCloud, that were accessed, attempts made to access, and or downloaded will be referred to as "Email Accounts."

454.   All of the conduct related to her personal computers, hacking into her personal computers, using her personal computers to spy on her, syncing her personal cell phone to her computer, accessing her Personal Accounts, accessing, downloading

and monitoring her Email Accounts, attempts to access her Personal Accounts and Email Accounts will be referred to as "Computer-Related Conduct."

**G.      Financial Impact of the Unlawful Computer Activities and Access to Curtis' Personal Accounts**

455.   After Plaintiff was fired, she spent several months and thousands of hours investigating and is continuing to investigate the Computer-Related Conduct, including but not limited to looking at her personal computers and iPhone, taking screen shots on all of her devices, talking to customer service departments at various companies where her accounts reside, hiring a computer expert, talking to individuals in law enforcement, talking to lawyers, writing Preservation of Evidence letters to the various companies, changing all of the passwords to all of her accounts, purchasing paper, purchasing printer ink, etc. This resulted in significant lost wages and costs, and costs that Curtis is still incurring.

456.   Plaintiff was forced to borrow computers from various people and buy a used laptop because her computers were still being accessed and she can no longer use her MAC1 and MAC2 computers because they can still be accessed by Everson

457.   Plaintiff was forced to buy a new iPhone and get a new cell phone number after 22 years of having the same number.

458.   These costs are well over $5,000.

**H.      Chasefield Capital Treated Lever Up and Pakems a Part of Chasefield Capital and Not as Separate Companies**

459.   Chasefield Capital employees had carte blanch access to Pakems' bank account and could write checks without approval. They wrote themselves checks, hired

vendors such as Pine's nephew who was a lawyer, an accountant, hired an IT contractor, and paid them, all without approval from Curtis, van Woudenberg, or Matthews.

460.   Funds were frequently transferred between Chasefield Capital's, Lever Up's, and Pakems' bank accounts.

461.   Despite Pine's assertions in a budget he created and presented to Curtis and van Woudenberg that Chasefield Capital's management fees during a three (3) month period would be $1,250, Chasefield Capital created an invoice and immediately transferred funds to the Chasefield Capital bank account, without approval, for $9,000 for three (3) months of Chasefield Capital management services.

462.   Chasefield Capital's IT contractor was hired by Chasefield Capital and directed to put spyware on Curtis' personal computers and paid by Chasefield Capital out of Pakems bank account, and then later paid directly by Chasefield Capital.

463.   Chasefield Capital was not made to pay Pakems back when Curtis uncovered the fact that it owed Pakems approximately $9,000.

464.   At her termination meeting, she was given an Option Agreement whereby she learned that van Woudenberg had an additional 304 shares of common stock related to his additional investment. At that time, Curtis was on the Board of Directors, however, there was not a board meeting held to vote on the granting of the additional shares.

465.   Chasefield Capital directed Everson to create a Microsoft 365 account, Pine approved the invoice and Beiers paid the invoice.

466.   Chasefield Capital employees and their agent Everson were all involved with the Computer-Related Conduct, including the most egregious conduct of spying on her, downloading BlueJeans to her personal computer so that she could be watched and

listened to in her own residence, configuring her Skype to do the same and then changing the settings on her computer to type what she said and what was on her computer.

467.    Pakems was inadequately capitalized.

468.    On March 21, 2019, Pine sent an email to Everson stating,

"*Hi Seth – please disconnect Chasefield internal drives and separate Pakems as its own entity as of 4.15.2019. Contact Julie as to how she wants to handle IT she may choose someone else or no one.*"

469.    This shows that Chasefield Capital and Pakems were considered as one entity. This disconnection never occurred.

## CLAIM I

### (Violation of the Stored Communications Act (SCA) (18 U.S.C. § 2701)

470.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 – 469 of this Complaint as though fully incorporated herein.

471.    For ease of reference, Plaintiff summarizes the conduct that violates the SCA for each individual Defendant below. The conduct includes, but is not limited to the following:

472.    Defendant Everson's conduct that violated the SCA is set forth below:

a.      Everson downloaded TeamViewer and Ninja Spyware on Curtis' MAC1 and MAC2 computers, which were his accounts and password protected by him. The settings were configured so that Curtis did not need to grant permission for him to access her computers. This allowed Everson access to both of Curtis' personal computers without Curtis' knowledge and her computers were accessed, on at least thirty-one (31) different days, sometimes multiple times a day. Evidence of his access includes, but is not limited to reconfiguring the software, applications, folders, files, and accounts

Everson downloaded or created on Curtis' computers when the computers were in his physical possession. Further evidence includes software that was downloaded to Curtis' computers that she did not download, such as BlueJeans and Microsoft 365, which was within a user account that she has never used, and a Google Takeout was used to create an archive that Curtis did not cause to occur.

      b.     Everson accessed various Personal Accounts and Email Accounts via the internet, including but not limited to:

      i.     julieadamscurtis@yahoo.com hosted by Yahoo (to download the calendar events to her MAC2 within that email account, to read the notes he forwarded to that account from her iPhone and was in the account when he researched how to "find-remove-unusual-activity-yahoo-account"),

      ii.     julieadams@pakems.com hosted by GoDaddy (to download all of the emails to the Microsoft 365 account he controlled),

      iii.     jadams@apresgear.com (to change the POP and IMAP settings so that all of the emails would download to the Microsoft 365 account he controlled and additional emails sent and received would also go to that same Microsoft 365 account),

      iv.     julieadamspakems@gmail.com (to change the password three (3) times and to change the IMAP settings so that emails sent and received would go to the Microsoft 365 account he controlled),

      v.     iCloud hosted by Apple (Everson had the password and linked his device to the account),

      vi.     Facebook (Everson changed the email settings),

vii.      Microsoft (Everson reconfigured this personal account so that all of the documents and photos would sync to Chasefield Capital's SharePoint drive),

viii.      Skype (Everson accessed this account to add over 200 Skype contacts), and

ix.      Dropbox (Everson accessed this account from Curtis' MAC1 computer via the window that was open).

c.  Everson accessed various Personal Accounts and Email Accounts on Curtis' personal computers, including but not limited to:

i.      Google accounts (the Google Takeout on her MAC2 computer included email from her adams.juliekay@gmail.com, jadams@apresgear.com, julieadamspakems@gmail.com accounts, Google voicemail, Google photos, Google Drive documents, etc.),

ii.      iCloud (Curtis' MAC1, MAC2 and iPhone were synced to her iCloud by Everson, thus every photo, video, document, contact, etc. that were on her computers were also in her iCloud account),

iii.      WhatsApp (this application was on her MAC2 computer),

iv.      Keeper Security (this application was on her MAC1 and MAC2 computers),

v.      GoDaddy (Curtis had emails on her MAC1 computer that were stored in her GoDaddy account), and

vi.      Yahoo (Curtis had emails on her MAC1 computer that were stored in her Yahoo account)

473.   Defendant's Pine and van Woudenberg's conduct that violates the SCA includes, but is not limited to:

a.   Chasefield Capital, owned by Pine and van Woudenberg, hired Everson, paid Everson, directed Everson, conspired with Everson, and ratified Everson conduct set forth above, and as such, Everson is their agent.

b.   The Ninja Spyware installed on Curtis' computers to access them was contained in a software package called "chasefieldcapitalmainoffice."

c.   Everson obtained passwords from Chasefield employees to assist with some of the conduct set forth above, including passing along the password to the email account pakemskickstarter@gmail.com which caused Everson to access Curtis' computer.

d.   Everson accessed Curtis' computers because he was told that van Woudenberg made the decision to terminate Curtis, including the day before she was terminated, and accessed her computer to reconfigure and uninstall Webroot after she was terminated, which was installed on her computer at the direction of a Chasefield Capital employee.

e.   The conduct set forth above involving the Microsoft 365 software package was ultimately paid for by Chasefield Capital.

f.   Chasefield Capital employee(s) accessing the Microsoft 365 account to monitor her email.

g.   Pine and/or van Woudenberg and/or Matthews telling Everson the existence of Curtis' brand new email account adams.juliekay@gmail.com so that Everson

could sync the email to the Apple Mail application on her MAC1 computer and archive it within the Google Takeout that Everson performed.

474.    Defendant Matthews conduct that violates the SCA includes, but is not limited to:

a.    Everson's conduct that was ratified by Matthews once he became a director of Lever Up.

b.    Everson accessing Curtis' computers after Matthews made the decision to terminate Curtis, including the day before she was terminated.

c.    Pine and/or van Woudenberg and/or Matthews telling Everson the existence of Curtis' brand new email account adams.juliekay@gmail.com so that Everson could sync the email to the Apple Mail application to her MAC1 computer and archive it within the Google Takeout that Everson performed.

475.    Chasefield Capital Employees, Beiers and Jordan Pine, violated the SCA through their actions set forth below, including but not limited to:

a.    Beiers scheduling the meeting Curtis had with Everson so that he could download TeamViewer and Ninja Spyware on her personal computers, among other configurations that were made by Everson.

b.    Jordan Pine gave Everson the password to the GoDaddy account to redirect the DNS so Curtis' email account, julieadams@pakems.com, that contained over 113,000 emails, including thousands of personal and Attorney/Client emails, could be downloaded to the Microsoft 365 Office account Beiers wrote a check for.

c. Jordan Pine created a document with all of the passwords to Curtis' accounts that Beiers uploaded to the SharePoint drive. These passwords were then passed along to Everson by either Beiers, Jordan Pine or Pine.

d. Jordan Pine, Beiers and/or Pine monitored the email account julieadams@pakems.com that was hosted by Microsoft.

476. Defendants Boccus Group, Chasefield Capital, Chasefield Real Estate, Pakems, Lever Up, and SCB Global are owned by the Defendants and employ the Defendants. Further, the conduct that violates the SCA were committed with equipment owned by the company Defendants:

477. All of the Defendants intentionally and knowingly accessed, conspired to access, directed to access, ratified to access, caused to access, and/or were involved with intentionally and knowingly accessing Plaintiff's password protected Email Accounts and Personal Accounts that were on servers owned by Google, GoDaddy, Microsoft, Yahoo, Skype, Apple iCloud, Facebook, WhatsApp, and Dropbox, which are facilities through which electronic communication services are provided.

478. Curtis' MAC1 and MAC2 computers that were accessed by Everson had photos, videos, iMessages, emails, and documents that are all in electronic storage within facilities through which electronic communication services are provided. These facilities are Google, GoDaddy, Microsoft, Yahoo, Apple iCloud, WhatsApp and Keeper Security.

479. By accessing the various facilities, without authorization or in excess of authorization by Curtis, all of the Defendants obtained, altered, and/or transferred and/or conspired, caused and were involved with obtaining, altering, and/or transferring a wire or electronic communications while in electronic storage, including but not limited to,

obtaining, altering and/or transferring personal and Attorney/Client emails, personal photos, personal videos, personal documents, iMessages, posts and messages in Facebook, and transferring and obtaining emails that were downloaded to the Microsoft account controlled by Everson and paid for by a Chasefield Capital employee so that they could be read in violation of the provisions of 18 U.S.C. § 2701.

480.   Curtis has been seriously damaged as a direct and proximate cause of all of the Defendants' involvement in the unauthorized access or access in excess of authorization in the Email Accounts, Personal Accounts and computers in violation of the provisions of 18 U.S.C. § 2701.

481.   Through all of the Defendants' actions set forth above, Plaintiff suffered actual damages in an amount to be determined at trial, which includes, but is not limited to, an unfair advantage in the negotiation of the purchase of Pakems and the contracts related to the employment of Curtis, loss of Attorney/Client confidentiality in the negotiation of Pakems and in this pending litigation, the contracts relating to the employment of Curtis, a factor in the hostile work environment that Curtis was subjected to and the decision to terminate her employment, and the thousands of hours spent investigating the unauthorized access into Plaintiff's Personal Accounts, Email Accounts and computers.

482.   Through all of the Defendants' actions set forth above, Plaintiff is also entitled to statutory damages pursuant to 18 U.S.C. § 2707 of $1,000 for every email, document, photo and video accessed; punitive damages; reasonable attorneys' fees and costs; and all such other and further relief as the court may deem just and equitable.

## CLAIM II

**(Violation of the Federal Wiretap Act (FWA) 18 U.S.C. § 2511 and § 18 U.S.C. § 2520)**

483.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 482 of this Complaint as though fully incorporated herein.

484.    Through Defendants' actions set forth above, all of the Defendants knowingly, purposefully and intentionally participated in, directed, conspired, and were aware of the actions taken for the purpose of intercepting, endeavoring to intercept, or procured another person to intercept or endeavor to intercept wire, oral, or electronic communications, at the time of transmission in violation of the provisions of 18 U.S.C. § 2511.

485.    The conduct of each individual Defendant that violates the FWA includes, but is not limited to:

a.    Everson configuring her computers so that Curtis could be, and was watched and listened to, including changing her MAC2 computer settings to braille so that what she said in front of the computer would be typed, changing the DNS and IMAP settings on her julieadams@pakems.com, jadams@apresgear.com, julieadamspakems@gmail.com email accounts so that the emails went to the Microsoft 365 account that he controlled, intercepting iMessages, photos and documents from her WhatsApp and iPhone, intercepting emails sent to adams.juliekay@gmail.com, attempting to intercept emails that went to her email accounts julieadamscurtis@gmail.com and julieadamspakems1@gmail.com, and intercepting photos, videos, and documents that were sent to Curtis' Apple iCloud account.

b.       Pine and van Woudenberg's conduct of hiring, directing, ratifying, and conspiring with Everson, their agent, watching and listening to Curtis through her computers, receiving information that Everson discovered by intercepting her wire, oral and electronic communications, monitoring her emails, passing along information to Everson that Curtis had a new email account adams.juliekay@gmail.com so those emails could be intercepted, purchasing the Microsoft 365 account so that emails could be intercepted, and Chasefield Capital employee(s) providing passwords to Everson to intercept electronic communications.

c.       Matthews conduct of ratifying Everson's conduct set forth above, receiving information that Everson discovered by intercepting her wire, oral and electronic communications, and passing along information to Everson that Curtis had a new email account adams.juliekay@gmail.com so those emails could be intercepted.

d.       Defendant Beiers scheduled the meeting with Everson and Defendants Beiers and Jordan Pine provided Everson with passwords so that he could intercept wire, oral and electronic communications.

e.       Defendants Boccus Group, Chasefield Capital, Chasefield Real Estate, Pakems, Lever Up, and SCB Global are owned by the Defendants and employ the Defendants. Further, the conduct that violates the FWA were committed with equipment owned by the company Defendants.

486.   Through Defendants' actions set forth above, all of the Defendants knowingly, purposefully and intentionally participated in, directed, conspired, and were aware of the actions taken for the purpose of intercepting, endeavoring to intercept, or procured another person to intercept or endeavor to intercept wire, oral, or electronic

communications, in violation of the provisions of 18 U.S.C. § 2511, including, but not limited to, by using Curtis' computers and the software thereon, as eavesdropping devices to intercept, and/or retain recordings of Curtis, via the camera, microphone and speakers on Curtis' computer, to watch Curtis and listen to Curtis while in her personal residence and in her bedroom likely capturing Curtis nude and/or during private intimate moments.

487.   Through Defendants' actions set forth above, all of the Defendants were involved with intentionally disclosing, or endeavoring to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of the provisions of 18 U.S.C. § 2511.

488.   Through Defendants' actions set forth above, all of the Defendants were involved with intentionally using, or endeavoring to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of the provisions of 18 U.S.C. § 2511.

489.   Curtis has been seriously damaged as a direct and proximate cause of all of the Defendants' actions set forth above that violate the FWA.

490.   Through Defendants' actions set forth above, Plaintiff suffered actual damages in an amount to be determined at trial, which includes, but is not limited to loss of Attorney/Client confidentiality in this pending litigation, a factor in the hostile work environment that Curtis was subjected to and the decision to terminate her employment, and the thousands of hours spent investigating the interception that occurred.

491.    Through Defendants' actions set forth above, Plaintiff is also entitled to statutory damages pursuant to 18 U.S.C. § 2520; punitive damages due to the willful and wanton, reckless and malicious misconduct of Defendants; reasonable attorneys' fees and costs; and all such other and further relief as the court may deem just and equitable.

## CLAIM III
**(Violation of the Computer Fraud and Abuse Act (CFAA) (18 U.S.C. § 1030)**

492.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 491 of this Complaint as though fully incorporated herein.

493.    Defendant Everson's conduct that violated the CFAA includes downloading TeamViewer and Ninja Spyware on Curtis' MAC1 and MAC2 computers so that he could access and did access her computers on at least 31 different days, sometimes multiple times in the same day, reconfigured her computers and iPhone so that he could gain access to information within her Personal Accounts, Email Accounts and iPhone, accessed her computers so that he could spy on her, downloaded software to spy on her, and reconfigured accounts to spy on her.

494.    Everson was Defendant Pine and Defendant van Woudenberg's agent and Beiers and Pine are their employees, Defendants Pine and van Woudenberg spied on Curtis, Defendant Matthews ratified Everson's conduct, and Defendants Beiers, Pine and/or Jordan Pine provided a password which caused Curtis' computer to be accessed.

495.    Defendants Boccus Group, Chasefield Capital, Chasefield Real Estate, Pakems, Lever Up, and SCB Global are owned by the Defendants and employ the Defendants.  Further, the conduct that violates the CFAA were committed with equipment owned by the company Defendants.

496.   Curtis' computers and iPhone are protected computers as that term is defined in the CFAA.

497.   Through Defendants' actions set forth above, all of the Defendants knowingly and intentionally conspired to have Everson access Plaintiff's personal computers and synchronize her personal iPhone to her MAC1 and/or MAC2 computers without authorization or exceeding authorization, and obtained information from these devices and knowingly caused the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caused damage without Plaintiff's authorization to her computers and personal iPhone, and intentionally accessed her computers and personal iPhone without her authorization, in violation of the provisions of 18 U.S.C. § 1030, and as a result of such conduct, caused damage and loss or recklessly caused damage well in excess of $5,000 over the year prior to the filing of this complaint.

498.   The remote hack into Curtis' computers in violation of the provisions of 18 U.S.C. § 1030, allowed all of the Defendants to obtain information they were not entitled to, including, but not limited to, very personal and sensitive information, by watching her through the camera on her computer in her own residence in her bedroom likely capturing Curtis nude and/or during private intimate moments, listening to her conversations through the microphone on her computer in her own residence, configuring her computer to type what was said around her computer or on the computer screen, accessing her iMessages on her MAC2 computer, accessing her WhatsApp and Skype accounts, accessing her text messages on her personal iPhone, and gaining access to Curtis' Apple iCloud account that contained personal documents and photos and videos that were on Curtis' personal iPhone.

499.    Curtis has been seriously damaged as a direct and proximate cause of all of the Defendants' actions set forth above that violate the CFAA.

500.    Through Defendants' actions set forth above, Plaintiff suffered actual damages in an amount to be determined at trial, which includes, but is not limited to loss of Attorney/Client confidentiality in this pending litigation, a factor in the hostile work environment that Curtis was subjected to and the decision to terminate her employment, and the thousands of hours spent investigating the interception that occurred.

501.    Through Defendants' actions set forth above, Plaintiff is also entitled to compensatory damages; reasonable attorneys' fees and costs; and all such other and further relief as the court may deem just and equitable.

## CLAIM IV
### (Invasion of Privacy – Intrusion Upon Seclusion)

502.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 501 of this Complaint as though fully incorporated herein.

503.    Plaintiff had a justifiable expectation of privacy of what occurred in her own residence and expected that she was not being watched, listened to and     recorded by Everson, Pine and van Woudenberg in her own residence and in her bedroom, during all hours of the night and day, likely capturing Curtis nude and/or during private intimate moments.  Plaintiff had an expectation of privacy in her own residence and expected that she was not being watched, listened to and recorded by Everson, who was Pine and van Woudenberg's agent, or that Everson was conveying information he learned to Pine and van Woudenberg.

504.    Plaintiff had a justifiable expectation of privacy of the content in, including but not limited to:

a.    her Email Accounts, especially when Everson emphasized that the email account julieadams@pakems.com was password protected, that were accessed by Everson because he was given the passwords by Chasefield Capital employee(s), including Jordan Pine giving Everson the password to her GoDaddy email, email accounts that were monitored by Chasefield Capital employee(s), and email accounts that were downloaded to the Microsoft 365 account controlled by Everson, paid for by Everson, who was then reimbursed by Beiers with Pine's approval,

b.    her iCloud account accessed by Everson (Pine and van Woudenberg's agent) with the password she was tricked into supplying him that contains personal documents, emails, photos and videos from her cell phone and computers,

c.    the personal documents, information, emails, text messages, iMessages, photos, and videos on her personal MAC1 and MAC2 computers that Everson     accessed on multiple occasions because he downloaded TeamViewer and Ninja Spyware onto her personal computers. The meeting to enable the access to her personal information, including spying on her was at Pine's request and the meeting was set up by Beiers, a Chasefield employee, at Chasefield Capital's offices, with an IT contractor hired and paid for by Chasefield Capital. This software was used to access both computers on various occasions, at least 31 times,

d.    the personal information, emails, text messages, iMessages, photos, videos and documents, including Attorney/Client Privileged documents, created or uploaded to her personal MAC1 and MAC2 computers after she was terminated that

Everson accessed because he downloaded TeamViewer and Ninja Spyware onto her personal computers. The meeting to enable the access to her personal information, including spying on her was at Pine's request and the meeting was set up by Beiers, a Chasefield employee, at Chasefield Capital's offices, with an IT contractor hired and paid for by Chasefield Capital. Everson accessed both her MAC1 and MAC2 computers after her termination of employment on numerous occasions,

e. the personal documents, information, emails, photos, and videos on her personal MAC1 and MAC2 computers that were accessed by Everson (Pine and van Woudenberg's agent and conduct that was ratified by Matthews) after Matthews and van Woudenberg made the decision to fire her and the day before Matthews and van Woudenberg fired her and thus, the access was caused by relaying the information to Everson that she would be fired,

f. the personal documents, information, emails, photos, text messages, iMessages, and videos on her MAC1 computer that Everson (Pine and van Woudenberg's agent and conduct that was ratified by Matthews) copied the day before she was terminated, which involves a decision made by van Woudenberg and Matthews,

g. documents on her personal iPhone that were downloaded to her personal MAC2 computer and opened by Everson (Pine and van Woudenberg's agent and conduct that was ratified by Matthews) the day before she was terminated, which involves a decision made by van Woudenberg and Matthews,

h. texts on her personal iPhone, including personal information in the Notes application, that Everson (Pine and van Woudenberg's agent) and conduct that

was ratified by Matthews) accessed by pairing her iPhone to her personal computer and sending her notes to her Yahoo email account,

      i.     contacts and images of her contacts that appear to be from Curtis' personal iPhone that Everson uploaded to her personal MAC2 computer on December 13, 2018, at a meeting at Chasefield Capital's office at the request of Pine and with Everson being an agent of Pine's and van Woudenberg's,

      j.     meetings that Curtis had going back to 2004 that Everson uploaded to her personal MAC2 computer on December 13, 2018, at a meeting at Chasefield Capital's office at the request of Pine and with Everson being an agent of Pine's and van Woudenberg's,

      k.     documents and photos in her personal Microsoft account accessed by Everson and shared to the Chasefield Capital SharePoint drive that was accessed by Pine, Beiers, Jordan Pine and Everson,

      l.     information such as personal email, personal photos, personal internet and YouTube searches, personal voicemail messages, etc. archived in the Google Takeout initiated by Everson (Pine and van Woudenberg's agent) after Curtis was fired that not only contained personal emails, but also contained Attorney/Client Privileged emails, and was an email account Everson learned the existence of through a Chasefield Capital employee and/or Matthews, and

      m.     messages and photos that were sent via WhatsApp and Skype that Everson (Pine and van Woudenberg's agent) sent to himself.

505.   Through each and every Defendants' actions set forth above, including Everson's conduct as Pine's and van Woudenberg's agent and ratified by Matthews, all

of the Defendants knowingly and intentionally intruded or conspired to intrude upon Plaintiff's solitude and her private affairs.

506.    The intrusions that were caused, directed, ratified, or done by all of the Defendants, as set forth above, were and are substantial and of the kind that would be highly offensive to the ordinary reasonable person and the intrusions were and are extremely offensive to Plaintiff.

507.    Plaintiff did not consent to the intrusions and did not have knowledge at the time of what          the Defendants were doing, hiring to be done, causing to be done, involved with being done, directing to be done, conspiring to be done, or ratifying to be done to her.

508.    Whatever purpose all of the Defendants had for invading her privacy was unwarranted and continued after she was fired.

509.    It was foreseeable that the intrusions could result in severe and permanent emotional distress, embarrassment, personal humiliation, mental anguish and suffering, physical suffering, loss of income, loss of security, and impairment to the Plaintiff's reputation.

510.    As a direct and proximate result of the intrusion of seclusion and invasion of privacy by Defendants van Woudenberg, Pine, Matthews, Everson, Beiers, Jordan Pine, and John Does 1 – 10, Curtis has suffered and continues to suffer from, including but not limited to, extreme and permanent emotional distress, mental anguish, harm to her interest in privacy, harm to her interest in security, impairment of the quality of life, embarrassment, personal humiliation, mental anguish and suffering, physical suffering,

loss of income, and impairment to the Plaintiff's reputation and is entitled to appropriate actual and compensatory damages.

511.    The actions of all of the Defendants were malicious and intentional and thus, Curtis is entitled to recover punitive damages.

### CLAIM V
### (Unlawful Discrimination Based on Sex in Violation of the Colorado Anti-Discrimination Act ("CADA", C.R.S. § 24-34-402, *et seq.*)

512.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 511 of this Complaint as though fully incorporated herein.

513.    Plaintiff was an employee pursuant to Colorado Civil Rights Commission Rule 10.2(N)(4) since she was subject to the company's direction and control.

514.    Lever Up and Pakems are employers pursuant to CADA.

515.    CADA prohibits discrimination based on sex.

516.    Pine's and van Woudenberg's conduct includes, but is not limited to, Pine frequently stating that Curtis was not fit to be a CEO, frequent threats and demands that Curtis should be fired, Pine lied to Curtis and about her, Pine taunted  Curtis with statements regarding the fact he was actually watching her and listening to her through her computer, Pine used profanity towards Curtis, Pine threatened Curtis about complaining about him to van Woudenberg, Pine sabotaged Curtis' work, Pine yelled and screamed at Curtis that she was on thin ice, Pine yelled and screamed at Curtis that she needed to watch her back which was a physical threat meant to intimidate her, Pine told Curtis to stop playing stupid, Pine told Curtis that she was just one of those girls that lies in bed at night and makes things up, van Woudenberg constantly telling Curtis that Pine wanted her to fail, van Woudenberg constantly telling Curtis that he was going to meet

with Pine after their meetings, van Woudenberg demanded that Curtis spend her time finding a new partner because of Pine's treatment of her, and van Woudenberg and/or Pine directing Everson to add the nickname "Stupid" in her contact in her personal Gmail account.

517.   Upon information and belief, van Woudenberg is an investor in four other (4) companies.

518.   Upon information and belief, none of the Defendants spied on any of the male CEOs of the other four (4) companies, including Matthews, monitored their emails, hacked into their computers, or hacked or attempted to hack into their personal accounts or personal email accounts, watch them in their bedrooms or listen to all of their conversations they had in their personal residences.

519.   Curtis was further treated differently than other similarly situated males in that other males were not subject to the abusive conduct at the hands of Pine.

520.   Further, Curtis was replaced by a male that negatively impacted the financial condition of the company, failed to grow the business, and failed to obtain potential sales opportunities and was not terminated.

521.   Further evidence that Curtis was treated different than all other males was when Beiers told her that Pine's conduct towards Curtis was bizarre and van Woudenberg stated that he had never seen him treat anyone the way he was treating her.

522.   Based on the above-described acts, practices and omissions, the Defendants Lever Up and Pakems engaged in unlawful discrimination under CADA based on Plaintiff's sex (female).

523.    Defendants Lever Up and Pakems willful and intentional actions against Curtis, because of her gender, were frequently severe, pervasive, and physically threatening and altered the terms and conditions of Curtis' employment, unreasonably interfered with her work performance and created an abusive and hostile working environment.

524.    Defendants Lever Up and Pakems conduct was sufficiently severe and pervasive that a reasonable person in Curtis' position would find the work environment to be hostile and abusive.

525.    At the time of the above described conduct, and as a result of such conduct, Curtis believed that her work environment was hostile and abusive.

526.    Van Woudenberg was witness to the abusive behavior and Curtis complained to van Woudenberg about Pine and he failed to take prompt, remedial action to stop the conduct.

527.    The other witnesses that support the abusive behavior are Ms. Miles when she stated that Pine's behavior towards Curtis was abusive, and Ms. Childers' statement that Pine's abusive behavior towards her was so alarming that he appeared unstable.

528.    Curtis suffered adverse employment actions.

529.    Lever Up and Pakems conduct amounts to actionable discrimination by not only subjecting her to sufficiently severe or pervasive harassment based on her sex, but also failing to act to end the harassment.

530.    Pine's conduct amounts to actionable sexual harassment in violation of CADA.

531.   Curtis was treated differently than other similarly situated males in that other males were not subject to the hacking into their personal accounts and computers, Pine's exertion of power and his bullying tactics, and she was replaced by a male that negatively impacted the financial condition of the company, failed to grow the business, and failed to obtain potential sales opportunities and was not terminated.

532.   In unlawfully discriminating against Curtis, Defendants Lever Up and Pakems acted willfully, wantonly and/or with malice or with conscious and/or reckless indifference to her equal rights under the law, thereby necessitating the imposition of exemplary damages.

533.   As a direct and proximate result of Defendants Lever Up and Pakems action, Curtis has suffered damages, including lost wages and benefits, severe and permanent emotional and physical pain and suffering, hospital expenses, and embarrassment and she is entitled to general and special damages, and economic damages including front and back pay.  Curtis is also entitled to and seeks her attorneys' fees and costs as permitted by law.

## CLAIM VI
### (Aiding & Abetting a Sexually Hostile Work Environment in Violation of the Colorado Anti-Discrimination Act, C.R.S. § 24-34-401, *et seq.*)

534.   Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 533 of this Complaint as though fully incorporated herein.

535.   Defendant Pine engaged in acts defined by CADA to be a discriminatory or unfair employment practices, specifically, a sexually hostile work environment.

536.   Defendant van Woudenberg aided, abetted, incited, or compelled Defendant Pine to engage in those acts by failing to prevent or correct the sexually hostile work environment.

537.   Defendants Jordan Pine, Beiers, and Everson aided, abetted, incited, or compelled Defendant Pine to create a hostile work environment by providing passwords, access to her computer and personal accounts, including watching her and listening to her.

538.   Because Defendants van Woudenberg, Jordan Pine, Beiers and Everson aided, abetted, incited, or compelled Defendant Pine to engage in acts defined by CADA to be a discriminatory or unfair employment practices, Curtis suffered damages.

## <u>CLAIM VII</u>
**(Unlawful Discrimination Based on Disability in Violation of the Colorado Anti-Discrimination Act ("CADA"), C.R.S. § 24-34-402, et seq.)**

539.   Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 538 of this Complaint as though fully incorporated herein.

540.   Plaintiff was regarded as having a mental disability that substantially limited one or more major life activities.

541.   Plaintiff was qualified for her position.

542.   On June 4, 2019, Plaintiff told van Woudenberg and Matthews that she had been in the hospital because she was having heart attack symptoms that were caused by stress.  This was prior to a meeting regarding finding a new investor.

543.   Shortly thereafter, Curtis was told by van Woudenberg that "it was in the company's best interest to terminate her employment because of her health issues."

544.   Curtis was terminated because of her perceived disability.

545.   On several occasions, Curtis asked for an accommodation in the form of asking permission to engage experienced individuals to offer advice, guidance and assistance.

546.   Curtis' accommodation requests were denied.

547.   The above set forth conduct amounts to unlawful disability discrimination in violation of CADA.

548.   As a direct and proximate result of Defendants Lever Up and Pakems actions, Curtis suffered damages.

## CLAIM VIII
### (Retaliation in Violation of the Colorado Anti-Discrimination Act, C.R.S. § 24-34-401, et seq.)

549.   Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 548 of this Complaint as though fully incorporated herein.

550.   Curtis was threatened that if she complained to van Woudenberg about Pine's behavior towards her it wouldn't end well for her just like the last person that had complained about his conduct.

551.   Plaintiff engaged in statutorily protected activity when she opposed and reported the unlawful and discriminatory practices under CADA by complaining about the hostile work environment to van Woudenberg.  In one conversation, Curtis stated to van Woudenberg that she believed Pine's conduct was based on the fact he is a narcissist and that she believed he was bothered by the fact she was a well-educated and strong female.

552.    Defendants van Woudenberg and Pine subjected Curtis to less favorable terms, conditions and privileges of employment immediately after she complained of the harassment, she was told she needed to now spend her time finding a new more suitable partner and she was subjected to further abusive conduct.

553.    Defendants van Woudenberg and Pine unlawfully retaliated against Curtis in the terms and conditions of her employment and subjected her to further harassment because she engaged in the above-described statutorily-protected activities.

554.    Defendants van Woudenberg, Pine and Matthews retaliated against Curtis when they ultimately terminated her employment.

555.    As a direct and proximate result of Defendants van Woudenberg's, Matthew's and Pine's actions, Curtis has suffered damages.

556.    In unlawfully discriminating and retaliating against Curtis, Defendants Pine, van Woudenberg and Matthews acted willfully, wantonly, and/or with malice or with conscious and/or reckless indifference to Curtis' equal rights under law, thereby necessitating the imposition of exemplary damages.


**CLAIM IX**
**(Termination in Violation of Public Policy)**

557.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 556 of this Complaint as though fully incorporated herein.

558.    Van Woudenberg directed Curtis to give up on trying to make sure that the 2018 taxes that were filed were correct stating that the small adjustments resulting from an expensive and time-consuming effort are just not worth it and are a major distraction from her sales efforts.

559.   Van Woudenberg's direction forced Curtis to endorse false tax returns in her role as a CEO and a director of Pakems. Pine was tasked with submitting the tax returns; however, he was not a director at the time the tax returns were submitted.

560.   The direction to give up on trying to ensure that the 2018 taxes that were filed prohibited Curtis from performing a public duty or exercising an important job-related right or privilege.

561.   The direction undermined a clearly expressed public policy of the professional ethics code that applied to her as a licensed attorney in the state of Colorado and her fiduciary duty to the company as the CEO of Pakems and the right or privilege as an employee.

562.   The ethical obligation of not filing a false tax return is designed to serve the interests of the public.

563.   Curtis pushed to hire another accountant to review the financial information that Pine gave her that Curtis knew was incorrect and was mistakenly accused of hiring her own accountant to investigate the taxes that were filed because of the information Pine relayed to van Woudenberg from an email message sent to Curtis' accountant from Curtis' personal email account.

564.   One of the reasons Curtis was terminated was as a result of exercising the privilege of ensuring the tax returns filed were not false which she was entitled to do as an employee of Pakems and Lever Up.

565.   Curtis believed that directing her to give up on trying to ensure that the taxes filed were correct was against her ethical obligations as an attorney and fiduciary duty as a CEO.

566.  Van Woudenberg, Pine, and Matthews were aware or reasonably should have been aware that Curtis' refusal to comply with the directive was based on her reasonable belief that the directive was contrary to a clearly expressed duty as an attorney and CEO and violative of Curtis' legal right or privilege as an employee.

567.  As a proximate cause of Defendant van Woudenberg's, Pine's and Matthews' actions, Curtis suffered damages, including her salary and benefits, damages for emotional distress, physical pain and suffering, and punitive damages.

## CLAIM X
### (Outrageous Conduct)

568.  Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 567 of this Complaint as though fully incorporated herein.

569.  Defendants knowingly and intentionally engaged in extreme and outrageous conduct and/or they intended to cause severe mental suffering.

570.  The direct and proximate result of Defendants' actions caused Plaintiff severe permanent emotional distress. Defendants knowingly and intentionally engaged in extreme and outrageous conduct, and a pattern of conduct in that the infliction of severe mental suffering was calculated or recklessly or callously inflicted.

571.  The extreme and outrageous conduct includes, but is not limited to the following:

a.  Defendants Pine and van Woudenberg, both through their actions and the actions of their agent, watching and listening to Curtis in her own residence, directing and ratifying Everson to configure her computers so that she could be watched and listened to in her own residence by them and Everson, Everson accessing her

computers whenever he wanted to, including accessing them on at least thirty-one (31) different days, Chasefield Capital employees passing along passwords to Everson that caused multiple text messages to be sent to Curtis every time Everson attempted or accessed her Personal Accounts and Email Accounts, especially after she had been fired and was trying to put Pakems behind her, Everson accessing her computers, Personal Accounts and Emails Accounts after she was terminated, and sabotaging her efforts to obtain an investor by ensuring that she didn't have accurate financials.

      b.    Defendants Pine, van Woudenberg and Matthews actions of not setting up an auto-response message that Curtis was no longer with the company which meant her reputation was damaged every time she would get an email to her work email account and there wasn't a response in return, subjecting Curtis to the horror she has had to endure over the last year and one half of uncovering all that was done to spy on her, and alerting Everson to the fact Curtis' had a brand new email account adams.juliekay@gmail.com that caused Everson to do a Google Takeout on her personal computer about two months after van Woudenberg and Matthews abruptly fired her.

      c.    Defendant Pine's actions of approving and paying for the purchase of a Microsoft 365 account that was used to download thousands of Curtis' personal emails in various personal Email Accounts, constantly demanding that she be fired to her face and to van Woudenberg in front of her or in emails to both of them, threatening her that she will be fired on several occasions, especially in light of the fact she was the founder and inventor of Pakems and had sacrificed so much time and money into the company, constantly yelling, screaming and being abusive to her in his efforts to exert power over her that amounted to subjecting Curtis on an almost daily basis to a workplace

bully, using profanity towards her, accusing her of playing stupid on multiple occasions, threatening her with physical violence, and constantly lying about her.

        d.      Defendant van Woudenberg's actions of allowing Pine to constantly demand that she be fired to her face and in emails sent to Curtis and van Woudenberg, especially in light of the fact she was the founder and inventor of Pakems and had sacrificed so much time and money into the company, allowing the constant yelling, screaming and abusive behavior Pine inflicted on Curtis, condoning Pine's behavior and telling Curtis he was not going to allow her to defend herself because he did not want to be forced to take sides, and constantly telling her that Pine wanted her to fail while constantly letting her know he was going to meet with Pine after their meetings,

        e.      Defendants van Woudenberg and Matthews actions include their decision to terminate Curtis without any warning whatsoever and from a company that she founded, their involvement with alerting Everson to the fact they were going to terminate her which caused him to hack into Curtis' personal computers between June 11, 2019 through June 17, 2019, and the day before she was terminated, including copying her entire MAC1 computer.

        f.      Defendant Everson's actions of accessing her computers, configuring her accounts and computers so that she could be spied on and was spied on, continuing to access her computers after she was fired, accessing her Personal Accounts and Email Accounts that contain personal information, including all of the photos and videos in her iPhone and all of her personal text messages, causing Curtis to constantly receive text messages when he attempted to access her various accounts, after she was fired and at a time she was wanting to put Pakems behind her, subjecting Curtis to the

horror of uncovering all of the actions he took to spy on her, syncing her brand new email account adams.juliekay@gmail.com to her MAC1 computer and doing a Google Takeout about two months after she was abruptly fired, and configuring her MAC1 computer two months after she was terminated so that he could continue spying on her.

572.    Each of the Defendants knowingly and intentionally engaged in extreme and outrageous conduct, and a pattern of conduct in that the infliction of severe mental suffering was calculated or recklessly or callously inflicted.

573.    The above listed behavior is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

574.    As a direct and proximate result of the above-stated extreme and outrageous conduct of Defendants van Woudenberg, Pine, Matthews, Everson, Beiers, Jordan Pine, and John Does 1 – 10, Plaintiff has suffered and continues to suffer damages, injuries, and losses, including but not limited to, severe and permanent psychological injury, including, but not limited to, emotional distress, mental anguish, pain and suffering, intimidation, humiliation, extreme anger and helplessness about stopping the violations into her private life that have continued for at least eight (8) months after her termination.

575.    Plaintiff is entitled to compensatory and punitive damages for the significant emotional harm caused.

## CLAIM XI
### (Breach of Duty of Loyalty)

576.   Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 575 of this Complaint as though fully incorporated herein.

577.   Defendant van Woudenberg, as a majority shareholder and director of Lever Up, owed a duty of loyalty to the minority shareholder Curtis to act solely for the benefit of the company.

578.   As the director of Lever Up, Matthews owed the minority shareholder Curtis a duty of loyalty to act solely for the benefit of the company.

579.   As the CEO, Secretary and Shareholder of Lever Up, Pine owed the minority shareholder Curtis a duty of loyalty to act solely for the benefit of the company.

580.   Defendants van Woudenberg, Matthews and Pine violated their duty of loyalty they owed to Plaintiff when they made the decision to engage in Computer-Related Conduct against Curtis, terminate Curtis, and replace her with Matthews on a part-time basis.

581.   The Computer-Related Conduct against Curtis negatively impacted Curtis' ability to perform simple tasks, subjected her to countless hours of wasted time dealing with Pine's verbal abuse because he was spying on her, and has subjected Lever Up and Pakems LLC to liability from other parties, and caused Curtis to suffer damages, including damages for invasion of privacy and severe permanent emotional distress.

582.   The termination of Curtis and the decision to replace her with Matthews and potentially with Pine's son, Andrew Pine, resulted in guaranteed sales going away, significant revenue making opportunities to go away, the financial health of the company

has been severely negatively impacted while Matthews has been the CEO, there is a lack of potential opportunities because of Matthews' failure to obtain those opportunities, and the opportunity to find a more suitable partner to take Pakems where it deserved to go went away. Currently it appears Pakems have shut their doors which is causing significant impact to the company and its value.

583.    Plaintiff has suffered damages and will continue to sustain damages as a direct and proximate result of Defendants' breach of their duty of loyalty in an amount to be proven at trial.

584.    Defendants van Woudenberg, Matthews and Pine's interference directly and proximately caused damages to Curtis in that her termination caused significant revenue making opportunities to go away, revenue has been severely negatively impacted while Matthews has been the CEO, there is a lack of potential opportunities because of Matthews' failure to obtain those opportunities, upon information and belief the company is being liquidated which means Curtis will lose her approximately $1 million investment, and the present dismal company's performance under Matthews' control has impacted the ability to find a new more suitable partner.

**CLAIM XII**
**(Intentional Interference with Prospective Business Advantage)**

585.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 – 584 of this Complaint as though fully incorporated herein.

586.    Curtis had business relationships, prospective business relationships or relationships with sales representatives that had very close relationships with Stepping Up Footwear, Uncharted Supply Company, L.L.Bean, Dick's Sporting Goods, REI,

Dunham's, Camping World, Vail Resorts, Alterra, Gorsuch, Steamboat Resort, Summit Sports, Gabe's, a UK Distributor, and Sinner.

587.   Defendants van Woudenberg, Matthews and Pine intentionally and improperly interfered with all of these business relations when they terminated Curtis.

588.   Upon information and belief, one of the decisions to terminate Curtis was based on the fact the potential business relations would improve her sales numbers which would have prevented them from arguing her termination was because of the sales numbers.

589.   Hamish Lorimer with Stepping Out Footwear was going to place an order the same day Curtis was terminated.

590.   Curtis was terminated a mere four (4) days after she attended the Outdoor Retailer Trade Show where the purpose of the three (3) day trade show was to create potential business relations, which she accomplished, and a mere five (5) days before she was terminated she relayed to van Woudenberg and Matthews that the trade show was going well, she was finding many potential business opportunities, L.L.Bean loved the samples she had provided and wanted additional samples made using their particular plaid pattern.

591.   Defendants van Woudenberg, Matthews and Pine's interference caused these individuals and entities not to enter or continue the prospective business relations with Pakems.

592.   Defendants van Woudenberg, Matthews and Pine's interference directly and proximately caused damages to Curtis in that her termination caused significant revenue making opportunities to go away, revenue has been severely negatively

impacted while Matthews has been the CEO, there is a lack of potential opportunities because of Matthews' failure to obtain those opportunities, upon information and belief the company is being liquidated which means Curtis will lose her approximately $1 million investment, and the present dismal company's performance under Matthews' control has impacted the ability to find a new more suitable partner.

## CLAIM XIII
### (Conspiracy)

593.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 592 of this Complaint as though fully incorporated herein.

594.    Defendants conspired to accomplish an unlawful purpose or a lawful purpose by unlawful means. Defendants had a meeting of the minds in their course of action and one or all committed an unlawful, overt act to further the object or their course of action.

595.    Specifically, Defendants Pine, van Woudenberg, Jordan Pine, Beiers, Everson and John Does 1-10 intentionally conspired and agreed by words or conduct to accomplish unlawfully accessing, obtaining, downloading, reviewing and/or monitoring her Personal Accounts, personal Email Accounts, and accessing Curtis' personal computers. Further, there was an agreement to intercept wire, oral, or electronic communications. When Matthews became a Director of Pakems, he conspired with the other Defendants.

596.    Further, Defendants Pine, van Woudenberg, and Matthews conspired to unlawfully terminate Curtis.

597.   As a result, Plaintiff suffered injuries, damages and losses as a proximate cause of such wrongful acts.

## CLAIM XIV
### (Intentional Interference with Contractual Relations)

598.   Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 – 597 of this Complaint as though fully incorporated herein.

599.   In emails dated January 8, 2019, January 13, 2019, February 18, 2019 and March 12, 2019, Pine voiced his opinion that he wanted Curtis to either resign or be fired.

600.   Pine constantly stated to Curtis and van Woudenberg that he did not believe she was fit to be a CEO and demanded that she be fired.

601.   Van Woudenberg frequently stated that Pine wanted her to fail.

602.   Pine frequently would not assist Curtis with things she needed assistance with as the CEO of Pakems.

603.   Van Woudenberg sent an email to Curtis agreeing that he would give her time to find a new more suitable partner.  Pine was carbon copied on this email.

604.   Pine frequently demanded that there be a time limit put on the agreement to give her time to find a new more suitable partner.

605.   Plaintiff had an Employment Agreement with Lever Up signed by the parties on October 26, 2018.

606.   Defendant Pine had knowledge of the contract, as he was a signatory to the contract on behalf of Lever Up.

607.   Defendant Pine intentionally made it known that he wanted Curtis fired which induced van Woudenberg's decision without true justification to terminate Curtis.

608.    Pine's justification was based on his improper and illegal conduct of spying on her and listening to her complain about him.

609.    Defendant Pine's conduct improperly interfered with her Employment Agreement when that agreement was terminated.

610.    Defendant Pine's conduct improperly interfered with the agreement that Curtis was to be given time to find a new more suitable partner.

611.    Defendant Pine's conduct was the proximate cause of the damages suffered by Curtis.

612.    Curtis is entitled to damages, including but not limited to lost benefits and wages, lost opportunity of future growth of Pakems if Curtis were able to find a new more suitable partner, potential to sell the company, lost profits, loss from negative impact to Pakems' financial position, loss of investment in Pakems Inc., severe permanent emotional distress, and harm to her reputation.

613.    Curtis is entitled to punitive damages as Pine's conduct was outrageous.


**CLAIM XV**
**(Defamation (Libel and Slander))**

614.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 613 of this Complaint as though fully incorporated herein.

615.    Pine stated to van Woudenberg and Matthews that there was a personality conflict between Curtis and Pine.

616.    Pine stated to Matthews that he had a conflict with Curtis and she was not receptive to advice or criticism.

617.    Pine stated in an email to Curtis and van Woudenberg on February 18, 2019, that, "Julie clearly doesn't want to be accountable and has demonstrated it by not providing the requested information or by blaming others, obfuscating or deflecting."

618.    On March 12, 2019, Pine sent an email to van Woudenberg and Curtis stating, "Yesterday was most unpleasant which seems to be a recurring theme for Julie and me."

619.    All of the above statements were a written or spoken publications of a false assertion of fact, not opinions, made with knowledge of or reckless disregard for the falsity of the publications.

620.    All of the above statements were published to third parties.

621.    All of the above statements caused harm to Curtis' reputation by prejudicing or lowering her in the estimation of van Woudenberg and Matthews.

622.    All of the above statements are defamatory per se as they were meant to damage her business reputation.

623.    All of the above statements caused injury, damage and prejudiced Curtis' business reputation.

624.    That as a direct and proximate result of the defamatory statements made by Defendant Pine, Curtis has suffered injury to her reputation, suffered humiliation, emotional distress, mental anguish and suffering, caused her to need to find a more suitable partner, was impactful on the decision to terminate her employment, caused the approximately $1 million loss of her investment in Pakems, and loss of income.

625.    The defamatory statements that Defendant Pine made were intentional, with malice or with reckless disregard as whether they were false or not, thus the Plaintiff is entitled to punitive damages.

## CLAIM XVI
**(Promissory Estoppel)**

626.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 625 of this Complaint as though fully incorporated herein.

627.    Curtis asked van Woudenberg whether he wanted her to quit because she had made so many financial sacrifices to keep Pakems operational and was left penniless and she did not want to ever go through that again.  He responded with a verbal promise that he would not just suddenly fire her one day and put her in the same financial position she had recently been in.

628.    In an effort to further emphasize his promise that she would not suddenly be fired without a monetary payment, he stated that "if there's no Julie, then there's no Pakems because you [Julie] are Pakems."

629.    Van Woudenberg made a written promise that she be given the time to find a new more suitable partner.

630.    Van Woudenberg should have reasonably expected that the promise that Curtis would not be suddenly terminated would induce her to continue her employment with Pakems, induce her not to look for another job, and led her to believe that he would exercise the option to purchase her shares in the company for $450,000 if she was terminated based on his promise that he would not leave her penniless.

631.    Van Woudenberg should have reasonably expected that Curtis believed that she had time to find a new partner which caused her to spend most of her time operating the company instead of looking for a new partner, especially in light of the fact Matthews, van Woudenberg and Curtis had a meeting a mere two (2) weeks before she was fired with third-party about finding a new partner.

632.    Curtis relied on the promise that she would not suddenly be fired and to her detriment, she was suddenly fired which left her in a compromised financial position because van Woudenberg did not exercise the option to purchase Curtis' shares in the company.

633.    Curtis relied on the promise that she had time to find a new more suitable partner and to her detriment she was fired which prevented her from being able to find a new partner.

634.    Both of van Woudenberg's promises should be enforced to prevent injustice.

635.    Curtis' damages include non-payment of $450,000, lost benefits and wages, lost opportunity of future growth of Pakems if Curtis were able to find a new more suitable partner, potential to sell the company, lost profits, loss from negative impact to Pakems' financial position, loss of investment in Pakems Inc., and emotional distress.


## <u>CLAIM XVII</u>
### (Breach of the Covenant of Good Faith and Fair Dealing)

636.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 635 of this Complaint as though fully incorporated herein.

637.    Defendants Pine and van Woudenberg entered into a Stock Restriction Agreement with Curtis on October 26, 2018.

638.    Curtis performed any and all obligations pursuant to the Stock Restriction Agreement.

639.    Pursuant to the Stock Restriction Agreement, Defendant van Woudenberg had discretion to terminate Curtis' employment within a year of her anniversary date with the company and the option to purchase her shares in the company for $450,000.

640.    Defendants Pine, van Woudenberg and Matthews failed to perform their obligation under the agreement.

641.    Defendants Pine, van Woudenberg, and Matthew's discretion was abused when they opted not to exercise the option which resulted in a breach of implied duty of good faith and fair dealing.

642.    Curtis had the reasonable expectation that this option would be exercised if she was terminated within a year since this amount was tied to the hard dollar amount of her investment in the company.

643.    Curtis also had the reasonable expectation that this option would be exercised because she never thought she would be forced to remain partners with individuals that decided to terminate her employment or with individuals that would violate numerous laws against her.

644.    Curtis also had the reasonable expectation that this option would be exercised if she was terminated within a year since Pine refused her request during the negotiation of her employment to be given severance if she were to be terminated within a year.

146

645.    Curtis also had the reasonable expectation that this option would be exercised if she was terminated within a year when she agreed to sell her company to Defendants and go from being a majority shareholder to a minority shareholder.

646.    Defendants van Woudenberg and Pine entered into the Stock Restriction Agreement in bad faith and Curtis was left to rely on the good faith of the party in control of exercising the option clause.

647.    Curtis was damaged by the Defendants' abuse of discretion in the amount of $450,000.

648.    If Pine, van Woudenberg, and Matthews were not required to exercise the option in the Stock Restriction Agreement in good faith, then they would effectively receive the benefit of purchasing her company, becoming majority shareholders, no longer paying her salary, and avoid buying her shares and Curtis received nothing.  Further, it would render the Stock Restriction Agreement unfair and contrary to the parties' intent of mutual benefit.


**<u>CLAIM XVIII</u>**
**(Alter Ego Liability)**

649.    Plaintiff hereby incorporates and restates all allegations contained in Paragraphs 1 - 648 of this Complaint as though fully incorporated herein.

650.    Lever Up is the parent of Pakems, is the sole member of Pakems, and was treated as one and the same company.

651.    Employees of Chasefield referred to Pakems as a DBA (Doing Business As) of Lever Up.

652.    Pine and van Woudenberg caused the incorporation of Lever Up.

653.   Pine and van Woudenberg are the directors and officers for Chasefield Capital, Chasefield Real Estate, LLC, Pakems and Lever Up.

654.   Funds were commingled between Chasefield Capital, Pakems, Lever Up and van Woudenberg.

655.   Pine paid invoices from the Lever Up and Pakems bank accounts that were not approved by van Woudenberg or Curtis, including paying himself for his services that well exceeded what had been approved.

656.   Pine transferred funds from the Lever Up checking account into the Chasefield Capital checking account. When it was later determined by Curtis that the funds transferred into the Chasefield Capital checking account exceeded what was supposed to be transferred by over $9,000, Pine was not required to transfer $9,000 back to the Lever Up checking account.

657.   Curtis was paid for her services by Chasefield Capital, then Lever Up, then Pakems.

658.   Curtis could not take independent action unless it was approved by the board of Lever Up.

659.   Pine and van Woudenberg failed to keep corporate minutes.

660.   Chasefield Capital purchased and owned the Pakems' inventory.

661.   Chasefield Real Estate, LLC was formed on July 12, 2019, after Curtis notified Defendants to preserve evidence because she would be filing an action.  Upon information and belief, this company is being used to transfer assets of Chasefield Capital. As such, Chasefield Real Estate, LLC is liable for any debts, obligations, acts, and liabilities of Chasefield Capital, Lever Up, and Pakems.

662.    The Computer-Related Conduct was done at the direction of a Chasefield Capital employee(s) and an IT contractor that Chasefield Capital hired and paid for. Chasefield Capital owned the accounts and equipment used to engage in the Computer-Related Conduct against Curtis.

663.    The above-stated facts show there was a unity of interest and lack of respect given to the separate identity of the various entities such that the personalities and assets of Pakems, Lever Up, Chasefield Capital, Chasefield Real Estate, LLC are indistinct.

664.    Chasefield Capital and Chasefield Real Estate, LLC are responsible for the corporate liability of Pakems and Lever Up because its employees and consultants committed the unlawful acts against Curtis, used their assets to commit the unlawful acts against Curtis, and made the decision to commit the unlawful acts against Curtis.

665.    The shareholders of the various entities disregarded treating Chasefield Capital, Pakems, and Lever Up as a separate entity such that adhering to the legal fiction of the corporation being a separate entity would result in fraud, promote injustice, or lead to an evasion of legal obligation.

666.    A fair and equitable result will be achieved by disregarding the separate corporate entities.

667.    Chasefield Capital and Chasefield Real Estate, LLC are liable for any debts, obligations, acts and liabilities of Lever Up and Pakems.

## VII.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff respectfully demands that the claims alleged herein be adjudicated in a trial by jury.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Julie Adams Curtis respectfully requests this Court to enter judgment in her favor and against Defendants on all claims for relief asserted in this Complaint and Request for Jury Trial, and in addition, grant the following relief:

1.      To enter judgment in favor of Plaintiff and against Defendants Lever Up Inc., Pakems, LLC, Chasefield Capital Inc., Chasefield Real Estate, LLC, SCB Global Capital Management, LLC, Boccus Group LLC, Pine, van Woudenberg, Matthews, Pine, Beiers, Everson, and John Does 1 – 10, finding the acts of the Defendants Lever Up Inc., Pakems, LLC, Chasefield Capital Inc., Chasefield Real Estate, LLC, SCB Global Capital Management, LLC, Boccus Group LLC, Pine, van Woudenberg, Matthews, Pine, Beiers, Everson, and John Does 1 – 10 constitute violations of the Stored Communications Act (18 U.S.C. § 2702 (a)), the Federal Wiretap Act (18 U.S.C. § 2511 and § 18 U.S.C. § 2520), and the Computer Fraud and Abuse Act (18 U.S.C. § 1030).

2.      To enter judgment in favor of Plaintiff and against Defendants Lever Up Inc. and Pakems, LLC finding the acts of the Defendants Lever Up Inc. and Pakems, LLC constitute discrimination in violation of the Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-401, *et seq*.

3.      To enter judgment in favor of Plaintiff and against Defendants van Woudenberg, Pine, Jordan Pine, Beiers and Everson finding the acts of the Defendants

van Woudenberg, Pine, Jordan Pine, Beiers and Everson constitute aiding & abetting a sexually hostile work environment in violation of the Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-401, *et seq*.

4.      To enter judgment in favor of Plaintiff and against Defendants van Woudenberg and Matthews finding the acts of the Defendants van Woudenberg and Matthews constitute unlawful disability discrimination in violation of the Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-401, *et seq*.

5.      To enter judgment in favor of Plaintiff and against Defendants van Woudenberg, Pine and Matthews finding the acts of the Defendants van Woudenberg, Pine and Matthews constitute unlawful retaliation in violation of the Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-401, *et seq*., violation of public policy, breach of the duty of loyalty, intentional interference with prospective business relations, and breach of the covenant of good faith and fair dealing.

6.      To enter judgment in favor of Plaintiff and against Defendants van Woudenberg, Pine, Matthews, Everson, Beiers, Jordan Pine, and John Does 1 – 10, finding the acts of Defendants van Woudenberg, Pine, Matthews, Everson, Beiers, Jordan Pine, and John Does 1 – 10 constitute invasion of privacy, conspiracy, and outrageous conduct.

7.      To enter judgment in favor of Plaintiff and against Defendant Pine finding the acts of Defendant Pine constitutes intentional interference with contractual relations and defamation.

8.      To enter judgment in favor of Plaintiff and against Defendant van Woudenberg finding the acts of Defendant van Woudenberg constitutes promissory estoppel.

9.      To enter judgment in favor of Plaintiff and against Defendants Chasefield Capital, Chasefield Real Estate, LLC, van Woudenberg and Pine, finding the acts of Defendants Chasefield Capital, Chasefield Real Estate, LLC, van Woudenberg and Pine constitute alter ego liability.

10.     To award Plaintiff actual, statutory, and compensatory damages as a result of Defendants' unlawful conduct.

11.     To award Plaintiff punitive damages as a result of Defendants' willful, intentional and malicious conduct and willful violation of CADA.

12.     To award Plaintiff, the remedies of damages for back pay, restored benefits, actual monetary damages, loss of wages, salary, retirement contributions, out of pocket medical expenses, all loss of income, and all loss of monetary damages to which she is entitled, pursuant to a willful violation of CADA.

13.     To award Plaintiff preliminary and permanent injunctive or other equitable relief as this Court deems necessary to protect Plaintiff's interests and to prohibit Defendants from further engaging in the wrongful conduct of the nature alleged herein.

14.     To award Plaintiff pre-judgement and post-judgement interest to the extent permitted under the law.

15.     In light of the threat to dissolve the Company, Defendants actions of selling corporate assets at a substantial discount, Plaintiff's potential loss of her investment if the Company is dissolved instead of given to her or sold, Plaintiff seeks the appointment of a

Receiver to manage the business and affairs of Pakems/Lever Up to prevent waste of corporate assets and to maximize the value of the Company through its continued operation until the resolution of the instant action.

16.     To award Plaintiff emergency injunctive relief to stop Defendants from further unlawful misconduct and to preserve evidence which might otherwise be destroyed.

17.     To award Plaintiff an award that the option clause in the Stock Restriction Agreement be exercised.

18.     To award Plaintiff reasonable litigation expenses and attorneys' fees.

19.     To award Plaintiff such further relief as this Court deems just and proper.

Respectfully Submitted,

Dated:  October 22, 2020

s/ *Christopher L. Limpus, Esq.*
Christopher L. Limpus
Limpus + Limpus, LLC
7723 Arlington Drive
Boulder, CO 80303
Telephone: (303) 731-9540
E-mail: chris@limpuslaw.com

Fredrick P. Coogan, III
Coogan & Associates, P.C.
225 Broken Fence Road
Boulder, CO 80302
Telephone: (512) 496-1071
E-mail: fcoogan@cooganfirm.com

*Attorneys for Plaintiff Julie Adams Curtis*

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of October 2020, a true and correct copy of the foregoing is being filed through the Court's CM/ECF system, which system will automatically serve all counsel of record, including counsel for Defendants listed below:

Patrick J. Bernal, Esq.
Michael Best & Friedrich LLP
8300 Arista Place, Suite 300
Broomfield, CO 80021
E-mail: pjbernal@michaelbest.com

Diane Wolfson, Esq.
Gray and Sparks
1850 Chestnut Place, #208
Denver, CO 80202
E-mail: wolfson@grayandsparks.com

Charles G. Crosse, Esq.
Crosse Law LLC
360 S. Garfield Street, Suite 600
Denver, CO 80209
E-mail: charliecrosse@crosselaw.com

s/  Christopher L. Limpus